UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NASSER AL-AULAQI,
as personal representative of the estates of
ANWAR AL-AULAQI and
ABDULRAHMAN AL-AULAQI
c/o American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434          No. 12-cv-_____
Washington, D.C. 20008,

SARAH KHAN,
as personal representative of the estate of
SAMIR KHAN
c/o American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008,

                        Plaintiffs,

      v.

LEON C. PANETTA,
Secretary of Defense
1000 Defense Pentagon
Washington, D.C. 20301-1000,

WILLIAM H. MCRAVEN,
Commander, Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, FL 33621-5323,

JOSEPH VOTEL,
Commander, Joint Special Operations Command
P.O. Box 70239
Fort Bragg, N.C. 28307,

DAVID H. PETRAEUS,
Director, Central Intelligence Agency
Central Intelligence Agency
Washington, D.C. 20505,

All in their individual capacities,

                        Defendants.

---

**COMPLAINT**
**(Violation of Fourth and Fifth Amendments and Bill of Attainder Clause – targeted killing)**

**INTRODUCTION**

1.       Since 2001, and routinely since 2009, the United States has carried out deliberate and premeditated killings of suspected terrorists overseas.  The U.S. practice of "targeted killing" has resulted in the deaths of thousands of people, including many hundreds of civilian bystanders.  While some targeted killings have been carried out in the context of the wars in Afghanistan and Iraq, many have taken place outside the context of armed conflict, in countries including Yemen, Somalia, Pakistan, Sudan, and the Philippines.  These killings rely on vague legal standards, a closed executive process, and evidence never presented to the courts.  This case concerns the role of Defendants Leon C. Panetta, William H. McRaven, Joseph Votel, and David H. Petraeus (collectively, "Defendants") in authorizing and directing the killing of three American citizens in Yemen last year.  The killings violated fundamental rights afforded to all U.S. citizens, including the right not to be deprived of life without due process of law.

2.       In late 2009 or early 2010, Anwar Al-Aulaqi, an American citizen, was added to "kill lists" maintained by the Central Intelligence Agency ("CIA") and the Joint Special Operations Command ("JSOC"), a component of the Department of Defense ("DOD").  On September 30, 2011, unmanned CIA and JSOC drones fired missiles at Anwar Al-Aulaqi and his vehicle, killing him and at least three other people, including Samir Khan, another American citizen.  Defendants authorized and directed their subordinates to carry out the strike.

3.      On October 14, 2011, Defendants authorized and directed another drone strike in Yemen, this one approximately 200 miles away from the strike that had killed Anwar Al-Aulaqi and Samir Khan two weeks earlier.  The October 14 strike killed at least seven people at an open-air restaurant, including two children.  One of the children was 16-year-old Abdulrahman Al-Aulaqi, who was Anwar Al-Aulaqi's son and also an American citizen.

4.      Defendants' killing of Anwar Al-Aulaqi was unlawful.  At the time of the killing, the United States was not engaged in an armed conflict with or within Yemen. Outside the context of armed conflict, both the United States Constitution and international human rights law prohibit the use of lethal force unless, at the time it is applied, lethal force is a last resort to protect against a concrete, specific, and imminent threat of death or serious physical injury.  Upon information and belief, Anwar Al-Aulaqi was not engaged in activities that presented such a threat, and the use of lethal force against him was not a last resort.  Even in the context of an armed conflict, the law of war cabins the government's authority to use lethal force and prohibits killing civilians who are not directly participating in hostilities.  The concept of "direct participation" requires both a causal and temporal nexus to hostilities.  Upon information and belief, Defendants directed and authorized the killing of Anwar Al-Aulaqi even though he was not then directly participating in hostilities within the meaning of the law of war.

