## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NASSER AL-AULAQI, as personal representative of the estate of ANWAR AL-AULAQI, et al., | |
| Plaintiffs, | No. 1:12-cv-01192 (RMC) |
| v. | |
| LEON E. PANETTA, et al., in their individual capacities, | |
| Defendants. | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants Secretary Leon Panetta, Admiral William McRaven, Lieutenant General Joseph Votel, and former CIA Director David Petraeus—all current or former federal employees sued in their individual capacities—hereby move this Court to dismiss Plaintiffs Nasser Al-Aulaqi and Sarah Khan's complaint because this Court lacks subject matter jurisdiction over Plaintiffs' claims, and because Plaintiffs have failed to state a claim upon which relief may be granted. The grounds for this motion are set forth in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated: December 14, 2012

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General
Civil Division

RUPA BHATTACHARYYA
Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel
D.C. Bar No. 427461


  /s/  *Paul E. Werner*
PAUL E. WERNER
(MD Bar, under LCvR 83.2(e))
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C.  20044
(202) 616-4152 (phone)
(202) 616-4314 (fax)
E-mail: Paul.Werner@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NASSER AL-AULAQI, as personal representative of the estate of ANWAR AL-AULAQI, et al., | |
| Plaintiffs, | No. 1:12-cv-01192 (RMC) |
| v. | |
| LEON E. PANETTA, et al., in their individual capacities, | |
| Defendants. | |

## MEMORANDUM OF SUPPORTING POINTS AND AUTHORITIES

STUART F. DELERY
Principal Deputy Assistant Attorney General
Civil Division

RUPA BHATTACHARYYA
Director, Torts Branch

MARY HAMPTON MASON
Senior Trial Counsel
D.C. Bar No. 427461

PAUL E. WERNER
Trial Attorney
MD Bar under LCvR 83.2(e)
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C.  20044
(202) 616-4152 (phone)
(202) 616-4314 (fax)
E-mail: Paul.Werner@usdoj.gov

Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.       Plaintiffs Have Failed To Demonstrate They Have the Capacity To Sue. ......................... 4

II.      Plaintiffs' Claims Raise Non-Justiciable Political Questions. .............................................. 5

   A. Plaintiffs' claims raise issues with a "textually demonstrable constitutional commitment" to the political branches. ......................................................................................................... 8

   B. Plaintiffs' claims raise issues lacking judicially "manageable standards." .......................... 12

   C. Resolution of Plaintiffs' claims requires an initial policy determination that would show a "lack of respect due" to the political branches. ...................................................................... 17

III.     Under Governing Precedent, Special Factors Preclude a Damages Remedy. ................... 21

   A.    Plaintiffs' claims raise separation-of-powers concerns, which counsel hesitation. ........... 21

   B.    Plaintiffs' claims raise additional special factors under D.C. Circuit precedent. .............. 24

IV.      Defendants Are Entitled to Qualified Immunity. ............................................................. 29

   A. Plaintiffs fail to allege the violation of a clearly established right. ...................................... 31

   B. Decedents' Fourth Amendment rights were not clearly established. ................................... 33

   C. Assuming the Fourth Amendment extends to this unique context, Plaintiffs fail to state a violation. ............................................................................................................................ 35

   D. Decedents' Fifth Amendment rights were not clearly established. ...................................... 39

   E. Assuming the Fifth Amendment extends to this unique context, Plaintiffs have failed to allege facts showing a due process violation. ........................................................................ 41

V.    The Bill of Attainder Does Not Apply to Executive Action. ............................................. 44

CONCLUSION ..................................................................................................................... 45

# **TABLE OF AUTHORITIES**

Cases

*Al Maqaleh v. Gates,*
   605 F.3d 84 (D.C. Cir. 2010) ................................................................................... 40

\*    *Al-Aulaqi v. Obama,*
   727 F. Supp. 2d 1 (D.D.C. 2010) .................................................................... passim

\*    *Ali v. Rumsfeld,*
   649 F.3d 762 (D.C. Cir. 2011) ......................................................................... passim

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ................................................................................................ 29

*Arar v. Ashcroft,*
   585 F.3d 559 (2d Cir. 2009) ............................................................. 22, 23, 27, 32

*Ashcroft v. Al-Kidd,*
   131 S. Ct. 2074 (2011) ..................................................................................... 29, 32

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................... 3, 23, 38, 42

*Ashwander v. TVA,*
   297 U.S. 288 (1936) ................................................................................................ 30

\*    *Baker v. Carr,*
   369 U.S. 186 (1962) ........................................................................................ passim

*Best v. United States,*
   184 F.2d 131 (1st Cir. 1950) ................................................................................... 34

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ................................................................................................ 22

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ......................................................................................... 12, 40

*Brower v. County of Inyo,*
   489 U.S. 593 (1989) ................................................................................................ 35

*Bush v. Lucas,*
   462 U.S. 367 (1983) ..................................................................................... 22, 23, 24

*Camreta v. Greene*,
   131 S. Ct. 2020 (2011) .................................................................................. 30, 39

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
   416 U.S. 663 (1974) ............................................................................................ 44

*Carlson v. Green*,
   446 U.S. 14 (1980) .............................................................................................. 22

*Chappell v. Wallace*,
   462 U.S. 296 (1983) ...................................................................................... 22, 25

\*    *Chicago & S. Air Lines v. Waterman S. S. Corp.*,
   333 U.S. 103 (1948) .............................................................................. 11, 13, 16

*Childress v. City of Arapaho, Okla.*
   210 F.3d 1154 (10th Cir. 2000) ......................................................................... 36

*Claybrook v. Birchwell*,
   199 F.3d 350 (6th Cir. 2000) ............................................................................. 36

*Coal. for Underground Expansion v. Mineta*,
   333 F.3d 193 (D.C. Cir. 2003) ........................................................................... 13

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) .............................................................................................. 22

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) .............................................................................. 31, 42, 43

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   407 F.3d 1220 (D.C. Cir. 2005) ....................................................................... 2, 9

*Ctr. for Nat. Sec. Studies v. U.S. Dep't. of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) ........................................................................... 19

*DaCosta v. Laird*,
   471 F.2d 1146 (2d Cir. 1973) ............................................................................. 14

*Davidson v. Cannon*,
   474 U.S. 344 (1986) ............................................................................................ 42

*Davis v. Passman*,
   442 U.S. 228 (1979) ............................................................................................ 22

iii

*Doe by Fein v. District of Columbia*,
   93 F.3d 861 (D.C. Cir. 1996) .......................................................................... 43

\*     *Doe v. Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) ............................................................. 22, 25, 28

*Elkins v. District of Columbia*,
   690 F.3d 554 (D.C. Cir. 2012) .................................................................... 42, 43

*El-Shifa Pharm. Indus. Co. v. United States*,
   378 F.3d 1346  (Fed. Cir. 2004) .......................................................................... 15

\*     *El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 997 (2011) ................. passim

*Emanuel v. District of Columbia*,
   224 F. App'x 1 (D.C. Cir. 2007) ................................................................... 35, 36

*Estate of Manook v. Research Triangle Inst.*,
   693 F. Supp. 2d 4 (D.D.C. 2010) ....................................................................... 5

*Ex parte Quirin*,
   317 U.S. 1 (1942) ................................................................................. 32, 40

*FDIC v. Meyer*,
   510 U.S. 471 (1994) .................................................................................... 22

*Gillars v. United States*,
   182 F.2d 962 (D.C. Cir. 1950) ......................................................................... 34

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ............................................................................. 10, 13, 19

*Global Relief Found., Inc. v. O'Neill*,
   315 F.3d 748 (7th Cir. 2002) .......................................................................... 45

*Gonzalez-Vera v. Kissinger*,
   449 F.3d 1260 (D.C. Cir. 2006) ........................................................................ 13

*Graham v. Connor*,
   490 U.S. 386 (1989) ............................................................................... passim

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................................... 8, 11

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) .................................................................................... 2, 9

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) .................................................................................... passim

*Harbury v. Hayden*,
  522 F.3d 413 (D.C. Cir. 2008) ................................................................... 7

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) .................................................................................... 29

*Holtzman v. Schlesinger*,
  484 F.2d 1307 (2d Cir. 1973) ..................................................................... 14

*Hope v. Pelzer*,
  536 U.S. 730 (2002) .................................................................................... 29

*In re Estate of Monge*,
  841 A.2d 769 (D.C. 2004) ........................................................................... 5

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) .................................................................................... 6, 18

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) .................................................................................... 11, 26

*Kar v. Rumsfeld*,
  580 F. Supp. 2d 80 (D.D.C. 2008) .............................................................. 34, 39, 40

*Khan v. Obama*,
  *Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011) ........................... 20

\*   *Lebron v. Rumsfeld*,
  670 F.3d 540 (4th Cir.), *cert. denied*, 132 S. Ct. 2751 (2012) ......................... passim

*Livermore v. Lubelan*,
  476 F.3d 397 (6th Cir. 2007) ..................................................................... 35

*Ludecke v. Watkins*,
  335 U.S. 160 (1948) .................................................................................... 12

*Malley v. Briggs*,
  475 U.S. 335 (1986) .................................................................................... 29

v

*Marbury v. Madison*,
   1 Cranch 137 (1803) ................................................................... 6

*Medeiros v. O'Connell*,
   150 F.3d 164 (2d Cir. 1998)......................................................... 36

*Minneci v. Pollard*,
   132 S. Ct. 617 (2012).................................................................. 22

*Mirmehdi v. United States*,
   689 F.3d 975 (9th Cir. 2012), *cert. petition filed*, No. 12-522 (U.S. Oct. 22, 2012) .......... 22, 32

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)..................................................................... 43

*Moyer v. Peabody*,
   212 U.S. 78 (1909)....................................................................... 44

*Oetjen v. Cent. Leather Co.*,
   246 U.S. 297 (1918)..................................................................... 11

*Padilla v. Yoo*,
   678 F.3d 748 (9th Cir. 2012) ....................................................... 41

*Paradissiotis v. Rubin*,
   171 F.3d 983 (5th Cir. 1999) ....................................................... 45

*Pearson v. Callahan*,
   555 U.S. 223 (2009)..................................................................... 30

*People's Mojahedin Org. of Iran v. U.S. Dep't. of State*,
   182 F.3d 17 (D.C. Cir. 1999)....................................................... 15

*Rasul v. Myers*,
   563 F.3d 527  (D.C. Cir. 2009) ................................................ 25, 30

*     *Reid v. Covert*,
   354 U.S. 1 (1957).................................................................. passim

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)..................................................................... 13

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985)................................................. 23, 28

*Saucier v. Katz,*
    533 U.S. 194 (2001) ........................................................................................ 30

\*      *Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) ................................................................ passim

*Schweiker v. Chilicky,*
    487 U.S. 412 (1988) ........................................................................................ 22

*Scott v. Harris,*
    550 U.S. 372 (2007) ................................................................................... 31, 37

*Tenet v. Doe,*
    544 U.S. 1 (2005) ........................................................................................... 27

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ........................................................................................... 39

*United States v. Bin Laden,*
    126 F. Supp. 2d 264 (S.D.N.Y. 2000) .......................................................... 34

*United States v. Lovett,*
    328 U.S. 303 (1946) ........................................................................................ 44

*United States v. Stanley,*
    483 U.S. 669 (1987) ................................................................................... 22, 25

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................................................... 33, 34

*United States v. Yunis,*
    924 F.2d 1086 (D.C. Cir. 1991) ..................................................................... 24

*Vance v. Rumsfeld,*
    --F.3d--, 2012 WL 5416500 (7th Cir. Nov. 7, 2012) ................................ passim

*Vanover v. Hartman,*
    77 F. Supp. 2d 91 (D.D.C. 1999) *aff'd,* 38 F. App'x 4 (D.C. Cir. 2002) ............................ 9, 19

*Walmer v. U.S. Dep't of Defense,*
    52 F.3d 851 (10th Cir. 1995) ......................................................................... 45

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ................................................................................... 22, 23

\* *Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) ................................................................................................. 23, 26, 27

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) ........................................................................................................................ 43

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................................................................................ 20