5.      Defendants' killing of Samir Khan and Abdulrahman Al-Aulaqi was also unlawful.  Upon information and belief, neither Samir Khan nor Abdulrahman Al-Aulaqi was engaged in any activity that presented a concrete, specific, and imminent threat to life; nor was either of them directly participating in hostilities.  The news media have

reported, based on statements attributed to anonymous U.S. government officials, that

Samir Khan was not the target of the September 30 strike and that Abdulrahman Al-

Aulaqi was not the target of the October 14 strike.  If the Defendants were targeting

others, they had an obligation under the Constitution and international human rights law

to take measures to prevent harm to Samir Khan, Abdulrahman Al-Aulaqi, and other

bystanders.  Even in the context of an armed conflict, government officials must comply

with the requirements of distinction and proportionality and take all feasible measures to

protect bystanders.  Upon information and belief, Samir Khan and Abdulrahman Al-

Aulaqi were killed because Defendants failed to take such measures.

6.     Plaintiffs are the personal representatives of the estates of Anwar Al-Aulaqi,

Samir Khan, and Abdulrahman Al-Aulaqi.  They seek damages from Defendants for their

role in authorizing and directing the killings of Plaintiffs' sons and grandson in violation

of the Fourth and Fifth Amendments and the Bill of Attainder Clause.

## JURISDICTION AND VENUE

7.     This complaint is for compensatory damages resulting from the conduct of

Defendants, all of them U.S. government officials, in violation of the Fourth and Fifth

Amendments and the Bill of Attainder Clause.

8.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331

(federal question) and the U.S. Constitution.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## PARTIES

10.     Plaintiff Nasser Al-Aulaqi is the father of Anwar Al-Aulaqi and the

grandfather of Abdulrahman Al-Aulaqi.  He is a citizen and resident of Yemen.  He

brings this suit as the personal representative of the estates of his son and grandson,
American citizens who were killed by missile strikes authorized and directed by
Defendants.

11.     Plaintiff Sarah Khan, an American citizen, is the mother of Samir Khan.  She
brings this suit as the personal representative of the estate of her son, an American citizen
who was killed by missile strikes authorized and directed by Defendants.

12.     Defendant Leon C. Panetta is the Secretary of Defense, a post he has held
since July 2011.  As Defense Secretary, he has ultimate authority over U.S. armed forces
worldwide, including over JSOC.  He authorized Anwar Al-Aulaqi's continued
placement on JSOC's kill list after July 2011 and authorized and directed the missile
strikes that killed Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi.  Between
February 2009 and June 2011, Defendant Panetta was the Director of the CIA.  As CIA
Director, he authorized the addition of Anwar Al-Aulaqi to the CIA's kill list.  He is sued
in his individual capacity.

13.     Defendant William H. McRaven is Commander of the U.S. Special
Operations Command ("USSOCOM"), a post he has held since August 2011.  As
Commander of USSOCOM, Defendant McRaven has authority over JSOC, a subordinate
unified command within USSOCOM.  He authorized and directed the missile strikes that
killed Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi.  Between June 2008
and June 2011, he was the Commander of JSOC.  In that capacity, he authorized the
addition of Anwar Al-Aulaqi to JSOC's kill list.  He is sued in his individual capacity.

14.     Defendant Joseph Votel is the Commander of JSOC, a post he has held since
June 2011.  As Commander of JSOC, he has authority over JSOC operations.  He

authorized and directed the missile strikes that killed Anwar Al-Aulaqi, Samir Khan, and

Abdulrahman Al-Aulaqi.  He is sued in his individual capacity.

15.     Defendant David H. Petraeus is the Director of the CIA, a post he has held

since September 2011.  As CIA Director, he has ultimate authority over the CIA's

operations worldwide.  He authorized and directed the missile strikes that killed Anwar

Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi.  He is sued in his individual

capacity.

## FACTUAL ALLEGATIONS

### "Targeted Killings" by the United States

16.     The first reported post-2001 targeted killing by the U.S. government outside

Afghanistan occurred in Yemen in November 2002, when a CIA-operated Predator drone

fired a missile at a terrorism suspect traveling in a car with other passengers.  The strike

killed all passengers in the vehicle, including an American citizen.  The United Nations

Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions later stated that

the strike constituted "a clear case of extrajudicial killing" and set an "alarming

precedent."

17.     Since 2002, the United States has continued to carry out targeted killings

outside the context of armed conflict.  The pace of these killings has increased

dramatically since 2009.  In the course of carrying out these killings, the government has

killed many hundreds of civilian bystanders.  In December 2009, a U.S. missile strike in

the village of al-Majalah, Yemen, killed 41 people, including 21 children.