*Zivotofsky v.Clinton*,
  132 S. Ct. 1421 (2012) ...................................................................................................................... 6

U.S. Constitution

U.S. Const. art. I ........................................................................................................................... 44, 45

U.S. Const. art. II ................................................................................................................... 10, 11, 35

U.S. Const. amend. IV ......................................................................................................................... 35

Statutes

8 U.S.C. § 1189 .................................................................................................................................... 15

10 U.S.C. § 2733 .................................................................................................................................. 24

10 U.S.C. § 2734 .................................................................................................................................. 24

10 U.S.C. § 821 .................................................................................................................................... 24

18 U.S.C. § 2441 .................................................................................................................................. 24

28 U.S.C. § 1350 .................................................................................................................................. 24

28 U.S.C. § 1346 .................................................................................................................................. 28

28 U.S.C. § 2401 .................................................................................................................................. 28

28 U.S.C. § 2671-2680 ........................................................................................................................ 28

42 U.S.C. § 1983 .................................................................................................................................. 17

Authorization for Use of Military Force,
  Pub. L. No. 107-40, 115 Stat. 224 (reprinted at 50 U.S.C. § 1541 note) ........................... 20, 21

Pub. L. No. 108-106, 117 Stat. 1209 ............................................................................................ 24

Rules

Fed. R. Civ. P. 17 ................................................................................................................... 4

Fed. R. Civ. P. 12 ............................................................................................................... 1, 13

## INTRODUCTION

Plaintiffs Nasser Al-Aulaqi and Sarah Khan, purportedly as representatives of the estates of three U.S. citizens killed in Yemen, ask this Court to impose personal liability on Defendants, including the Secretary of Defense and the former Director of the Central Intelligence Agency, based on the Executive Branch's alleged conduct of military and counterterrorism operations against an elusive and hostile enemy abroad in the course of an ongoing, congressionally authorized armed conflict with al-Qa'ida and associated forces. Particularly, Plaintiffs seek damages from individual government officials for allegedly authorizing and directing missile strikes that they contend resulted in these citizens' deaths abroad.

But courts repeatedly have recognized that the political branches, with few exceptions, have both the responsibility for—and the oversight of—the defense of the Nation and the conduct of armed conflict abroad. The Judiciary rarely interferes in such arenas. In this case, Plaintiffs ask this Court to take the extraordinary step of substituting its own judgment for that of the Executive. They further ask this Court to create a novel damages remedy, despite the fact that—based on Plaintiffs' own complaint—their claims are rife with separation-of-powers, national defense, military, intelligence, and diplomatic concerns. Judicial restraint is particularly appropriate here, where Plaintiffs seek non-statutory damages from the personal resources of some of the highest officials in the U.S. defense and intelligence communities. Under these weighty circumstances, this Court should follow the well-trodden path the Judiciary—and particularly the D.C. Circuit—have taken in the past and should leave the issues raised by this case to the political branches.

## BACKGROUND

In the exercise of the United States' inherent right to national self-defense, the U.S.

government has been engaged in an armed conflict against al-Qa'ida and associated forces since 2001. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630-31 (2006). Plaintiffs' allegations involve the deaths of three individuals in Yemen, including Anwar Al-Aulaqi, in that conflict. Anwar Al-Aulaqi was killed in Yemen in 2011. Compl. ¶ 2. At the time of his death, Al-Aulaqi was known to be a leader of al-Qa'ida in the Arabian Peninsula (AQAP) and had been designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist (SDGT). *See* Designation of Anwar Al-Aulaqi Pursuant to Executive Order 13224 and Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594, 75 Fed. Reg. 43,233-34 (publicly announced July 12, 2010) (SDGT Designation).[1]

AQAP is an organized armed group that is either part of, or an associated force of, al-Qa'ida. *See infra* p. 20 & n.12. Anwar Al-Aulaqi played "a key role in setting the strategic direction for AQAP"; "recruited individuals to join AQAP"; "facilitated training" at AQAP camps in Yemen; and "helped focus AQAP's attention on planning attacks on U.S. interests." SDGT Designation. The SDGT Designation also identifies Al-Aulaqi's role in the plot to detonate an explosive device aboard a U.S. airliner en route from Amsterdam to Detroit on Christmas Day, 2009. *Id.* (reciting that Umar Abdulmutallab "received instructions" from Al-Aulaqi to detonate an explosive device "aboard a U.S. airplane over U.S. airspace" and then "obtained the explosive device" he used in the attempted attack). *Accord* Gov.'s Sentencing Mem. 12-15, *United States v. Abdulmutallab*, No. 2:10-cr-20005 (E.D. Mich. Feb. 19, 2012), ECF No. 130. Al-Aulaqi had called for "jihad against the West" and declared he "will never surrender." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

---

[1] This Court can take judicial notice of the United States' published designation of Anwar Al-Aulaqi as an SDGT and of its asserted basis for that designation. *See Covad Comms. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

Plaintiffs Nasser Al-Aulaqi and Sarah Khan filed this complaint as the purported representatives of the estates of Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi (Anwar Al-Aulaqi's son), claiming decedents died in two separate "missile strikes" in Yemen.[2] *See* Compl. ¶¶ 2-3, 10-11. Plaintiffs claim these alleged strikes were launched from remotely piloted aircraft (RPAs)—commonly referred to as "drones." *Id.* The first alleged strike occurred on September 30, 2011, and purportedly targeted "Anwar Al-Aulaqi and his vehicle." *Id.* ¶ 31. Anwar Al-Aulaqi and Samir Khan allegedly were killed by this strike. *Id.* The complaint does not deny that Anwar Al-Aulaqi was part of an enemy force, nor does it provide any hint that the United States' information regarding his activities was mistaken. The complaint nonetheless maintains in conclusory fashion that Anwar Al-Aulaqi did not pose a "concrete, specific, and imminent threat" at the time of the strike. *Id.* ¶ 34. Plaintiffs opine in similar conclusory fashion that "means short of lethal force" were available that "could reasonably have been used to neutralize any threat" he posed. *Id.* ¶ 24. The second alleged strike occurred on October 14, 2011, and purportedly targeted "Ibraham al Banna, an Egyptian national." *Id.* ¶ 37. According to the complaint, Abdulrahman Al-Aulaqi died in this second alleged strike. *Id.*

Plaintiffs claim that the first alleged strike targeting Anwar Al-Aulaqi occurred after he had been placed on a purported "kill list" of the Central Intelligence Agency (CIA) and a purported "kill list" of the Joint Special Operations Command (JSOC). The complaint alleges that Secretary Leon Panetta, the former Director of the CIA and current Secretary of Defense, "authorized the addition" of Anwar Al-Aulaqi to the purported "kill list" of the CIA. *Id.* ¶ 12.

---

[2] For purposes of this motion only, the Court should assume the truth of Plaintiffs' factual allegations, but not of any legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In filing this motion, however, Defendants make no suggestion as to the veracity of any of those allegations or conclusions. Nor in filing this motion based on these assumed facts do the Defendants—or the United States, which is not a party to this litigation but filed a statement of interest concurrently with this motion—confirm or deny any of Plaintiffs' underlying allegations.

Plaintiffs claim that Admiral William McRaven, the former commander of JSOC, "authorized the addition" of Anwar Al-Aulaqi to the purported "kill list" of JSOC and that Secretary Panetta "authorized" his "continued placement" on that list. *Id.* ¶ 12-13. The complaint avers that these two Defendants—along with former CIA Director David Petraeus and current commander of JSOC Lieutenant General Joseph Votel—"authorized and directed" the two alleged strikes "without taking legally required measures to avoid harm," and that they "failed" to "take all feasible measures to protect bystanders." *Id.* ¶¶ 12-15, 35, 40.

Based on these allegations, Plaintiffs seek damages from Defendants individually under the Fourth Amendment for the purportedly unreasonable seizure of decedents. *Id.* ¶ 42. They also claim Defendants violated decedents' Fifth Amendment due process rights. *Id.* ¶ 41. Lastly, they claim these alleged acts violated the Bill of Attainder Clause. *Id.* ¶ 43.

This Court should dismiss the complaint on four independent grounds. First, Plaintiffs have failed to demonstrate they have the capacity to sue. Second, their claims raise quintessential political questions, and therefore this Court lacks jurisdiction to consider them. Third, under governing precedent, special factors counsel against inferring a damages remedy in this novel context. And fourth, Defendants are entitled to qualified immunity because Plaintiffs have failed to allege the violation of any clearly established constitutional right.

## ARGUMENT

### I.      Plaintiffs Have Failed To Demonstrate They Have the Capacity To Sue.

This Court should dismiss Plaintiffs' complaint because they have not properly alleged they have the capacity to sue. Under Federal Rule of Civil Procedure 17(b), the capacity to sue for individuals acting as representatives of an estate is governed by the law of the state where the court sits. Fed. R. Civ. P. 17(b)(3). Therefore, District of Columbia law applies.

Plaintiffs fail to demonstrate they have complied with that law's requirements to act as personal representatives. Under D.C. law, a "personal representative" is a "person . . . who has been appointed by the Court to administer the estate of a decedent." D.C. Stat. Ann. § 20-101(j). A lawsuit can be considered personal property for purposes of acting in a representative capacity. *See Estate of Manook v. Research Triangle Inst.*, 693 F. Supp. 2d 4, 17 (D.D.C. 2010) (citation omitted). As none of the decedents was domiciled in the District, *see* Compl. ¶¶ 22, 29, 36, Plaintiffs must qualify as "foreign personal representatives" of their estates. *See In re Estate of Monge*, 841 A.2d 769, 773 (D.C. 2004).

Plaintiffs have failed to properly allege they qualify. Where a non-domiciliary's estate has property in the District, a foreign personal representative must "file with the Register a copy of the appointment as personal representative" in another jurisdiction. D.C. Stat. Ann. § 20-341(b); *see In re Estate of Monge*, 841 A.2d at 774. This suit may be considered such property. *See Estate of Manook*, 693 F. Supp. 2d at 17. Accordingly, Plaintiffs are required to file their appointments as personal representative with the Register of Wills in order to proceed with this litigation. *See* D.C. Stat. Ann. § 20-101(m) (defining "Register" as "Register of Wills"); *see also Estate of Manook*, 693 F. Supp. 2d at 17 (requiring plaintiff to submit to Register "Qassam Sharie" documents issued by Iraqi court to proceed as foreign personal representative of Iraqi decedent in litigation). Plaintiffs have failed to allege they complied with this requirement or to demonstrate their legal capacity to sue on decedents' behalf, and their allegations that they are decedents' personal representatives, *see* Compl. ¶¶ 10-11, are conclusory. Thus, the Court should require Plaintiffs to demonstrate their capacity to sue and, if they fail to do so, dismiss their suit.

## II.     Plaintiffs' Claims Raise Non-Justiciable Political Questions.

At the core of their claims, Plaintiffs ask this Court to pass judgment on the alleged

conduct of Executive Branch officials in carrying out purported military and counterterrorism operations abroad in exercising the Executive's prerogative of national self-defense and in the course of an armed conflict authorized by Congress. Such a request is a "quintessential source[]" of non-justiciable political questions. *Al-Aulaqi*, 727 F. Supp. 2d at 45 (citation omitted).

The Supreme Court has long recognized that certain questions, "in their nature political," are not fit for adjudication. *Marbury v. Madison*, 1 Cranch 137, 170 (1803). The "political question doctrine" is "primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210-11 (1962). It is the "relationship between the judiciary and the coordinate branches of Federal Government" that gives rise to a political question. *Id.* at 210. Such questions arise in "controversies which revolve around policy choices and value determinations" that are constitutionally committed to the Executive or Legislative Branches of our system of government. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

In this case, the gravamen of Plaintiffs' complaint is that U.S. officials unlawfully applied the warmaking and national defense powers of the political branches to conduct alleged missile strikes abroad against enemy forces engaged in an armed conflict against the United States—a subject that, under governing precedent, squarely implicates the political question doctrine. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841, 845 (D.C. Cir. 2010) (en banc) (dismissing on political question grounds tort action brought for U.S. missile strike in Sudan). To evaluate whether a case raises political questions, it is important for a court to first "identify with precision" the issues it is being asked to decide. *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1434 (2012) (Sotomayor, J., concurring). *See also El-Shifa*, 607 F.3d at 842 ("[T]he presence of a political question . . . turns not on the nature of the government conduct under review but more precisely on the question the plaintiff raises about the challenged action."). Once the court

6

identifies the issues presented, it considers whether any factors the Supreme Court identified in *Baker v. Carr* apply.