18.     In April 2012, Deputy National Security Advisor John Brennan acknowledged

publicly that the United States carries out targeted killings of suspected terrorists "beyond

hot battlefields like Afghanistan," often using "remotely piloted aircraft" known as "drones." Both the CIA and JSOC are involved in authorizing, planning, and carrying out these killings; both the CIA and JSOC have carried out such killings in Yemen; and, according to a December 2011 report in the *Washington Post* and other news sources, the CIA and JSOC "share intelligence and coordinate attacks." Greg Miller, *Under Obama, an Emerging Global Apparatus for Drone Killing*, Wash. Post, Dec. 27, 2011.

19.     Both the CIA and JSOC maintain "kill lists" setting out the names of the individuals they intend to kill. *See* Jo Becker & Scott Shane, *Secret 'Kill List' Proves a Test of Obama's Principles and Will*, N.Y. Times, May 29, 2012. Upon information and belief, the inclusion of an individual on one or both of the lists represents a standing order authorizing and directing certain government personnel to kill that individual. In a February 2011 interview with *Newsweek*, the CIA's former acting general counsel John Rizzo described the CIA's list as "basically a hit list." He stated that there are approximately 30 individuals on the list "at any given time," and that "[t]he Predator [drone] is the weapon of choice, but it could also be someone putting a bullet in your head." Tara McKelvey, *Inside the Killing Machine*, Newsweek, Feb. 13, 2011.

20.     Senior government officials, including then-Director of National Intelligence Dennis Blair and Deputy National Security Advisor John Brennan, have made clear that the government's claimed authority to carry out the targeted killing of suspected terrorists, including killings executed outside the context of armed conflict, extends to American citizens. However, government officials have offered incomplete and inconsistent explanations of the legal standards that govern the placement of U.S. citizens on the kill lists. Some officials have suggested that the U.S. government targets its

citizens only if they present "imminent" threats, but they have defined the term "imminent" so broadly as to negate its meaning.

<u>Defendants' Decision to Authorize the Killing of Anwar Al-Aulaqi</u>

21.     Plaintiff Nasser Al-Aulaqi is a Yemeni citizen who moved to the United States in 1966 to study as a Fulbright scholar at New Mexico State University.  He and his wife lived in the United States until 1978, when they moved back to Yemen.  In Yemen, he served as Minister of Agriculture and Fisheries and president of Sana'a University, and founded and served as president of Ibb University.  He currently resides in Yemen with his wife, who is an American citizen, and their family.

22.     Plaintiff Nasser Al-Aulaqi's son, Anwar, was born in 1971 in New Mexico. He moved to Yemen with his parents in 1978.  In 1991, he returned to the United States to attend college at Colorado State University.  He obtained his master's degree from San Diego State University and then enrolled in a Ph.D. program at George Washington University, which he attended through December 2001.  While living in the United States, he married and had children, including Abdulrahman.  He left the United States in 2003, first for the United Kingdom and then for Yemen.

23.     In January 2010, the *Washington Post* reported that JSOC had added Anwar Al-Aulaqi to its kill list and had tried unsuccessfully to kill him in December 2009.  Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010.  Other media organizations reported the same information.  In March 2010, the *Wall Street Journal* reported that then-CIA Director Defendant Panetta stated that Anwar Al-Aulaqi was "someone that we're looking for" and that "there isn't any question that he's one of the individuals that we're focusing on."  Keith Johnson,

*U.S. Seeks Cleric Backing Jihad*, Wall St. J., Mar. 26, 2010.  In April 2010, multiple

media organizations, including the *Washington Post*, reported that Anwar Al-Aulaqi had

been added to the CIA's kill list.  *See* Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S.*

*Citizen on List of Those CIA Is Allowed To Kill*, Wash. Post, Apr. 7, 2010.