In *Baker*, the Court listed six factors to consider in determining whether a suit presents non-justiciable political questions. Courts should refrain from adjudicating suits raising issues that (1) have a "textually demonstrable constitutional commitment" to the political branches; (2) lack "judicially discoverable and manageable standards" for resolution; (3) require "an initial policy determination of a kind clearly for nonjudicial discretion" for resolution; (4) require the court to express "lack of the respect due coordinate branches of government" through their resolution; (5) present "an unusual need for unquestioning adherence to a political decision already made"; or (6) risk embarrassing the government through "multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217. The first two factors are the "most important." *Harbury v. Hayden*, 522 F.3d 413, 418 (D.C. Cir. 2008). However, to dismiss a case on political question grounds, a court "need only conclude that one factor is present, not all." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

Here, even assuming that Plaintiffs' complaint properly identifies the issues that would need to be decided to adjudicate their claims, those issues each implicate *Baker* factors. First, the complaint as pled by Plaintiffs asks this Court to determine that Anwar Al-Aulaqi did not pose a "concrete, specific, and imminent threat of death or serious physical injury" (presumably to U.S. citizens) at the time he was allegedly targeted by a missile strike while in Yemen. Compl. ¶¶ 24, 34. Second, the complaint asks this Court to determine that at the time of the alleged strike, "means short of lethal force" were available—presumably to the federal officials allegedly participating in any underlying decisions—which "could reasonably have been used to neutralize any threat" that Anwar Al-Aulaqi posed. *Id.* ¶ 34. Third, Plaintiffs contend that Defendants did

not use "all feasible measures to protect bystanders" during alleged missile strikes on Anwar Al-Aulaqi and an Egyptian national in Yemen, thereby violating Samir Khan and Abdulrahman Al-Aulaqi's Fourth and Fifth Amendment rights. *Id.* ¶¶ 35, 40.[3]

Plaintiffs thus invite this Court to determine whether an individual in Yemen whom the Executive Branch had already declared a leader of an organized armed enemy group, and a foreign operative of that group, posed a sufficient threat to the United States and its citizens to warrant the alleged use of missile strikes abroad within the context of an armed conflict and the Executive's national self-defense mission. Moreover, they ask this Court to pass judgment on the Executive's purported battlefield and operational decisions in that conflict—namely, to determine whether lethal force was the most appropriate option available; if so, what sort of lethal force to employ; and whether appropriate measures were taken to minimize collateral damage. Each of these issues is a "quintessential source" of political questions.

**A. Plaintiffs' claims raise issues with a "textually demonstrable constitutional commitment" to the political branches.**

There is "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider*, 412 F.3d at 194. The issues raised by this complaint unquestionably involve the conduct of hostilities in armed conflict, as well as national security, and foreign policy—matters which are constitutionally committed to the Executive and the Legislature in the first instance and are "rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981) (citations omitted).

First and foremost, Plaintiffs' claims directly challenge the Executive's alleged acts of

_____

[3] In assessing the claims of Samir Khan and Abdulrahman Al-Aulaqi, the complaint also implicitly asks this Court to determine the magnitude of the threats posed by the alleged targets, Anwar Al-Aulaqi and Al-Banna—a necessary predicate to evaluating which protective "measures" were "feasible" or "proportionat[e]" in any action against them.

8

warfighting and national self-defense abroad targeting members of an armed enemy group against which the political branches have authorized the use of all necessary and appropriate force. The United States is currently engaged in an armed conflict with al-Qa'ida and associated forces. *See Hamdan*, 548 U.S. at 630-31 (holding that Common Article 3 of the Geneva Conventions—which applies in armed conflicts not of an international character—applies to the conflict between the United States and al-Qa'ida and associated forces). The stated reasons for the U.S. government's designation of Anwar Al-Aulaqi as an SDGT explain his role in that conflict. *See* SDGT Designation. Particularly, Al-Aulaqi was a leader of AQAP, which had conducted numerous attacks on U.S. targets, and he had "taken on an increasingly operational role" in that group, including preparing an individual to attack the United States by giving him instructions "to detonate an explosive aboard a U.S. airplane over U.S. airspace." *Id.* at 75 Fed. Reg. 43,234. *See also* Unclassified Declaration in Support of Formal Claim of State Secrets Privilege by James R. Clapper, Director of National Intelligence ¶¶ 13-15, *Al-Aulaqi v. Obama*, No. 1:10-cv-1469 (D.D.C. Sept. 25, 2010), ECF No. 15-2 (Clapper Decl.).[4] Any alleged missile strikes targeting Al-Aulaqi and Al-Banna, both members of AQAP, would have been taken in furtherance of the Nation's self-defense in an armed conflict with al-Qa'ida and associated forces.[5]

The conduct of armed conflict is a matter with a "textually demonstrable constitutional

---

[4] As mentioned above, *supra* note 1, the Court can take judicial notice of "facts on the public record" in considering a motion to dismiss. *Covad Commc'ns Co.*, 407 F.3d at 1222. This Court can properly take judicial notice both of the United States' SDGT designation, and of the *stated reasons* that federal officials proffered regarding Al-Aulaqi's activities, even if Plaintiffs were to dispute, as a factual matter, the actual extent of his terrorist involvement. *See id.*

[5] Al-Banna is "an Egyptian member of AQAP." Gregory Johnsen, *Signature Strikes in Yemen*, bigthink – Waq al-Waq (Apr. 19, 2012 2:45 PM), http:// bigthink.com/waq-al-waq/signature-strikes-in-yemen?page=all. Plaintiffs refer to this article and therefore the Court can consider it in a motion to dismiss. *See* Compl. ¶ 37; *Vanover v. Hartman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).

commitment" to the Executive and Legislative Branches. The President is "Commander in Chief" of the United States Armed Forces. U.S. Const. art. II, § 2. And the Constitution invests Congress with the power to "provide for the Common Defence"; "declare War"; "raise and support Armies"; "provide and maintain a Navy"; "make Rules for the Government and Regulation of the land and naval Forces"; and "provide for calling forth the Militia to . . . repel Invasions." *Id.* art. I, § 8.

The en banc D.C. Circuit in *El-Shifa* explicitly recognized that claims directly implicating the political branches' powers to use force abroad will often fall outside the Judiciary's competence. There, the court dismissed on political question grounds tort claims seeking compensation for a U.S. missile strike against a factory in Sudan. In dismissing the claim, the court was unequivocal: "Whether the circumstances warrant a military attack on a foreign target is a 'substantive political judgment[] entrusted expressly to the coordinate branches of government.'" 607 F.3d at 845 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 11 (1973)). Plaintiffs' complaint asks this Court to make a similar judgment as to whether the circumstances warranted the United States' alleged conduct of missile strikes against targets located overseas.

Indeed, in *Al-Aulaqi v. Obama*, Judge Bates of this Court found *El-Shifa* dispositive on facts that are materially identical to those here. There, plaintiff sought a preliminary injunction that would forbid the use of force against Anwar Al-Aulaqi unless certain conditions were met. *See Al-Aulaqi*, 727 F. Supp. 2d at 12. Here, Plaintiffs base their claims on the alleged use of that force. In dismissing the complaint in the earlier litigation, Judge Bates explained: "plaintiff asks this Court to do exactly what the D.C. Circuit forbid in *El-Shifa*—assess the merits of the President's (alleged) decision to launch an attack on a foreign target." *Id.* at 47. The same logic applies here, particularly given that Plaintiffs challenge not only the alleged attack on Anwar Al-

10

Aulaqi, but also the propriety of the alleged attack on Al-Banna, an Egyptian national. *Cf.*

*Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) ("Certainly it is not the function of the

Judiciary to entertain private litigation—even by a citizen—which challenges the legality, the

wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to

any particular region.").

In addition to the conduct of war and national self-defense, matters of foreign affairs—

which clearly are implicated in a case challenging alleged missile strikes against targets on

foreign soil, including a foreign national—also have a "textually demonstrable constitutional

commitment" to the political branches. Article II of the Constitution states that the President

"shall have Power, by and with the Advice and Consent of the Senate, to make Treaties . . . [and]

appoint Ambassadors," and also "shall receive Ambassadors and other public Ministers." *Id.* art.

II, §§ 2-3. Article I gives Congress the power to "regulate Commerce with foreign Nations" and

"To define and punish Piracies and Felonies committed on the high Seas, and Offences against

the Law of Nations." *Id.* art. I, § 8.

It is little surprise, therefore, that courts have repeatedly declined to adjudicate cases

directly implicating those areas. *See, e.g.*, *Haig*, 453 U.S. at 292 ("Matters intimately related to

foreign policy and national security are rarely proper subjects for judicial intervention."

(citations omitted)); *Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111

(1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial.

Such decisions are wholly confided by our Constitution to the political departments of the

government, Executive and Legislative."); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)

("The conduct of foreign relations of our government is committed by the Constitution to the

executive and legislative—'the political'—departments of the government."); *El-Shifa*, 607 F.3d

at 841 ("Disputes involving foreign relations, such as the one before us, are 'quintessential sources of political questions.'" (internal citation omitted)); *Schneider*, 412 F.3d at 194 (noting that there is "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches" in dismissing tort claims on political question grounds). *Cf. Ludecke v. Watkins*, 335 U.S. 160, 169 (1948) ("Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled.").

That is not to say that every claim that "touches foreign relations," *Baker*, 369 U.S. at 211, or involves national security necessarily implicates the political question doctrine. For example, courts "have been willing to hear habeas petitions (from both U.S. citizens and aliens)" that implicate national security and foreign relations. *Al-Aulaqi*, 727 F. Supp. 2d at 49 (citing *Boumediene v. Bush*, 553 U.S. 723 (2008)). That is because "the Suspension Clause reflects a textually demonstrable commitment of habeas corpus claims to the Judiciary." *Id.* (quotation marks omitted). But there "is no 'constitutional commitment to the courts for review of a military decision to launch a missile at a foreign target.'" *Id.* at 50 (quoting *El-Shifa*, 607 F.3d at 849). Such matters "are textually committed not to the Judiciary, but to the political branches." *Id.* Accordingly, the sorts of inquiries that would be triggered by any substantive examination of the Plaintiffs' allegations squarely implicate issues with a "textually demonstrable constitutional commitment" to the political branches, and the first *Baker* factor warrants dismissal.

**B. Plaintiffs' claims raise issues lacking judicially "manageable standards."**

Plaintiffs' complaint also asks this Court to decide questions lacking "judicially discoverable and manageable standards" for resolution. *Baker*, 369 U.S. at 217. To be clear, Defendants do not suggest that there are no standards that would be applied to purported missile

strikes on AQAP targets. To the contrary, the Attorney General has laid out some of the principles underlying the Executive Branch's exercise of its national self-defense prerogative against a leader of al-Qa'ida or an associated force.[6] It is the notion of *judicially* crafted and managed standards in the context of the issues raised by Plaintiffs' complaint that collides with the separation of powers delineated in our Constitution.[7]

Plaintiffs challenge alleged decisions by the military and the CIA purportedly to carry out missile strikes in Yemen—decisions that exceed the scope of the Judiciary's expertise. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999) (explaining that courts are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the government's "reasons for deeming nationals of a particular country a special threat"); *see also El-Shifa*, 607 F.3d at 845 (citing *Reno*). The Supreme Court has acknowledged that with respect to decisions involving military matters, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10. *See also Waterman*, 333 U.S. at 111 (noting that the Executive "has available intelligence services whose reports neither are nor ought [sic] to be published to the world"); *Schneider*, 412 F.3d at

---

[6] *See Attorney General Eric Holder Speaks at Northwestern University School of Law*, Justice News, Mar. 5, 2012, *available at* http://www.justice.gov/iso/opa/ag/speeches/2012/ag-speech-1203051.html (last visited Dec. 4, 2012) (Holder Speech), at 3. Defendants' political question argument is raised under Rule 12(b)(1). *See Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1262 (D.C. Cir. 2006). Thus, courts can consider matters outside of the pleadings in evaluating that argument. *See Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

[7] Similarly, Defendants do not suggest that the Executive has unchecked power to conduct purported missile strikes abroad, particularly against citizens. Indeed, the Legislative Branch has been informed of strikes and has reviewed the authority to carry out such operations. *See infra* p. 20, n.14. Thus, refusal to adjudicate Plaintiffs' claims in this unique context "does not leave the executive power unbounded." *Schneider*, 412 F.3d at 200. "If the executive in fact has exceeded his appropriate role in the constitutional scheme, Congress enjoys a broad range of authorities with which to exercise restraint and balance." *Id.* In addition, checks and balances exist within the Executive Branch itself.