24.    The decision to add Anwar Al-Aulaqi to government kill lists was made after

a closed executive process.  Defendant Panetta participated in this process, and upon

information and belief Defendant McRaven participated in this process as well.  Upon

information and belief, Defendants authorized and directed Anwar Al-Aulaqi's killing

even though, at the time lethal force was used, Anwar Al-Aulaqi was not engaged in

activities that presented a concrete, specific, and imminent threat to life, and even though

there were means short of lethal force that could reasonably have been used to address

any such threat.  Upon information and belief, Defendants authorized and directed Anwar

Al-Aulaqi's killing even though he was not then directly participating in hostilities within

the meaning of the law of war.

25.    In or around June 2010, the Department of Justice's Office of Legal Counsel

completed a memorandum providing legal justifications for the killing of Anwar Al-

Aulaqi.  Substantial portions of the memorandum were summarized in October 2011 by

the *New York Times*, which reported, based on conversations with individuals who had

read the document, that the memorandum "provided the justification for acting [against

Anwar Al-Aulaqi] despite an executive order banning assassinations, a federal law

against murder, protections in the Bill of Rights and various strictures of the international

laws of war."  Charlie Savage, *Secret U.S. Memo Made Legal Case to Kill a Citizen*,

N.Y. Times, Oct. 8, 2011.

26.     Between the time Anwar Al-Aulaqi was added to the JSOC and CIA kill lists and the time he was killed, government officials told reporters that Al-Aulaqi had "cast his lot" with terrorist groups and encouraged others to engage in terrorist activity.  Later, they claimed he had played "a key role in setting the strategic direction" for "Al Qaeda in the Arabian Peninsula (AQAP)."  The government never publicly indicted Anwar Al-Aulaqi for any crime.

Nasser Al-Aulaqi's Lawuit to Enjoin the Government from Killing His Son

27.     On August 30, 2010, Nasser Al-Aulaqi filed suit in this Court as next friend of his son, Anwar, asking that the Court enter an injunction barring the President, the CIA, and DOD (including JSOC) from carrying out the targeted killing of his son unless the executive concluded that he presented a concrete, specific, and imminent threat to life, and that there were no reasonably available measures short of lethal force that could be expected to address that threat.  After hearing argument on November 8, 2010, the Court dismissed the Complaint on December 7, 2010, holding that Nasser Al-Aulaqi lacked standing to assert his son's constitutional rights and that at least some of the issues raised by the Complaint were non-justiciable political questions.  No appeal was taken.

Samir Khan

28.     Plaintiff Sarah Khan is a U.S. citizen who has lived in the United States since 1992 with her husband and children.  Her son, Samir, was born in 1985 and became a U.S. citizen in 1998.

29.     Samir Khan attended elementary school in Queens, New York, and high school on Long Island, New York.  After graduating from high school in 2003, he moved

to North Carolina, where he attended a community college and worked part-time.  He left

for Yemen in October 2009.

30.     Anonymous government officials have told reporters that Samir Khan was a

"propagandist" for AQAP.  The government never publicly indicted him for any crime.

<u>The September 30, 2011 Killing of Anwar Al-Aulaqi and Samir Khan</u>

31.     On the morning of September 30, 2011, Anwar Al-Aulaqi and Samir Khan

were in the Yemeni province of al-Jawf, some 90 miles northeast of Sana'a.  Upon

information and belief, Defendants Panetta, McRaven, Votel, and Petraeus authorized

and directed personnel under their command to fire missiles at Anwar Al-Aulaqi and his

vehicle from unmanned U.S. drones.  The missiles destroyed the vehicle and killed

Anwar Al-Aulaqi, Samir Khan, and at least two others.  Witnesses reported that the

missile strike left the vehicle a "charred husk" and "tore the [victims'] bodies to pieces."

Dominic Rushe, et al., *Anwar al-Awlaki Death: US Keeps Role Under Wraps to Manage

Yemen Fallout*, Guardian, Sept. 30, 2011; Sudarsan Raghavan, *Awlaqi Hit Misses al-

Qaeda Bombmaker, Yemen Says*, Wash. Post, Sept 30, 2011.  According to a September

30, 2011 article in the *Washington Post* and a June 2012 book by journalist Daniel

Klaidman, personnel under Defendants' command had been surveilling Anwar Al-Aulaqi

for a period as long as three weeks leading up to the strike.  Greg Miller, *Strike on Aulaqi

Demonstrates Collaboration Between CIA and Military*, Wash. Post, Sept. 30, 2011;

Daniel Klaidman, *Kill or Capture* (2012).  Defendants' lengthy surveillance suggests that

the use of lethal force was not a last resort and that additional measures could have been

taken to protect bystanders from harm.