13

197 (finding non-justiciable claim challenging alleged CIA action because there were "no justiciably discoverable and manageable standards for the resolution of such a claim").

Litigating a case involving such alleged circumstances would be rife with problems of manageability. In general, courts do not "sit in camera in order to be taken into executive confidences." *Waterman*, 333 U.S. at 111. Thus, in a case such as this, "[i]t would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret." *Id.* Even if courts were privy to the information the Executive receives from its military and intelligence advisors, they "are hardly competent to evaluate it." *Holtzman v. Schlesinger*, 484 F.2d 1307, 1310 (2d Cir. 1973) (denying injunction to stop bombing of Cambodia). *See also DaCosta v. Laird*, 471 F.2d 1146, 1155 (2d Cir. 1973) ("Judges, deficient in military knowledge, lacking vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action, cannot reasonably or appropriately" evaluate the consequences of "a specific military operation").

These limitations of judicial capacity come into sharper focus when considering the specific issues Plaintiffs contend this Court must address. As mentioned above, Plaintiffs claim that, notwithstanding his "increasingly operational role" in AQAP, SDGT Designation, Anwar Al-Aulaqi was not a "concrete, specific, and imminent" threat to the United States at the time of the purported strike and thus, his constitutional rights were allegedly violated. Even if Plaintiffs have properly articulated the relevant standard, this Court would still need to define how "concrete, specific, and imminent" the threat of an enemy belligerent must be—and how sure the Executive must be that he met that standard—to justify action. This Court could not do so without establishing novel judicial standards for use in evaluating such national self-defense

14

decisions. *See El-Shifa*, 607 F.3d at 845 (noting the court could not evaluate the decision to conduct a missile strike on foreign soil "without first fashioning out of whole cloth some standard for when military action is justified"). Faced with that prospect in a similar context, the en banc D.C. Circuit stated bluntly: "The judiciary lacks the capacity for such a task." *Id. See also El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1367 n.6 (Fed. Cir. 2004) ("[I]t would be difficult, if not extraordinary, for the federal courts to discover and announce the threshold standard by which the United States government evaluates intelligence in making a decision to commit military force in an effort to thwart an imminent terrorist attack on Americans."); *Al-Aulaqi*, 727 F. Supp. 2d at 47.

Moreover, determining when a member of an enemy force is an appropriate target of a purported missile strike cannot be addressed with a judicially manageable standard because the assessment of whether an individual presents a sufficient threat to warrant such an action is itself a political question. *Cf. People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) ("*PMOI*"). In *PMOI*, the D.C. Circuit held that although courts could review other aspects of the validity of the Secretary of State's designation of a foreign entity as a terrorist organization, they could not review the determination that such an entity "threatens the security of United States nationals." *Id.* at 23 (quoting 8 U.S.C. § 1189(a)(1)(C)). Such an issue was "nonjusticiable." *Id.* [8] This Court should similarly decline to announce a standard to determine whether the alleged targets posed a "concrete, specific, and imminent threat." *See Al-Aulaqi*, 727 F. Supp. 2d at 47. [9]

---

[8] Defendants do not that suggest the particular threat standard applicable in *PMOI* would apply here. Rather, the point is that the standard here, as pled by Plaintiffs, involves an inquiry that is non-justiciable, as did the inquiry in *PMOI*.

[9] The precise question of whether Anwar Al-Aulaqi posed a "concrete, specific, and imminent" threat was the subject of the military and state secrets privilege invoked in *Al-Aulaqi v. Obama*.

The other two specific issues Plaintiffs contend this Court must resolve also lack judicially manageable standards. Whether other "means short of lethal force" were available that "could reasonably have been used" to counter "any" threat the alleged targets posed, Compl. ¶ 24, is not a question the Judiciary is suited to decide. Myriad military, intelligence, and foreign policy considerations arise from the issue of whether less-than-lethal means were "reasonably" available to counter a threat posed by a leader of AQAP in the course of this armed conflict. Such a determination necessarily would require the Judiciary to weigh—in hindsight—the costs and benefits of other possible options. For example, perhaps the United States could send ground troops into Yemen to attempt to apprehend someone who, like Anwar Al-Aulaqi, was a leader of AQAP. But surely such an operation would present its own unique risks of harm to those troops, collateral damage, and foreign policy consequences. It could also raise the possibility of U.S. soldiers captured in foreign lands by hostile enemies—with significant humanitarian, diplomatic, and military implications. These are but a few of the host of considerations that would have to be balanced when determining whether "means short of lethal force" were "reasonably" available. These considerations are "delicate, complex, and involve large elements of prophecy." *Waterman*, 333 U.S. at 111. They "should be undertaken only by those directly responsible to the people whose welfare they advance or imperil." *Id.*

Whether, as Plaintiffs contend, other "feasible measures" were available "to protect bystanders from harm" during the alleged strikes, Compl. ¶¶ 31, 35, 40, also raises a host of considerations most appropriately evaluated by the political branches. Determining which

---

*See* Clapper Decl. at ¶ 18 (asserting privilege over "information that relates to the terrorist threat posed by Anwar al-Aulaqi, including information related to whether this threat may be 'concrete,' 'specific' or 'imminent'"). The United States, which is not a party to this suit, has filed a statement of interest and has reserved its right to invoke the state secrets privilege in the event this case proceeds beyond the motion-to-dismiss stage.

"feasible measures" to protect bystanders are "legally required," *id.*, when missiles are allegedly launched from RPAs at a leader of AQAP and at an AQAP operative abroad, requires an analysis to which the Judiciary is ill-suited. Relevant factors could include what other assets were available in the region at the time; where they were located; how long it would take to divert them for an operation; whether the alleged target would have moved to another location by the time those assets arrived; what risks would arise from removing those assets from their original locations; what additional risks may arise to U.S. forces during the modified operation; and any additional risks to civilians during the operation. And this list would only be the tip of the iceberg. The courts, however, "lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded." *El-Shifa*, 607 F.3d at 844. Moreover, the nature of intelligence-gathering at a given moment may also be fluid—requiring action far more flexible than a judicial proceeding is equipped to reflect. Indeed, a court case—which may take years to resolve—would not produce a manageable, specific, and useful standard in this rapidly evolving context.[10]

In short, there is a notable lack of "judicially manageable" standards necessary to litigate Plaintiffs' complaint. Accordingly, the second *Baker* factor applies and warrants dismissal.

### C. Resolution of Plaintiffs' claims requires an initial policy determination that would show a "lack of the respect due" to the political branches.

The third and fourth *Baker* factors also warrant dismissal. The decision to use lethal force involves policy choices—to be taken in light of fast-paced and evolving intelligence available

---

[10] Nor does the legal framework for domestic law-enforcement provide an appropriate guide. The context of Plaintiffs' claims—alleged missile strikes abroad against enemy targets in the course of armed conflict—is wholly distinct. *Cf. Lebron v. Rumsfeld*, 670 F.3d 540, 554 (4th Cir. 2012) ("The inquiries presaged by Padilla's action are far removed from questions of probable cause or deliberate indifference to medical treatment routinely confronted by district courts in suits under 42 U.S.C. § 1983 or *Bivens*." (citations omitted)), *cert. denied*, 132 S. Ct. 2751 (2012).

regarding specific threats posed by armed terrorist organizations that operate outside the constraints of the laws of war and hide amongst civilian populations—that are "of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. It requires balancing the risk of harm to our Nation and the potential consequences of using force. Similarly, whether non-lethal means were "reasonably" available requires "policy choices and value determinations." *Japan Whaling*, 478 U.S. at 230. As detailed above, the risks to ground forces that may or may not be tolerable as a possible non-lethal alternative to a purported missile strike clearly involve policy choices, as do the foreign policy implications that making such an operational choice abroad might entail.

Any decision on the potential level of harm to innocent bystanders that may be tolerable in the context of alleged missile strikes against enemy targets overseas in an armed conflict undoubtedly raises policy choices for executive, not judicial, determination. As Plaintiffs implicitly acknowledge, Compl. ¶¶ 35, 40, civilian casualties are a regrettable but ever-present reality in armed conflict. The question is not whether such casualties will occur, but rather if they do, what amount of risk of harm to bystanders would be consistent with an appropriate use of force under the circumstances, based on principles that guide the Executive in an armed conflict. Moreover, judicially crafted standards that are specific, particular, and applied to a given set of facts may prevent or control the contours of future operations involving armed force overseas, which could inhibit the Executive's ability to carry out its national self-defense prerogative. These issues all require "policy choices and value determinations" that are reserved for the Executive. *Japan Whaling*, 478 U.S. at 230.

Deciding these issues in the context of this case would also fail to acknowledge the distinct role and structure of judicial decision-making in relation to the political branches, and would thus show a "lack of the respect due" to those branches, the fourth *Baker* factor. The

18

Judiciary has "institutional limitations" when it comes to "strategic choices" involving national security and foreign affairs. *El-Shifa*, 607 F.3d at 843. Unlike the Executive, "the judiciary has no covert agents, no intelligence sources, and no policy advisors." *Schneider*, 412 F.3d at 196. Moreover, the "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan*, 413 U.S. at 10. "The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability." *Id.* Thus, "[i]t is not the role of judges to second-guess, with the benefit of hindsight, another branch's determination that the interests of the United States call for military action." *El-Shifa*, 607 F.3d at 844.

The use of RPAs to combat the threat to this Nation's security emanating from abroad posed by al-Qa'ida and associated forces involves just such a considered policy choice. *See* Robert Chesney, *Text of John Brennan's Speech on Drone Strikes Today at the Wilson Center (RPA Speech)*, Lawfare (Apr. 30, 2012, 12:50 pm), http://www.lawfareblog.com/2012/04/ brennanspeech/ ("Targeted strikes are wise.").[11] A finding by a court that another method of counterterrorism was more appropriate under the precise circumstances alleged—and in fact was constitutionally required—would show a "lack of the respect due" to the Executive's policy choices regarding how to conduct a congressionally authorized armed conflict and its national defense mission. *See El-Shifa*, 607 F.3d at 844; *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003) ("It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.").

---

[11] Because Plaintiffs refer to the above speech and quote from it, *see* Compl. ¶ 18, it can be considered in deciding this motion to dismiss. *See Vanover*, 77 F. Supp. 2d at 99.

As noted, here, in addition to its inherent national self-defense prerogative, the Executive's alleged conduct is consistent with an affirmative act of Congress—the Authorization for Use of Military Force. *See* Pub. L. No. 107-40, 115 Stat. 224 (reprinted at 50 U.S.C. § 1541 note) (AUMF). Judicial intervention in these matters would thus be particularly inappropriate, given that the political branches have exercised their respective constitutional authorities to protect national security in this arena. For example, Congress, through the AUMF, authorized the Executive to use necessary and appropriate military force against al-Qa'ida and associated forces.[12] Accordingly, as alleged, these strikes would be consistent with both law and policy. Under such circumstances, the Executive's actions are afforded the "strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 636 (1952) (Jackson, J., concurring).