32.     The surveillance and the strike were carried out by the CIA and JSOC.  Upon

information and belief, Defendant Petraeus was personally responsible for authorizing

and directing the CIA's involvement in the September 30 strike, and Defendants Panetta,

McRaven, and Votel were personally responsible for authorizing and directing JSOC's

involvement in it.  Defendants coordinated with each other in planning the attack and

carrying it out.

33.     Senior government officials, including Defendant Panetta and President

Barack Obama, have acknowledged the responsibility of the United States for killing

Anwar Al-Aulaqi.  On the same day the strike was carried out, DOD published a news

article stating that "[a] U.S. airstrike . . . killed . . . Anwar [Al-Aulaqi] early this

morning" and that he had been "high on the military-intelligence list of terrorist targets."

Lisa Daniel, *Panetta: Awlaki Airstrike Shows U.S.-Yemeni Cooperation*, Am. Forces

Press Service, Sept. 30, 2011.  The following day, Defendant Panetta stated in a public

speech that "it is because of th[e] teamwork between our intelligence and our military

communities that we were successful in . . . taking down al-Awlaki."  Three weeks later,

President Obama stated on national television that "working with the Yemenis, we were

able to remove [Anwar Al-Aulaqi] from the field."  *Tonight Show with Jay Leno* (NBC

television broadcast Oct. 25, 2011).

34.     Defendants' killing of Anwar Al-Aulaqi was unlawful.  Upon information and

belief, Defendants authorized and directed the strike even though, at the time the strike

was carried out, Anwar Al-Aulaqi was not engaged in activities that presented a concrete,

specific, and imminent threat of death or serious physical injury.  Upon information and

belief, Defendants authorized and directed the strike even though there were means short

of lethal force that could reasonably have been used to neutralize any threat that Anwar Al-Aulaqi's activities may have presented.  The killing of Anwar Al-Aulaqi was unlawful even if analyzed under the law of war because, upon information and belief, Defendants authorized and directed the strike even though Anwar Al-Aulaqi was not then directly participating in hostilities within the meaning of the law of war.

35.     Defendants' killing of Samir Khan was also unlawful.  Samir Khan was not engaged in any activity that presented a concrete, specific, and imminent threat of death or serious physical injury; nor was he directly participating in hostilities.  If he was killed because of the government's targeting of Anwar al-Aulaqi, his killing was unlawful because Al-Aulaqi's killing was unlawful and because, upon information and belief, Defendants authorized and directed the strike without taking legally required measures to avoid harm to bystanders.  Even in the context of an armed conflict, government officials must comply with the requirements of distinction and proportionality and take all feasible measures to protect bystanders.  Upon information and belief, Samir Khan was killed because Defendants failed to take such measures.

### The October 14, 2011 Killing of Abdulrahman Al-Aulaqi

36.     Plaintiff Nasser Al-Aulaqi's grandson, Abdulrahman Al-Aulaqi, was born in Denver, Colorado, on August 26, 1995.  He was raised in the United States until 2002, when he moved with his family to Yemen.  At the time of his death, he was a student in his first year of high school and resided in Sana'a, Yemen, with his mother, siblings, grandmother, and grandfather.

37.     On October 14, 2011, Abdulrahman was at an open-air restaurant near the town of Azzan, in the southern Yemeni province of Shabwa.  Upon information and

belief, Defendants Panetta, McRaven, Votel, and Petraeus authorized and directed

personnel under their command to fire missiles from unmanned U.S. drones at a person at

or near the restaurant.  According to media sources, the intended target was Ibraham Al-

Banna, an Egyptian national, but it was later reported that he was not among those killed

by the strike.  *See* Gregory Johnsen, *Signature Strikes in Yemen*, Waq al-Waq, Apr. 19,

2012.  The strike killed at least seven people, including Abdulrahman and one of his

cousins, another minor.  Abdulrahman himself was 16 years old.