Finding the alleged strikes unlawful would show a lack of respect not only to the Executive, but also to Congress. Congress has had the opportunity to modify the AUMF or pass legislation limiting the Executive's ability to carry out such alleged strikes. Yet despite numerous public statements by Executive Branch officials indicating that the AUMF provides legal authority for targeted strikes against enemy forces beyond the battlefields of Afghanistan,[13] Congress has not modified the AUMF to preclude their use, nor has it passed any other law

---

[12] Given public information regarding its relationship with al-Qa'ida, AQAP is either part of, or an "associated force" of, al-Qa'ida and therefore falls within the AUMF's ambit. *Cf. Khan v. Obama*, 655 F.3d 20, 32-33 (D.C. Cir. 2011) (upholding detention under the AUMF of member of "associated force" of al-Qa'ida); *see* Statement for Record, Senate Homeland Security and Government Affairs Committee, "Nine Years After 9/11: Confronting the Terrorist Threat to the Homeland," September 22, 2010 at 2, 4-5 (statement of then-Director of the National Counterterrorism Center Michael Leiter), attached as exhibit in *Al-Aulaqi*, No. 10-cv-1469 (D.D.C. Sept. 25, 2010), ECF No. 15-4.

[13] *See, e.g.*, RPA Speech at 3; Holder Speech at 3. *See also* Harold Hongju Koh, *The Obama Administration and International Law*, *available at* http://www.state.gov/s/l/releases/remarks/139119.htm (last visited Dec. 6, 2012), at 8.

limiting the Executive's authority to conduct missile strikes of the type alleged here.[14]

Accordingly, a judicial finding that the alleged strikes were illegal would show a lack of deference regarding policy choices made by the political branches. It would take the Judiciary well beyond its traditional role and would thrust it into the realm of policymaking. *See Schneider*, 412 F.3d at 197 ("To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking."). And it would upend the carefully balanced "relationship between the judiciary and the coordinate branches of Federal Government," *Baker*, 369 U.S. at 210, and violate the separation of powers the Constitution enshrines.

In sum, at a minimum, the first four *Baker* factors apply. Plaintiffs' complaint raises non-justiciable political questions. Accordingly, this Court should dismiss this case.

## III.   Under Governing Precedent, Special Factors Preclude a Damages Remedy.

Even if this Court determines that Plaintiffs have the capacity to sue and their claims do not raise non-justiciable political questions, the issues detailed above counsel against devising a discretionary damages remedy not authorized by Congress in this highly sensitive context.

### A.  Plaintiffs' claims raise separation-of-powers concerns, which counsel hesitation.

As a threshold matter, the separation-of-powers concerns detailed in the preceding section apply with special force when considering whether to infer a new damages remedy in this context at all. Indeed, the five federal courts of appeals—the D.C., Ninth, and Fourth Circuits,

---

[14] Not only have members of the Executive Branch made public statements regarding counterterrorism operations carried out under the AUMF, but the Legislative Branch has been explicitly notified of alleged missile strikes—and has not acted to preclude them. *See* Sen. Dianne Feinstein, *Letters: Sen. Feinstein on Drone Strikes*, L.A. Times, May 17, 2012 (noting that the Senate Intelligence Committee receives "key details" shortly after each strike; has held twenty-eight oversight meetings to question "every aspect" of the targeting program, "including legality"; and "has been satisfied with the results").

the en banc Second Circuit, and most recently the en banc Seventh Circuit—to address whether to infer civil damages actions against federal officials in novel separation-of-powers contexts have unanimously declared: "No."[15]

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court inferred a damages remedy under the Fourth Amendment against federal law enforcement agents operating domestically for an allegedly unlawful arrest of an individual in his Brooklyn apartment. *Id.* at 389, 397. The Court did so only after noting that the case "involves no special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 396. Since that decision, the Court has inferred a damages remedy in new contexts only twice. *See Carlson v. Green*, 446 U.S. 14 (1980) (prisoner in federal prison); *Davis v. Passman*, 442 U.S. 228 (1979) (employment discrimination). In the thirty-two years since *Carlson*, the Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).[16]

As this case law makes clear, a *Bivens* remedy is "not an automatic entitlement no matter what other means there may be to vindicate a protected interest." *Wilkie*, 551 U.S. at 550.

---

[15] *See Vance v. Rumsfeld*, --F.3d--, 2012 WL 5416500, *3-8 (7th Cir. Nov. 7, 2012) (en banc); *Mirmehdi v. United States*, 689 F.3d 975, 982-83 (9th Cir. 2012), *cert. petition filed*, No. 12-522 (U.S. Oct. 22, 2012); *Doe v. Rumsfeld*, 683 F.3d 390, 394-96 (D.C. Cir. 2012); *Lebron*, 670 F.3d at 548-49; *Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) (en banc).

[16] *See Minneci v. Pollard*, 132 S. Ct. 617, 620 (2012) (refusing to infer damages remedy against private contractors working in federal prison); *Wilkie v. Robbins*, 551 U.S. 537, 560-62 (2007) (refusing to infer damages remedy against federal employees who "push too hard" in performing their duties); *FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (refusing to infer damages remedy against federal agencies); *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988) (refusing to infer damages remedy for allegedly improper denial of social security benefits); *United States v. Stanley*, 483 U.S. 669, 679-80 (1987) (refusing to infer damages remedy for former serviceman against military and civilian personnel); *Chappell v. Wallace*, 462 U.S. 296, 301-02 (1983) (refusing to infer damages remedy for servicemen against superiors); *Bush v. Lucas*, 462 U.S. 367, 390 (1983) (refusing to infer damages remedy for alleged First Amendment violation in government personnel decision).

Instead, judicial creation of such a remedy in a new context is a matter of discretion. *See id.* ("[A] *Bivens* remedy is a subject of judgment."). *See also Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) ("We have discretion in some circumstances to create a remedy against federal officials for constitutional violations, but we must decline to exercise that discretion where special factors counsel hesitation." (quotation and citation omitted)). It may be undertaken only after a court has *both* determined that no "alternative, existing process for protecting the interest" is present, *and* made "a remedial determination that is appropriate for a common-law tribunal" to decide whether to authorize "a new kind of federal litigation." *Wilkie*, 551 U.S. at 550. In making this determination, a court should pay "particular heed" to any "special factors counselling hesitation." *Id.* Moreover, implied causes of action like *Bivens* are "disfavored." *Iqbal*, 556 U.S. at 675. *See also Vance*, 2012 WL 5416500 at *4 ("Whatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated."). Accordingly, the threshold for whether a special factor counsels hesitation in creating a damages remedy "is remarkably low." *Arar*, 585 F.3d at 574.

Given the Supreme Court's refusal to extend *Bivens* into new contexts, the core separation-of-powers concerns that demonstrate that Plaintiffs' claims raise political questions certainly counsel against *inferring* a remedy in this context. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) ("Whether or not this is . . . a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief."). Also, as explained above, whether alleged missile strikes against enemy forces in foreign countries to counter threats from an armed enemy abroad should be undertaken as a matter of policy involves weighing and appraising a "host of considerations." *Bush*, 462 U.S. at 380. In addition, allowing money damages suits

against military officers for alleged actions taken on the battlefield would risk "fettering" field commanders in their operations. *Ali v. Rumsfeld*, 649 F.3d 762, 773 (D.C. Cir. 2011). Thus, if any remedy should be available here, it should be created by "those who write the laws, rather than . . . those who interpret them." *Bush*, 462 U.S. at 380.[17]

Indeed, in the context presented here, "those who write the laws" have made a deliberate choice *not* to create a judicially enforceable cause of action. Instead of providing a judicial remedy for harms arising from combat activities abroad, Congress has funded Executive Branch programs permitting military commanders to provide discretionary "humanitarian relief" in active theaters of war. Pub. L. No. 108-106, 117 Stat. 1209, 1215 (2003).[18] That Congress forbade judicial relief for combat activities abroad and instead chose to provide certain discretionary relief through the Executive strongly counsels hesitation in augmenting such decisions by way of judicially implied remedies. *See Vance*, 2012 WL 5416500, at *7.

**B. Plaintiffs' claims raise additional special factors under D.C. Circuit precedent.**

Aside from these over-arching separation-of-powers concerns, Plaintiffs' claims directly implicate four special factors under binding precedent: (1) national security; (2) the effectiveness of the military; (3) the risk of disclosing classified information; and (4) foreign affairs. Any *one*

---

[17] To the extent Plaintiffs may attempt to rely on customary international law as support for their individual-capacity damages claims, such an attempt must fail. The Constitution does not perforce incorporate all customary international law. *See United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law."). When Congress has wanted to make claims for violations of customary international law actionable in domestic courts, it has done so. *See, e.g.*, 18 U.S.C. § 2441 (war crimes); 28 U.S.C. § 1350 (tort claims); 10 U.S.C. § 821 (law of war).

[18] The Military Claims Act, 10 U.S.C. § 2733, and the Foreign Claims Act, 10 U.S.C. § 2734, are among other vehicles Congress has provided to offer compensation for injuries caused by the military. Both provisions, however, allow for compensation through an administrative process, not a judicial one. *See* 10 U.S.C. §§ 2733(a), 2734(a). More importantly, both preclude compensation for injuries resulting from combat. *See id.*

would warrant denying a judge-made constitutional tort remedy in this novel context. Together, they are overwhelming.

First, the D.C. Circuit has repeatedly held that where claims directly implicate matters involving national security and particularly war powers, special factors counsel hesitation. *See Doe*, 683 F.3d at 394-95 (discussing the "strength of the special factors of military and national security" in refusing to infer remedy for citizen detained by military in Iraq); *Ali*, 649 F.3d at 773 (explaining that "the danger of obstructing U.S. national security policy" is a special factor in refusing to infer remedy for aliens detained in Iraq and Afghanistan (internal quotation and citation omitted)); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009) (same for aliens detained at Guantánamo Bay). These cases alone should control Plaintiffs' claims here. Plaintiffs challenge the alleged targeting of and missile strikes against members of AQAP in Yemen. Few cases more clearly present "the danger of obstructing U.S. national security policy" than this one. *Ali*, 649 F.3d at 773. Accordingly, national security considerations bar inferring a remedy for Plaintiffs' claims.[19]

Second, Plaintiffs' claims implicate the effectiveness of the military. As with national security, the D.C. Circuit has consistently held that claims threatening to undermine the military's command structure and effectiveness present special factors. *See Doe*, 683 F.3d at 396; *Ali*, 649 F.3d at 773. Allowing a damages suit brought by the estate of a leader of AQAP against officials who allegedly targeted and directed the strike against him would fly in the face of

---

[19] Decedents' citizenship does not affect this analysis. *See Vance*, 2012 WL 5416500 at *8 ("We do not think that the plaintiffs' citizenship is dispositive one way or the other."); *Doe*, 683 F.3d at 396 (holding that the plaintiff's citizenship "does not alleviate" the special factor of national security). *See also Lebron*, 670 F.3d at 554 (noting, in case involving treatment of U.S. citizen, that "[t]he source of hesitation is the nature of the suit and the consequences flowing from it, not just the identity of the plaintiff."). Indeed, all Supreme Court cases in which the Court has precluded a *Bivens* remedy because of special factors involved U.S. citizens. *See, e.g., Stanley*, 483 U.S. at 671; *Chappell*, 462 U.S. at 297.

explicit circuit precedent. As the court in *Ali* explained: "It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." 649 F.3d at 773 (quoting *Eisentrager*, 339 U.S. at 779). Moreover, allowing such suits to proceed "would diminish the prestige of our commanders, not only with enemies but with wavering neutrals." *Id.*; *see also Vance*, 2012 WL 5416500 at *5 ("The Supreme Court's principal point was that civilian courts should not interfere with the military chain of command . . . ."); *Lebron*, 670 F.3d at 553 (barring on special factors grounds *Bivens* claims by detained terrorist because suit would "require members of the Armed Services and their civilian superiors to testify in court as to each other's decisions and actions" (citation and internal quotation omitted)).

Creating a new damages remedy in the context of alleged missile strikes against enemy forces in Yemen would have the same, if not greater, negative outcome on the military as in the military detention context that is now well-trodden territory in this and other circuits. These suits "would disrupt and hinder the ability of our armed forces to act decisively and without hesitation in defense of our liberty and national interests." *Ali*, 649 F.3d at 773 (citation and internal quotation omitted). To infuse such hesitation into the real-time, active-war decision-making of military officers absent authorization to do so from Congress would have profound implications on military effectiveness. This too warrants barring this new species of litigation.