38.     After the strike, a senior Obama administration official described

Abdulrahman to the *Los Angeles Times* as a "military-aged male."  Ken Dilanian,

*Grieving Awlaki Family Protests Yemen Drone Strikes*, L.A. Times, Oct. 19, 2011.  Other

news sources described Abdulrahman as a militant in his twenties.  To correct these

erroneous descriptions, Abdulrahman's family provided his birth certificate to the

*Washington Post*.  After the *Washington Post* published the birth certificate, U.S. officials

acknowledged in anonymous statements to the press that Abdulrahman had been a minor.

39.     Upon information and belief, Defendant Panetta was personally responsible

for authorizing and directing the CIA's involvement in the October 14 strike, and

Defendants Petraeus, McRaven, and Votel were personally responsible for authorizing

and directing JSOC's involvement in the October 14 strike.  Defendants coordinated with

each other in planning the attack and carrying it out.

40.     The killing of Abdulrahman Al-Aulaqi was unlawful.  Abdulrahman was not

engaged in any activity that presented a concrete, specific, and imminent threat of death

or serious physical injury; nor was he directly participating in hostilities.  If he was killed

because the government was targeting another individual, his killing was unlawful

because, upon information and belief, Defendants authorized and directed the strike

without taking legally required measures to avoid harm to him.  Even in the context of an

armed conflict, the government must comply with the requirements of distinction and

proportionality and take all feasible measures to protect bystanders.  Upon information

and belief, Abdulrahman Al-Aulaqi was killed because Defendants failed to take such

measures.

### CAUSES OF ACTION

### First Claim for Relief
### Fifth Amendment: Due Process

41.    Defendants' actions described herein violated the substantive and procedural

due process rights of Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi under

the Fifth Amendment to the Constitution.  Defendants Panetta, McRaven, Votel, and

Petraeus violated the Fifth Amendment due process rights of Anwar al-Aulaqi, Samir

Khan, and Abdulrahman Al-Aulaqi by authorizing and directing their subordinates to use

lethal force against them in the circumstances described above.  The deaths of Anwar al-

Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi were a foreseeable result of

Defendants' actions and omissions.

### Second Claim for Relief
### Fourth Amendment: Unreasonable Seizure

42.    Defendants' actions described herein violated the rights of Anwar Al-Aulaqi,

Samir Khan, and Abdulrahman Al-Aulaqi to be free from unreasonable seizures under

the Fourth Amendment to the Constitution.  Defendants Panetta, McRaven, Votel, and

Petraeus violated the Fourth Amendment rights of Anwar al-Aulaqi, Samir Khan, and

Abdulrahman Al-Aulaqi by authorizing and directing their subordinates to use lethal

force against them in the circumstances described above. The deaths of Anwar al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi were a foreseeable result of Defendants' actions and omissions.

### Third Claim for Relief
### Bill of Attainder

43.     Defendants' actions described herein with respect to Anwar Al-Aulaqi violated the Constitution's Bill of Attainder Clause. Defendants' actions constituted an unconstitutional act of attainder because Defendants designated Anwar Al-Aulaqi for death without the protections of a judicial trial in the circumstances described above. The death of Anwar al-Aulaqi was a foreseeable result of Defendants' actions and omissions.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment awarding them:

A.     Damages in an amount to be determined at trial; and

B.     Such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
Telephone: (202) 457-0800; Fax: (202) 452-1868
art@aclu-nca.org

Jameel Jaffer (to be admitted *pro hac vice*)
Hina Shamsi (to be admitted *pro hac vice*)
Nathan Freed Wessler
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7814
jjaffer@aclu.org

Pardiss Kebriaei (to be admitted *pro hac vice*)
Maria C. LaHood (to be admitted *pro hac vice*)
Baher Azmy
Center for Constitutional Rights
666 Broadway, 7th floor
New York, NY 10012
(212) 614-6452
pkebriaei@ccrjustice.org

July 18, 2012