Third, Plaintiffs' claims raise the specter of disclosing classified intelligence information in open court. The D.C. Circuit has recognized that "the difficulties associated with subjecting allegations involving CIA operations and covert operatives to judicial and public scrutiny" are pertinent to the special factors analysis. *Wilson*, 535 F.3d at 710. In such suits, "'even a small

26

chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to close up like a clam.'" *Id.* (quoting *Tenet v. Doe*, 544 U.S. 1, 11 (2005)). And where litigation of a plaintiff's allegations "would inevitably require an inquiry into 'classified information that may undermine ongoing covert operations,'" special factors apply. *Wilson*, 535 F.3d at 710 (quoting *Tenet*, 544 U.S. at 11). *See also Vance*, 2012 WL 5416500 at *8 ("When the state-secrets privilege did not block the claim, a court would find it challenging to prevent the disclosure of secret information."); *Lebron*, 670 F.3d at 554 (noting that the "chilling effects on intelligence sources of possible disclosures during civil litigation and the impact of such disclosures on military and diplomatic initiatives at the heart of counterterrorism policy" are special factors); *Arar*, 585 F.3d at 576 (holding that the risk of disclosure of classified information is a special factor in the "extraordinary rendition" context).

This precedent controls here. Plaintiffs' allegations that Department of Defense and CIA officials targeted Al-Aulaqi and then "authorized and directed" a series of missile strikes in Yemen are claims which—assuming their truth as pled for purposes of this motion only—would "inevitably require an inquiry into classified information," *Wilson*, 535 F.3d at 710, as the United States has made clear in its statement of interest.[20] The Court thus should not infer a novel remedy in this context.

Lastly, litigating this suit directly implicates foreign affairs, yet another special factor

---

[20] *See, e.g.*, United States' Statement of Interest at 3-4 (noting that the United States previously invoked the state secrets privilege over "information that relates to the terrorist threat posed by Anwar Al-Aulaqi, including information related to whether this threat may be 'concrete,' 'specific,' or 'imminent'"; "[i]ntelligence information concerning Anwar al-Aulaqi"; "any information concerning . . . criteria or procedures [the Department of Defense] may utilize in connection with [military operations in Yemen]"; and "any information, if it exists, that would tend to confirm or deny any allegations" regarding CIA involvement in the purported targeting of Anwar Al-Aulaqi).

under binding precedent. *See Ali*, 649 F.3d at 774 ( "[T]he danger of foreign citizens' using the courts . . . to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." (quoting *Sanchez-Espinoza*, 770 F.2d at 209)). Although Plaintiffs' decedents are all U.S. citizens, and therefore the precise foreign affairs concerns detailed in *Ali* and *Sanchez-Espinoza* do not squarely arise in this case, *see Doe*, 683 F.3d at 396, without question, litigating the allegations in this case, which involve at least one foreign citizen and purported events abroad, threatens to disrupt U.S. foreign policy. *Cf. Vance*, 2012 WL 5416500 at *4 ("The [Supreme] Court has never created or even favorably mentioned a nonstatutory right of action for damages on account of conduct that occurred outside the borders of the United States.").[21]

Plaintiffs' claims, if litigated, could clearly affect our government's relations with the government of Yemen. Litigating these issues also could affect our relations with Egypt because Plaintiffs claim Defendants specifically targeted and attempted to kill an Egyptian national. *See* Compl. ¶ 37. Beyond these countries, Plaintiffs allege that the United States has conducted strikes in other countries as well. *See id.* ¶ 1. Assuming the truth of Plaintiffs' allegations, adjudication of this case could disrupt U.S. relations with these countries too. It takes little imagination to envision the repercussions on foreign relations that could be spurred by the creation of an entirely novel and discretionary damages remedy—in private civil litigation no less. Given the above separation-of-powers, national security, military effectiveness, classified information, and foreign policy concerns—and the binding precedent on these issues—the Court should decline to create a remedy for Plaintiffs' claims in this novel context.

---

[21] Indeed, even Congress's express authorization of damages actions against the United States, the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401, 2671-80, does not allow for claims arising from injuries occurring abroad. *Id.* § 2680(k).

**IV.     Defendants Are Entitled to Qualified Immunity.**

In this suit, Plaintiffs seek money damages from the personal resources of individual

federal officials. The Supreme Court has long recognized that such personal-capacity suits

"entail substantial social costs, including the risk that fear of personal monetary liability and

harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987). In light of these concerns, government officials performing

discretionary functions are protected by qualified immunity and cannot be liable unless their

actions violate "clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

For a right to be clearly established, the "contours" of the right "must be sufficiently clear

that a reasonable officer would understand that what he is doing violates that right." *Anderson*,

483 U.S. at 640. The Court has "repeatedly" instructed lower courts "not to define clearly

established law at a high level of generality." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2084 (2011).

Instead, the law must be defined "in a more particularized, and hence more relevant, sense."

*Anderson*, 483 U.S. at 640. In essence, qualified immunity contains a "fair notice" requirement.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002). It is meant to protect all but the "plainly incompetent"

or those who "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And

although guiding precedent need not be directly on point for a right to be clearly established,

"existing precedent must have placed the  . . . constitutional question *beyond debate*." *Al-Kidd*,

131 S. Ct. at 2083 (emphasis added). Therefore, to overcome a qualified immunity defense, a

complaint must plead two things: that a constitutional right was violated, and that the contours of

the right violated were clearly established "beyond debate." *Id.*

When addressing a qualified immunity defense, courts exercise their "sound discretion"

in deciding whether first to consider the constitutional question, or to forego the constitutional

inquiry altogether and proceed immediately to the second prong. *Pearson*, 555 U.S. at 236.

Under the longstanding principle of constitutional avoidance, courts should resolve a case on

clearly-established grounds alone whenever possible. *See Ashwander v. TVA*, 297 U.S. 288, 346-

47 (1936) (Brandeis, J., concurring). Indeed, the "usual adjudicatory rules suggest that a court

*should* forbear" resolving the constitutional issue in qualified immunity cases. *Camreta v.

Greene*, 131 S. Ct. 2020, 2031 (2011). The D.C. Circuit has clearly heeded this counsel, noting

that the earlier "*Saucier* procedure" of deciding the constitutional issue first "is not appropriate in

most cases." *Ali*, 649 F.3d at 773 (proceeding directly to clearly-established prong in dismissing

claims directly implicating national security); *see also Rasul*, 563 F.3d at 530 (same).[22]

     Beyond the principle of constitutional avoidance, the Supreme Court has provided

additional guideposts for when courts should proceed directly to the second prong. For example,

in cases where it is "plain that a constitutional right is not clearly established," courts should

resolve the case on that basis. *Pearson*, 555 U.S. at 237. So too where a court can "rather quickly

and easily decide" there was no clearly established violation. *Id.* at 239. Also, where the

constitutional inquiry is highly fact-dependent—and, as is often the case at the pleadings stage,

the factual record is scant—a decision on the constitutional issue will provide "little guidance"

for future cases and should be avoided. *Id.* at 237 (citations omitted).

     These guideposts all apply here. There is no precedent decided in the unique and

extraordinary circumstances alleged here: the purported targeting by military and intelligence

officers, in the course of waging war, of a U.S. citizen abroad who was declared a leader of an

---

[22] Under *Saucier v. Katz*, 533 U.S. 194 (2001), courts were required to address the constitutional issue first before proceeding to the question of whether the alleged right was clearly established. The Supreme Court abandoned this requirement in *Pearson*.

armed terrorist group. Nor does any body of case law involve the specific context of the death of

U.S. citizens abroad as the unintended result of such alleged operations. Accordingly, regardless

of the particular constitutional provision at issue, it can "rather quickly and easily" be determined

that the contours of any constitutional right allegedly violated were not clearly established, let

alone so clearly established as to *require* officials to disregard the legal analysis Plaintiffs allege

the Executive Branch conducted. *See* Compl. ¶ 25 (alleging the Department of Justice provided

"legal justifications" for the purported targeting of Anwar Al-Aulaqi). Moreover, avoiding the

constitutional question is appropriate here because deciding abstract principles based on sparse

pleadings would provide "little guidance" to courts in what would ultimately be a highly fact-

dependent inquiry. *See Scott v. Harris*, 550 U.S. 372, 383 (2007) (noting that resolution of

Fourth Amendment claim requires court to "slosh" its way "through the factbound morass of

'reasonableness'"); *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("What we have

said of due process in the procedural sense is just as true here: . . . 'Asserted denial is to be tested

by an appraisal of the totality of facts in a given case.'" (citation omitted)). Therefore, each

principle warrants proceeding directly to the second prong of the qualified immunity analysis.[23]

### A. Plaintiffs fail to allege the violation of a clearly established right.

The three decedents in this case are U.S. citizens allegedly killed abroad during armed

conflict. Given the unique and extraordinary context of these allegations, the extent to which

particular Fourth and Fifth Amendment rights apply to decedents simply is not clearly

established. Context is "a potentially recurring scenario that has similar legal and factual

---

[23] Furthermore, because binding circuit precedent on both the political question doctrine and special factors demonstrates that this case should be dismissed, *see supra* Parts II-III, the above guidance with respect to the lack of clarity in the governing legal principles applies with even more force. Accordingly, if this Court determines it needs to reach qualified immunity at all, it should proceed directly to the clearly established prong.

components." *Arar*, 585 F.3d at 572. *See also Mirmehdi*, 689 F.3d at 981. The context here is unique for a number of reasons: it is an alleged (1) military and intelligence action; (2) abroad; (3) during the course of ongoing armed conflict; (4) targeting a U.S. citizen declared a leader of an armed terrorist group (and Al-Banna, a non-citizen enemy). Thus, an analysis of the extraterritorial question presented requires this Court to determine whether, and to what extent, to judicially enforce the particular Fourth and Fifth Amendment protections that may apply to a U.S. citizen allegedly targeted and killed—or inadvertently killed—by a purported missile strike abroad on members of an organization against which the political branches have authorized the use of all necessary and appropriate force. There are no cases holding such conduct illegal, let alone illegal "beyond debate." *Al-Kidd*, 131 S. Ct. at 2083. To the extent the Supreme Court has discussed the constitutional rights of U.S. citizens abroad, it has generally done so in the context of custody, detention, or trials—not in the active battlefield. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (plurality) (detention); *Reid v. Covert*, 354 U.S. 1 (1957) (plurality) (trials).

The absence of case law on point is notable. The United States military killed thousands of U.S. citizens during the Civil War, and also likely killed U.S. citizens fighting abroad as part of enemy forces during more recent wars, such as World War II. *Cf. Ex parte Quirin*, 317 U.S. 1, 37-38 (1942). Not only have no courts adjudicated the constitutional claims of such casualties, there is not even a judicially recognized test—as a matter of constitutional law—that is accepted to apply in this context. And there would be sound reasons to conclude that no test the Supreme Court has articulated to date—in either the Fourth or Fifth Amendment arenas—adequately accounts for the extremely weighty government interests during armed conflict abroad against declared enemies. Thus, the extraterritorial application of the specific provisions Plaintiffs invoke in this context is not clearly established. *Cf. Reid*, 354 U.S. at 75 ("[T]he question of

32

which specific safeguards of the Constitution are appropriately to be applied in a *particular context* overseas can be reduced to the issue of what process is 'due' . . . in the *particular circumstances* of a *particular case*." (emphasis added)). Moreover, no court has explained whether or how the Fourth and Fifth Amendments apply to operations involving armed force in a foreign country. Given the unique and extraordinary circumstances alleged by Plaintiffs' complaint, and the standards for qualified immunity, it is impossible to avoid the conclusion that any rights decedents had under the Fourth and Fifth Amendments were not clearly established. Thus, qualified immunity applies.

**B. Decedents' Fourth Amendment rights were not clearly established.**

In Count II of Plaintiffs' complaint, Plaintiffs allege each decedent was unconstitutionally "seized" in violation of the Fourth Amendment. Compl. ¶ 42. Because the Supreme Court has suggested that traditional notions of the Fourth Amendment may not apply in the context of the conduct of armed conflict abroad, and because sufficiently analogous case law in the lower courts is wholly lacking, the scope of any Fourth Amendment rights of decedents was not clearly established. To the extent the Supreme Court has intimated anything in this extraterritorial context, it has suggested at most that Fourth Amendment protections would be limited. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Court noted that application of the Fourth Amendment in the context of military action abroad to protect national security "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Id.* at 273-74. *Cf. Hamdi*, 542 U.S. at 534 (plurality) (noting that "initial captures on the battlefield" need not receive the due process protections required for U.S. citizens in the context of lengthy military detention). Certainly, nothing in the existing body of precedent clearly establishes that routine application of the Fourth Amendment to the conduct

alleged—at least to the same extent and in the same manner it applies in the domestic law-enforcement context—would be workable. *Cf. Verdugo*, 494 U.S. at 278 (Kennedy, J., concurring) (noting that the "need to cooperate with foreign officials" and the implications for military actions abroad, *inter alia*, make it "impracticable and anomalous" to apply the Fourth Amendment to searches abroad of aliens without property or presence in the United States).

Moreover, most of the scant case law on the application of the Fourth Amendment to U.S. citizens abroad involves searches—not seizures.[24] The only case addressing the "seizure" of a U.S. citizen in an active theater of war—*Kar v. Rumsfeld*—is inapposite. There, Iraqi troops detained plaintiff at a checkpoint after finding suspicious items in the taxi he travelled in and transferred him to U.S. forces. *Kar*, 580 F. Supp. 2d at 85-86. The *Kar* plaintiff did not challenge his initial arrest and detention. *Id.* at 84. Rather, he challenged acts of U.S. officials after they had custody of him. Even then, the court found that plaintiff's Fourth and Fifth Amendment rights were not clearly established. *Id.* at 85-86. Thus, *Kar* provides no guidance for the seizures alleged here—alleged missile strikes at designated targets from RPAs circling above Yemen in the context of an ongoing armed conflict. Given *Verdugo*'s intimation of the Fourth Amendment's limited application, the lack of other case law providing relevant guidance, and the unique context of Plaintiffs' claims, the contours of any Fourth Amendment protections here were not clearly established.

---

[24] *See Gillars v. United States*, 182 F.2d 962, 973-74 (D.C. Cir. 1950) (assuming without deciding that Fourth Amendment protections applied to warrantless search of citizen's apartment in post-war, occupied Germany in holding that no violation occurred); *Best v. United States*, 184 F.2d 131, 140 (1st Cir. 1950) (finding reasonable warrantless search of citizen's apartment in post-war, occupied Austria); *Kar v. Rumsfeld*, 580 F. Supp. 2d 80, 85 (D.D.C. 2008) (applying Fourth Amendment to arrest and detention of citizen by military in wartime Iraq); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 277 (S.D.N.Y. 2000) (applying Fourth Amendment to warrantless search of citizen's home in Kenya, but adopting exception to warrant requirement where search aimed at foreign intelligence gathering against foreign powers and their agents).

Plaintiffs, then, are left to argue that this Court should import a Fourth Amendment standard from the domestic law enforcement context and apply it to the alleged facts of this case. But the very process of importing such a standard for the first time into a unique context *itself* makes the law not clearly established. Finally, even were this Court to rely on domestic Fourth Amendment law enforcement case law by analogy, the case law that is arguably most analogous from the domestic context does not (as explained below) warrant the finding of a constitutional violation, let alone a clearly established one.

### C. Assuming the Fourth Amendment extends to this unique context, Plaintiffs fail to state a violation.

The Fourth Amendment protects "the people" from "unreasonable . . . seizures." U.S. Const. amend. IV. The burden is upon Plaintiffs to state a Fourth Amendment claim. To state such a claim, Plaintiffs must show both that a "seizure" of each decedent occurred, and that it was "unreasonable." In the domestic law-enforcement context, a "seizure" only occurs when government action terminates freedom of movement "*through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597-99 (1989) (holding driver of car that collided with police roadblock was seized). Under *Brower*, the "means intentionally applied" must terminate the movement of the *intended* target to constitute a seizure. *See Emanuel v. District of Columbia*, 224 F. App'x 1, 2 (D.C. Cir. 2007) ("There is no evidence that Officer Long intended to shoot Emanuel rather than the plainclothes officer, as a valid [Fourth Amendment] claim requires." (citing *Brower* and other cases)). *Cf. Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (analyzing claim of decedent killed by police sniper under the Fourth Amendment).

Because the context of Plaintiffs' claims is unique, however, there is no clear body of case law to apply to the Fourth Amendment claims here. Courts have repeatedly held that law enforcement officials who shoot at fleeing or resisting suspects and accidently strike bystanders

do not seize those bystanders.[25] To the extent any traditional domestic law-enforcement cases

apply by analogy, those cases provide the closest analogy and foreclose Abdulrahman Al-

Aulaqi's and Samir Khan's unique Fourth Amendment claims. As pled, the alleged targets were

Anwar Al-Aulaqi and Al-Banna. *See* Compl. ¶¶ 31, 37. Based on these allegations, Abdulrahman

Al-Aulaqi was a bystander unintentionally struck by the alleged launch against Al-Banna, and

Samir Khan was a bystander unintentionally struck by the alleged launch against Al-Aulaqi.

Assuming the Fourth Amendment applies here in the same manner it does in the domestic law-

enforcement context, no seizure of these individuals would have occurred, and any Fourth

Amendment reasonableness inquiry regarding them is inapplicable. And to the extent that the

above analogy suffers because of the extraordinary context of Plaintiffs' claims, that is a

detriment to Plaintiffs, who carry the burden to state a claim.

     As for Anwar Al-Aulaqi, Plaintiffs cannot establish that his alleged seizure—assuming it

occurred as claimed—was as a matter of law unreasonable. Any reasonableness inquiry requires

a "careful balancing of the 'nature and quality of the intrusion on the individual's Fourth

Amendment interests' against the countervailing governmental interests at stake." *Graham v.

Connor*, 490 U.S. 386, 396 (1989) (citation omitted). The proper application of this "careful

balancing" requires a focus on "the facts and circumstances of each particular case." *Id.* at 396.

Relevant "facts and circumstances" include the severity of the crime at issue, the threat an

individual poses, and whether that individual is evading arrest through flight. *Id.* Even as

Plaintiffs allege the facts to be, Anwar Al-Aulaqi's seizure cannot be said to be unreasonable.

---

[25] *See, e.g.*, *Emanuel*, 224 F. App'x at 2 (no seizure of bystander killed by stray bullet during
arrest of suspect); *Childress v. City of Arapaho, Okla.*, 210 F.3d 1154, 1157 (10th Cir. 2000) (no
seizure of mother and child held hostage who were accidentally shot during high-speed chase of
hostage takers); *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (no seizure of
bystander hit by stray bullet during gun battle with suspect); *Medeiros v. O'Connell*, 150 F.3d
164, 168 (2d Cir. 1998) (no seizure of hostage hit by stray bullet during rescue attempt).

A seizure satisfies this balancing test so long as it is "objectively reasonable." *Harris*, 550 U.S. at 381. Even in the domestic law-enforcement context, when lethal force is used, no "magical on/off switch" exists to trigger "rigid preconditions" for when such force may be reasonable. *Id.* at 382. Instead, the objective reasonableness of a specific use of force "must be judged from the perspective of a reasonable officer on the scene," and not with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Also, a reasonableness determination must allow for the reality that government officials "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397.

This last point is particularly relevant here, where Plaintiffs allege that military and intelligence officials purportedly directed a missile strike against a vehicle carrying a declared leader of an armed enemy group in a foreign country. The calculus of whether to strike, when the next opportunity to strike may arise, and how many possible bystander casualties could occur in this alleged strike versus a later strike—to name but a few considerations—is undoubtedly "tense" and involves "uncertain" and "rapidly evolving" variables.

Given the information the United States published supporting its designation of Al-Aulaqi as an SDGT based on his leadership role in AQAP, there are a number of factors supporting the conclusion that the alleged missile strike, as pled in the complaint, was not constitutionally unreasonable. First, in terms of the severity of the conduct at issue, Anwar Al-Aulaqi had played a key role in setting the strategic direction of AQAP and had prepared and provided instructions to another terrorist who attempted to bring down an airliner filled with passengers while over the United States. *See* SDGT Designation. He also recruited individuals to join AQAP and helped to focus that terrorist organization's sights on attacking U.S. interests. *See*

*id*.; *see also* Clapper Decl. ¶ 14.[26] The objective severity of this conduct as understood by U.S.

officials is plain. Second, regarding the threat Anwar Al-Aulaqi posed, the United States

possessed information indicating that he had already directed an attack on a civilian airliner. *See*

SDGT Designation. If successful, that operation would undoubtedly have cost all the passengers

and crew on the flight their lives. Under such circumstances, the complaint does not "plausibly

suggest" it would have been objectively unreasonable to have viewed Anwar Al-Aulaqi as an

enemy and an active threat to the lives of U.S. citizens. *Iqbal*, 556 U.S. at 681.[27] Third, it would

have been equally and objectively reasonable to conclude that surrender was not a viable option.

As this district noted, Anwar Al-Aulaqi had stated in a video interview that he "will never

surrender." *Al-Aulaqi*, 727 F. Supp. 2d at 11. *See also* Clapper Decl. ¶ 16 (stating that Anwar Al-

Aulaqi "declares he has no intention of turning himself in to America").

     As the Supreme Court stated in *Tennessee v. Garner*—another domestic law-enforcement

case—if there is "probable cause to believe that [a suspect] has committed a crime involving the

infliction or threatened infliction of serious physical harm, deadly force may be used if necessary

to prevent escape." 471 U.S. 1, 11 (1985). The alleged strike on Anwar Al-Aulaqi at the very

least fits that example. And again, to the extent that case law is not directly on point, it is

---

[26] Defendants reiterate that the information in the Clapper Declaration is used not to establish that information in a factual sense. Rather, the Court can take judicial notice of the government's understanding, *i.e.*, "the perspective of" reasonable officials "on the scene" at the time of the alleged strike, which informs the qualified immunity inquiry. *Graham*, 490 U.S. at 396. The complaint, in any event, does not dispute these assertions. Nor could Plaintiffs plausibly deny the United States' stated *understanding* regarding Al-Aulaqi's activities—even if they sought to dispute, as a matter of fact, particular pieces of evidence that supported that understanding.

[27] Were this Court to seek to delve into the particulars of the United States' knowledge regarding the threat Anwar Al-Aulaqi posed, the state secrets privilege could be implicated. *See* United States Statement of Interest. This possible outcome is all the more reason why this Court should avoid the constitutional issue and instead should resolve this case on any of the numerous other grounds presented in this motion.

Plaintiffs' burden to state a claim in the first instance. Accordingly, Plaintiffs cannot establish that the alleged seizure of Anwar Al-Aulaqi violated the Fourth Amendment.

**D. Decedents' Fifth Amendment rights were not clearly established.**

In Count I of their complaint, Plaintiffs allege that decedents' Fifth Amendment due process rights were violated when Defendants allegedly authorized and directed their subordinates to use lethal force. Compl. ¶ 41. Legal precedent provides almost no guidance on whether and to what extent the Fifth Amendment applies extraterritorially in the battlefield context presented. The very question of the extent to which the Fifth Amendment applies abroad in particular circumstances "is one of judgment, not of compulsion." *Reid*, 354 U.S. at 75. As Justice Harlan explained, the question of "which specific safeguards" of the Fifth Amendment "are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is 'due' . . . in the particular circumstances of a particular case." *Id.* No cases clearly state what test to apply in considering whether specific provisions of the Fifth Amendment are judicially enforceable abroad in the "particular circumstances" alleged here. These circumstances all demonstrate that no Defendant could have had "fair notice" of the parameters that would have made any of their alleged actions clearly unconstitutional. *Camreta*, 131 S. Ct. at 2031.

The few cases that do address the due process rights of citizens abroad—*Hamdi v. Rumsfeld*, *Reid v. Covert*, and *Kar v. Rumsfeld*—involve entirely different "particular circumstances." All three cases involved the detention of citizens—not the alleged targeting of an AQAP leader or the unintended death of citizens in the course of an armed conflict. *See Hamdi*, 542 U.S. at 509 (considering due process rights of U.S. citizen captured abroad and detained in United States); *Reid*, 354 U.S. at 3-5 (considering due process rights of non-military

personnel subjected to courts martial abroad); *Kar*, 580 F. Supp. 2d at 85-86 (considering due process rights of U.S. citizen detained in Iraq). And again, there are good reasons to think that tests as to any process constitutionally due would operate differently when the United States is a custodian of a military or security detainee as compared to when the United States engages in alleged battlefield actions—a conclusion underscored by the Supreme Court's observation in *Hamdi* that the parties to that case agreed that the "process" due there did not apply to "initial captures." 542 U.S. at 534. Lastly, the *Hamdi* Court noted that the process it outlined "meddles little, if at all, in the strategy or conduct of war." *Id.* at 535. The case law thereby leaves unanswered the question of what process may be due to citizens in the particular context of Plaintiffs' claims—alleged missile strikes against enemy forces in a foreign country in the course of active hostilities.[28]

Along those lines, this particular context provides further confirmation that the contours of any due process rights of the decedents were not clearly established. As the Supreme Court has noted: "In the face of an actively hostile enemy, military commanders necessarily have broad power over persons on the battlefront." *Reid*, 354 U.S. at 33. Accordingly, "the extraordinary circumstances present in an area of actual fighting have been considered sufficient" to allow for punishing through military courts certain civilians accompanying troops. *Id.*[29] Because Plaintiffs'

---

[28] Once active hostilities have begun, certainly citizenship does not immunize one from becoming an enemy belligerent. *See Ex parte Quirin*, 317 U.S. at 37-38 ("Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction [engage in] hostile acts are enemy belligerents."). Nor does citizenship relieve one of the consequences of belligerency. *See id.* (holding that U.S. citizen associated with German forces during World War II could be subjected to military tribunal); *see also Hamdi*, 542 U.S. at 523 (discussing *Ex parte Quirin*).

[29] *Cf. Boumediene*, 553 U.S. at 770 (acknowledging that the context of "an active theater of war" could diminish the level of Suspension Clause rights available to detainees); *Al Maqaleh v. Gates*, 605 F.3d 84, 97-99 (D.C. Cir. 2010) (refusing to extend the Suspension Clause to aliens

claims as alleged present those precise "extraordinary circumstances," the extent of judicially

enforceable due process rights in the context pled is wholly unclear.

In sum, the threshold question of which, whether, and to what extent Fifth Amendment

due process rights apply abroad under the circumstances alleged is simply unclear. The very

context of Plaintiffs' claims—the conduct of hostilities in an armed conflict—means that the

precise contours of any due process rights of the decedents were not clearly delineated. *See*

*Padilla v. Yoo*, 678 F.3d 748, 761-62 (9th Cir. 2012). And, as with the Fourth Amendment claim,

even if this Court were to borrow from an otherwise accepted standard for the Fifth Amendment

in this novel context, the very borrowing of standards would make any right not clearly

established. Finally, even assuming the requisite "test" were clearly established, which it is not,

its application to the extraordinary and unique circumstances of this case does not, for the

reasons explained below, state a Fifth Amendment claim and so such a claim certainly could not

be clearly established. Qualified immunity thus applies, and this Court should dismiss Plaintiffs'

claims.

### E. Assuming the Fifth Amendment extends to this unique context, Plaintiffs have failed to allege facts showing a due process violation.

To the extent Plaintiffs seek to bring a substantive due process claim on behalf of Anwar

Al-Aulaqi, a point on which the complaint is unclear, that claim fails because such a claim would

be properly addressed under the Fourth Amendment. *See supra* Part IV.C. As the Court in

*Graham* held, claims that government officials used excessive force in seizing a citizen "should

be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a

'substantive due process' approach." *Graham*, 490 U.S. at 395. This is because the Fourth

---

detained by the military in Afghanistan because of the "practical obstacles" inherent in applying
that clause in an active theater of war).

Amendment "provides an explicit textual source" of protection against unreasonable seizures, in contrast to the "more generalized notion of 'substantive due process.'" *Id.* Accordingly, any substantive due process claim by Anwar Al-Aulaqi fails as a matter of law.

Even if Samir Khan and Abdulrahman Al-Aulaqi could raise colorable substantive due process claims in light of the fact that they were not "seized" for Fourth Amendment purposes, the allegations in the complaint fail to state a substantive due process violation as to them. The allegation that Defendants failed to "take all feasible measures to protect bystanders," Compl. ¶ 40, sounds in negligence. Negligence does not give rise to a due process claim— substantive or procedural. *See Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("[T]he protections of the  Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care . . . .").

Moreover, a substantive due process claim requires allegations of conduct that "shocks the conscience," which is generally defined as "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 846, 849. Plaintiffs' complaint provides "no reason to believe" Defendants' purported actions met that standard. *Lewis*, 523 U.S. at 849, 855 (dismissing substantive due process claim based on unintentional death of bystander in domestic law enforcement context). Nor, in the context of alleged missile strikes targeting AQAP operatives abroad in the course of an armed conflict, would there be any plausible basis to second-guess the strikes' alleged purpose, *see* Compl. ¶ 1, or to otherwise conclude that the alleged actions were unrelated to a legitimate government interest. *See Iqbal*, 556 U.S. at 678. Accordingly, the substantive due process claims fail.

Lastly, Plaintiffs fail to state a procedural due process claim. Plaintiffs make no allegations that either Samir Khan or Abdulrahman Al-Aulaqi was subjected to any

unconstitutional "process" as they were not alleged to have been "targeted." Any procedural due process claim on behalf of Anwar Al-Aulaqi also "suffers from a fundamental flaw." *Elkins v. District of Columbia*, 690 F.3d 554, 561 (D.C. Cir. 2012). Procedural due process "is flexible." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). It warrants those procedural protections that "the particular situation demands." *Id.* Moreover, the "core" of due process is "protection against arbitrary action." *Lewis*, 523 U.S. at 845. *See also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). A complaint alleging a procedural due process violation "must suggest 'what sort of process is due.'" *Elkins*, 690 F.3d at 561 (citation omitted). *See also Doe by Fein v. District of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996) ("[A] procedural due process claim requires the plaintiff to identify the process that is due."). Plaintiffs have not done so.

In any event, under any reasonable construction of procedural due process and on the facts alleged, Anwar Al-Aulaqi's claim fails. The Supreme Court has recognized that procedural due process rights may be diminished in a battlefield situation. *See Hamdi*, 542 U.S. at 534 (noting that "initial captures on the battlefield need not receive the process" afforded to longer-term, U.S. citizen detainees). *See also Reid*, 354 U.S. at 33 (noting that "the extraordinary circumstances present in an area of actual fighting have been considered sufficient" to allow for diminished procedural protections in that area). Such a construct only makes sense: to give enemies "notice" of battlefield attacks in some sort of traditional procedural due process manner would surely permit them to evade an attack and thereby continue their hostile activity.

Anwar Al-Aulaqi was a declared leader of AQAP who had publicly announced "he 'will never surrender.'" *See Al-Aulaqi*, 727 F. Supp. 2d at 10-11. The complaint itself identifies an "executive process" through which it alleges decisions regarding any missile strike on Anwar Al-

Aulaqi were reached—albeit a "closed" one. Compl. ¶ 24.[30] And the Executive has "regularly

inform[ed]" members of Congress regarding any missile strikes. RPA Speech at 5.

Where an individual identified as a leader of AQAP orchestrated a failed terrorist attack

on a U.S.-bound airliner but remains abroad, evading capture, and declares his refusal to submit

to U.S. authorities, nothing suggests that the "closed" executive process that the complaint

alleges the government undertook to decide what particular threat he posed and whether to use

lethal force would constitute arbitrary government action. *Cf. Calero-Toledo v. Pearson Yacht

Leasing Co.*, 416 U.S. 663, 680 (1974) (holding that seizure, without prior notice and hearing, of

yacht in "extraordinary situation" was constitutional). To the extent Plaintiffs are suggesting

that—under the facts alleged and in the extraordinary context of purported missile strikes abroad

against enemies—Anwar Al-Aulaqi was constitutionally entitled to *judicial* process to determine

the threat he posed and how the United States should respond to that threat, that claim must fail,

both as a historical and a practical anomaly. Indeed, in this weighty and unique context, "[w]hen

it comes to a decision by the head of the state upon a matter involving its life," such a situation

of national danger "warrants the substitution of executive process for judicial process." *Moyer v.

Peabody*, 212 U.S. 78, 85 (1909). Accordingly, Plaintiffs' due process claims fail.

## V.     The Bill of Attainder Does Not Apply to Executive Action.

Plaintiffs' bill of attainder claim fails because the Bill of Attainder Clause applies to bills:

legislative acts—not executive ones. That clause is found in Article I of the Constitution, the

---

[30] That an executive process exists, as alleged, with respect generally to decisions to launch missile strikes of the sort claimed comports with the statements by a U.S. official, which Plaintiffs refer to, *see supra* note 12, that any proposed targeting by the government of an individual undergoes a "careful review," which may include an evaluation by "the very most senior officials in our government." RPA Speech, at 4 (describing the process as "rigorous"). While the particulars of any alleged process surrounding the purported targeting of terrorists like Anwar Al-Aulaqi may be subject to the state secrets privilege, that does not change the fact that, as alleged, a process did exist.

article addressing the powers of Congress. U.S. const. art. I., § 9 cl. 3. *See also United States v. Lovett*, 328 U.S. 303, 315 (1946) ("A bill of attainder is a legislative act which inflicts punishment without a judicial trial." (quotation and citation omitted)). Lower courts have uniformly refused to apply the Bill of Attainder Clause to Executive Branch acts. *See Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999) ("No circuit court has yet held that the bill of attainder clause . . . applies to regulations promulgated by an executive agency."). *See also Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 755 (7th Cir. 2002); *Walmer v. U.S. Dep't of Defense*, 52 F.3d 851, 855 (10th Cir. 1995). Even if this Court determines the Bill of Attainder Clause somehow applies, special factors would preclude inferring a private right of action under that clause in this context for the same reasons no Fourth or Fifth Amendment action should be inferred. *See supra* Part III. In any event, Defendants are certainly entitled to qualified immunity as no such claim could be clearly established. *See supra* Part IV.A. Accordingly, that claim fails.

## CONCLUSION

The significance of the use of missile strikes abroad as a counterterrorism tool in armed conflict to secure our national defense, and the political considerations that frame the debate on the appropriateness of their use in particular circumstances, cannot be denied. Nor can it be denied that to adjudicate this suit in a judicial forum raises a number of distinct political questions and directly implicates multiple special factors under binding precedent. In any event, Plaintiffs cannot hold Defendants individually liable for the alleged violation of constitutional rights—rights the contours of which were by no means clearly established—in the course of purported missile strikes against terrorists overseas. Accordingly, this Court should dismiss Plaintiffs' complaint, and should leave the wide-ranging policy debate inherent to the conduct of war to the political branches.

Dated: December 14, 2012                    Respectfully submitted,

                                           STUART F. DELERY
                                           Principal Deputy Assistant Attorney General
                                           Civil Division

                                           RUPA BHATTACHARYYA
                                           Director, Torts Branch

                                           MARY HAMPTON MASON
                                           Senior Trial Counsel
                                           D.C. Bar No. 427461


                                             /s/  *Paul E. Werner*
                                           PAUL E. WERNER
                                           (MD Bar, under LCvR 83.2(e))
                                           Trial Attorney
                                           United States Department of Justice
                                           Torts Branch, Civil Division
                                           P.O. Box 7146, Ben Franklin Station
                                           Washington, D.C.  20044
                                           (202) 616-4152 (phone)
                                           (202) 616-4314 (fax)
                                           E-mail: Paul.Werner@usdoj.gov

                                           Attorneys for Defendants