# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NASSER AL-AULAQI, as personal representative
of the estates of ANWAR AL-AULAQI and
ABDULRAHMAN AL-AULAQI, *et. al.*,

       *Plaintiffs*,

    v.

No. 12-cv-01192 (RMC)

LEON C. PANETTA, *et. al.*, in their individual
capacities,

       *Defendants*.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Pardiss Kebriaei (*pro hac vice*)
Maria C. LaHood (*pro hac vice*)
Susan Hu
Baher Azmy
Center for Constitutional Rights
666 Broadway—7th Floor
New York, NY 10012
T: 212.614.6452
F: 212.614.6499
pkebriaei@ccrjustice.org

Hina Shamsi (*pro hac vice*)
Brett Max Kaufman (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street—18th Floor
New York, NY 10004
T: 212.519.2500
F: 212.549.2654
hshamsi@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
T: 202.457.0800
F: 202.452.1868
artspitzer@aclu-nca.org

February 5, 2013

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION..........................................................................................................1

BACKGROUND ............................................................................................................2

ARGUMENT ..................................................................................................................5

I.     **Plaintiffs Have Properly Pled Constitutional Claims and Defendants' Arguments Depend on Factual Assertions That Cannot be Considered at This Stage of the Litigation** ............................................................5

II.    **Plaintiffs' Constitutional Claims Are Not Barred by the Political Question Doctrine**..........................................................................................7

    A.    Resolution of the constitutional questions Plaintiffs pose is committed to the Judiciary ....................................................................9

    B.    The Court is capable of resolving the constitutional questions Plaintiffs pose ................................................................................12

    C.    Plaintiffs' constitutional claims pose legal questions, not policy choices, and the Court's adjudication of those questions would not show a lack of due respect to the political branches ....................................14

III.   **A *Bivens* Remedy Is Available to Plaintiffs**..........................................15

    A.    No special factors counsel hesitation ..................................................17

        1.    *"Special factors" identified by the Supreme Court concern the legislative, not executive, prerogative* ............................................17

        2.    *The "special factors" identified by Defendants do not counsel hesitation* ..................................................................................20

    B.    Congress has not provided an alternative remedy ................................25

    C.    A *Bivens* remedy should be available to Plaintiffs even if the Court concludes that special factors "counsel[] hesitation."...........................26

IV.   **The Defendants Are Not Entitled to Qualified Immunity from Their Violations of Decedents' Constitutional Rights** ....................................27

    A.    Defendants' use of lethal force violated the decedents' clearly established constitutional rights..........................................................28

1. *Defendants' conduct violated the Fourth Amendment rights of the decedents* ...................................................................................29

2. *Defendants' conduct violated the decedents' Fifth Amendment Rights* ...........................................................................................35

3. *Defendants' conduct violated the Bill of Attainder Clause with respect to Anwar Al-Aulaqi* ...........................................................38

B. Even if the law of armed conflict does apply, Defendants violated decedents' clearly established rights.................................................40

1. *The rights of the decedents were clearly established under the law of armed conflict*.................................................................40

2. *Plaintiffs have adequately alleged that the Due Process rights of the decedents, as informed by the laws of war, were violated within the context of armed conflict* .............................................41

V. **Plaintiffs Have Capacity To Sue on Behalf of Decedents** ...................................44

**CONCLUSION** ........................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Abu Ali v. Ashcroft*,
   350 F. Supp. 2d 28 (D.D.C. 2004) .................................................................. 14, 25

*Al Ginco v. Obama*,
   626 F. Supp. 2d 123 (D.D.C. 2009) ....................................................................... 13

*Al-Aulaqi v. Obama*,
   727 F. Supp. 2d 1 (D.D.C. 2010) ......................................................................... 14

*Ali v. D.C. Court Servs.*,
   538 F. Supp. 2d 157 (D.D.C. 2008) ...................................................................... 42

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ...................................................................... 21, 22

*Andronicou and Constantinou v. Cyprus*,
   1997-VI Eur. Ct. H.R. ....................................................................................... 30

*Ashcroft v. Al-Kidd*,
   131 S. Ct. 2074 (2011) ....................................................................................... 41

*Aytekin v. Turkey*,
   App. No. 22880/93, Eur. Comm'n H.R. (1997) ...................................................... 30

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................................... 8, 9, 13

*Barhoumi v. Obama*,
   609 F.3d 416 (D.C. Cir. 2010) ............................................................................. 11

*Bell v. Hood*,
   327 U.S. 678 (1946) ........................................................................................... 16

*BellSouth Corp. v. F.C.C.*,
   162 F.3d 678 (D.C. Cir. 1998) ............................................................................. 39

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
   403 U.S. 388 (1971) .................................................................................... passim

*Boumediene v. Bush*,
   476 F.3d 981 (D.C. Cir. 1997) ............................................................................. 13

*Boumediene v. Bush*,
    553 U.S. 723 (2008)................................................................................ 8, 13, 38

*Boyd v. Benton Cnty.*,
    374 F.3d 773 (9th Cir. 2004) ............................................................................... 33

*Brendlin v. California*,
    551 U.S. 249 (2007)................................................................................ 32, 34

*Brower v. Cnty. of Inyo*,
    489 U.S. 593 (1989)................................................................................ 32, 34

*Burgess v. Lowery*,
    201 F.3d 942 (7th Cir. 2000) ............................................................................... 41

*Bush v. Lucas*,
    462 U.S. 367 (1983)................................................................................ 17, 25, 26

*Butz v. Economou*,
    438 U.S. 478 (1978)................................................................................ 20, 27

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974)................................................................................ 44

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000)................................................................................ 9

*Camreta v. Greene*,
    131 S. Ct. 2020 (2011)................................................................................ 28

*Carlson v. Green*,
    446 U.S. 14 (1980)................................................................................ 16, 17, 26

*Case v. Milewski*,
    327 F.3d 564 (7th Cir. 2003) ............................................................................... 24

*Chappell v. Wallace*,
    462 U.S. 296 (1983)................................................................................ 17, 18

*Childress v. City of Arapaho*,
    210 F.3d 1154 (10th Cir. 2000) ............................................................................... 34

*Clarke ex rel. Estate of Medina v. Dist. of Columbia*,
    No. CIV.A 06-0623, 2007 WL 1378488 (D.D.C. May 9, 2007)............................................. 44

*Claybrook v. Birchwell*,
    199 F.3d 350 (6th Cir. 2000) ............................................................................... 34

*Cnty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ................................................................................ 36, 37

*Cohens v. Virginia*,
   19 U.S. (6 Wheat.) 264 (1821) .................................................................. 8

*Comm. of U.S. Citizens v. Reagan*,
   859 F.2d 929 (D.C. Cir. 1988) .................................................................. 9

*Coolidge v. New Hampshire*,
   403 U.S. 443 (1971) ................................................................................ 28

*Cordova v. Aragon*,
   569 F.3d 1183 (10th Cir. 2009) ............................................................... 29, 30

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) .................................................................................. 16, 18

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   407 F.3d 1220 (D.C. Cir. 2005) ............................................................... 7

*Davidson v. Cannon*,
   474 U.S. 344 (1986) ................................................................................ 38

*Davis v. Passman*,
   442 U.S. 228 (1979) ................................................................................ 16

*Deirmenjian v. Deutsche Bank, A.G.*,
   No. CV 06-00774, 2006 WL 4749756 (C.D. Cal. Sept. 25, 2006) ............ 44

*Del Raine v. Williford*,
   32 F.3d 1024 (7th Cir. 1994) ................................................................... 20

*Doe v. Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) ................................................................. 21

*Doe v. Rumsfeld*,
   800 F. Supp. 2d 94 (D.D.C. 2011) ........................................................... 41

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) (en banc) ................................................. 9, 10, 12, 15

*Emanuel v. Dist. of Columbia*,
   224 F. App'x 1 (D.C. Cir. 2007) .............................................................. 34

*Espinosa v. City & Cnty. of S.F.*,
   598 F.3d 528 (9th Cir. 2010) ................................................................... 30

*Estate of Manook v. Research Triangle Inst., Int'l,*
  693 F. Supp. 2d 4 (D.D.C. 2010) .......................................................... 45

*F.D.I.C. v. Meyer,*
  510 U.S. 471 (1994) ............................................................................ 18

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) .................................................................................. 8

*Goldwater v. Carter,*
  444 U.S. 996 (1979) ............................................................................ 15

*Graham v. Connor,*
  490 U.S. 386 (1989) .................................................................. 29, 31, 37

*Haim v. Islamic Rep. of Iran,*
  784 F. Supp. 2d 1 (D.D.C. 2011) ............................................................ 7

*Hamdan v. Rumsfeld,*
  548 U.S. 557 (2006) ............................................................................ 11

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ..................................................................... passim

*Hamlily v. Obama,*
  616 F. Supp. 2d 63 (D.D.C. 2009) ........................................................ 42

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ...................................................................... 26, 28

*Hoffa v. Saxbe,*
  378 F. Supp. 1221 (D.D.C. 1974) ......................................................... 39

*Holland v. Harrington,*
  268 F.3d 1179 (10th Cir. 2001) ........................................................... 35

*Hope v. Pelzer,*
  536 U.S. 730 (2002) ...................................................................... 28, 41

*Hui v. Castaneda,*
  130 S. Ct. 1845 (2010) ........................................................................ 17

*In re Terrorist Bombings of U.S. Embassies in E. Afr.,*
  552 F.3d 157 (2d Cir. 2008) .................................................................. 5

*Johnson v. Dist. of Columbia,*
  528 F.3d 969 (D.C. Cir. 2008) ............................................................. 30

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
   341 U.S. 123 (1951) ........................................................................... 35, 38

*Jordan v. De George*,
   341 U.S. 223 (1951) ................................................................................ 36

*Kastigar v. United States*,
   406 U.S. 441 (1972) ................................................................................ 21

*Kennedy v. Mendoza-Martinez*,
   372 U.S. 144 (1963) ................................................................................ 36

*Khan v. Obama*,
   655 F.3d 20 (D.C. Cir. 2011) ................................................................ 11

*Khan v. Obama*,
   741 F. Supp. 2d 1 (D.D.C. 2010) ........................................................... 13

*Lamont v. Woods*,
   948 F.2d 825 (2d Cir. 1991) .................................................................... 9

*Lawson v. United States*,
   176 F.2d 49 (D.C. Cir. 1949) ................................................................. 21

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ........................................................... 20, 25

Legality of the Threat or Use of Nuclear Weapons,
   Advisory Opinion, 1996 I.C.J. 226 (July 8) ......................................... 42

*Lytle v. Bexar Cnty.*,
   560 F.3d 404 (5th Cir. 2009) ................................................................. 33

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .................................................................. 7

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) .......................................................................... 35, 36

*Mattos v. Agarano*,
   661 F.3d 433 (9th Cir. 2011) ................................................................. 31

*McCann v. United Kingdom*,
   324 Eur. Ct. H.R. (1995) ....................................................................... 30

*McConnell v. Air Line Pilots' Ass'n, Int'l*,
   No. 08-1600 (RMC), 2009 WL 765884 (D.D.C. Mar. 23, 2009) ............. 6

*McDonald v. Haskins,*
    966 F.2d 292 (7th Cir. 1992) ................................................................. 35

*McMillian v. Dist. of Columbia,*
    466 F. Supp. 2d 219 (D.D.C. 2006) ........................................................ 6

*Medeiros v. O'Connell,*
    150 F.3d 164 (2d Cir. 1998) ................................................................. 34

*Minneci v. Pollard,*
    132 S. Ct. 617 (2012) ......................................................................... 16

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ......................................................... 19, 20, 26, 27

*Morgan v. United States,*
    323 F.3d 776 (9th Cir. 2003) .............................................................. 20

*Moyer v. Peabody,*
    212 U.S. 78 (1909) ............................................................................ 44

*Murray v. The Schooner Charming Betsy,*
    6 U.S. (2 Cranch) 64 (1804) .............................................................. 40

*N.Y. Times Co. v. U.S. Dep't of Justice,*
    Nos. 11 Civ 9336 & 12 Civ. 794, 2013 WL 50209 (S.D.N.Y. Jan. 3, 2013) ............... 3, 39, 44

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) .......................................................................... 11

*Nelson v. City of Davis,*
    685 F.3d 867 (9th Cir. 2012) ......................................................... 31, 34

*Nixon v. United States,*
    506 U.S. 224 (1993) ............................................................................ 8

*Norris v. Dist. of Columbia,*
    737 F.2d 1148 (D.C. Cir. 1984) .......................................................... 37

*Parisi v. Davidson,*
    405 U.S. 34 (1971) ............................................................................ 23

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
    182 F.3d 17 (D.C. Cir. 1999) .............................................................. 15

*Philips v. Perry,*
    106 F.3d 1420 (9th Cir. 1997) ............................................................ 23

*Phillips v. Cmty. Ins. Corp.*,
   678 F.3d 513 (7th Cir. 2012) ............................................................... 30

*Pino v. City of Sacramento*,
   No. Civ. S-052080, 2006 WL 193181 (E.D. Cal. Jan. 19, 2006) ............................................ 44

*Powell v. McCormack*,
   395 U.S. 486 (1969)................................................................................ 9

*Price v. United States*,
   728 F.2d 385 (6th Cir. 1984) ............................................................... 30

*Prosecutor v. Haradinaj, Balaj and Brahimaj*,
   Case No. IT-4-84-T, Judgment (ICTY Trial Chamber Apr. 3, 2008) ....................... 6

*Prosecutor v. Tadić*,
   Case No. IT-94-1-AR72, Decision on Defence Motion for Interlocutory Appeal on
   Jurisdiction (ICTY Appeals Chamber Oct. 2, 1995) ................................. 6

*Rasul v. Myers*,
   563 F.3d 527 (D.C. Cir. 2009).......................................................... 21, 22

*Reid v. Covert*,
   354 U.S. 1 (1957)............................................................................ 5, 29

*Richards v. Mileski*,
   662 F.2d 65 (D.C. Cir. 1981) ............................................................... 6

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985)............................................................. 22

*Saucier v. Katz*,
   533 U.S. 194 (2001)........................................................................... 28

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974)........................................................................... 44

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988)........................................................................... 25

*Scott v. Harris*,
   550 U.S. 372 (2007)....................................................................... 29, 31

*Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*,
   468 U.S. 841 (1984)........................................................................... 39

*Spagnola v. Mathis*,
   859 F.2d 223 (D.C. Cir. 1988) ............................................................. 19

*Tennessee v. Garner*,
   471 U.S. 1 (1985)..................................................................................... 29, 30, 32

*Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen*,
   130 S. Ct. 584 (2009).......................................................................................... 7

*United States v. Abu Ali*,
   528 F.3d 210 (4th Cir. 2008) ............................................................................. 25

*United States v. Bass*,
   404 U.S. 336 (1971).......................................................................................... 36

*United States v. Kellogg Brown & Root Servs., Inc.*,
   800 F. Supp. 2d 143 (D.D.C. 2011) ..................................................................... 6

*United States v. Lee*,
   106 U.S. 196 (1882).......................................................................................... 16

*United States v. Lovett*,
   328 U.S. 303 (1946).......................................................................................... 39

*United States v. Stanley*,
   483 U.S. 669 (1987)..................................................................................... 17, 18

*United States v. U.S. Dist. Court for the E. Dist. of Mich.*,
   407 U.S. 297 (1972).......................................................................................... 24

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990).......................................................................................... 29

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003) ............................................................................... 25

*Vance v. Rumsfeld*,
   653 F.3d 591 (7th Cir. 2011) ............................................................................. 41

*Vance v. Rumsfeld*,
   701 F.3d 193 (7th Cir. 2012) (en banc) ......................................................... 22, 23

*Warren v. Dist. of Columbia*,
   353 F.3d 36 (D.C. Cir. 2004).............................................................................. 6

*Wilkie v. Robbins*,
   551 U.S. 537 (2007)................................................................................... passim

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008).................................................................. 19, 24, 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ............................................................................................. 11

*Zivotofsky v. Clinton*,
132 S. Ct. 1421 (2012) ................................................................................... passim

*Zweibon v. Mitchell*,
516 F.2d 594 (D.C. Cir. 1975) (en banc) ........................................................... 24

**Statutes**

10 U.S.C. § 2733(a) ...................................................................................... 19, 25

10 U.S.C. § 2734(a) ...................................................................................... 19, 25

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 .................................. 6

Classified Information Procedures Act, 18 U.S.C. app ....................................... 24

Detainee Treatment Act of 2005, Pub. L. No. 109-148 (2005) ...................................... 19

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ...................... 19

**Other Authorities**

Ashley S. Deeks, *"Unwilling or Unable": Toward a Normative Framework for Extraterritorial Self-Defense*, 52 Va, J. Int'l L. 483 (2012) ...................................... 12

Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, princ. 4, 9, U.N. Doc. A/CONF.144/28/Rev.1 (Aug. 27–Sept. 7, 1990) ................................ 30

Eric Holder, Attorney General, Speech at Northwestern University (Mar. 5, 2012) ......... 8, 13, 41

Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ............................................... 42

Letter from Sens. Ron Wyden *et al.* to President Barack Obama (Feb. 4, 2013) .......................... 8

Nils Melzer, Interpretive Guidance on the Notion of Direct Participation in Hostilities Under International Humanitarian Law (2009) ....................................... 42

Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), art. 13(3), June 8, 1977, 1125 U.N.T.S. 609 ................................................................ 42

Report of the Special Rapporteur on Extrajudicial Executions, Human Rights Council, 14th Sess., A/HRC/14/24/Add.6 (May 28, 2010) ......................................... 11, 12

Ryan Patrick Alford, *The Rule of Law at the Crossroads: Consequences of Targeted Killing of Citizens*, 2011 Utah L. Rev. 1203 (2011) ................................................................. 38

The Federalist No. 47 (James Madison) ...................................................................... 39

The Federalist No. 84 (Alexander Hamilton) (Clinton Rossiter ed., 1961)................................... 38

U.N. Charter art. 2.................................................................................................... 11

U.N. Charter art. 51.................................................................................................. 11

U.S. Air Force, Targeting: Air Force Doctrine Document 2-1.9 (2006) ................................ 42, 43

U.S. Dep't of the Army, Field Manual 27-10: The Law of Land Warfare (1956) ........... 23, 42, 43

**Rules**

Fed. R. Civ. P. 9(a) ................................................................................................ 44

Fed. R. Civ. P. 12(b)(1)........................................................................................... 7

Fed. R. Civ. P. 17(a)(3)........................................................................................... 45

Fed. R. Evid. 201(b)................................................................................................ 7

D.C. Super. Ct. R. Civ. P. 44(a)(2) ........................................................................... 45

**Regulations**

32 C.F.R. § 536.42 .............................................................................................. 19, 25

32 C.F.R. § 536.45 .............................................................................................. 19, 25

**INTRODUCTION**

This case concerns the most fundamental right the Constitution guarantees to citizens: the right not to be deprived of life without due process of law.  Defendants respond with various arguments for dismissal of the case, but they all boil down to a single assertion:  The Executive has the unilateral authority to carry out the targeted killing of Americans it deems terrorism suspects—even if those suspects do not present any truly imminent threat, even if they are located far away from any recognized battlefield, and even if they have never been convicted (or even charged) with a crime.  The Executive can exercise this authority, Defendants say, without presenting evidence to any court before or after a killing is carried out and without even acknowledging to any court that their claimed authority to kill has been exercised.

Defendants argue, in other words, that the Judiciary has no role whatsoever to play in assessing whether the Executive's killing of American citizens is lawful.  This argument is exceedingly dangerous, and it is wrong.  Under our constitutional system, the right to life is not entrusted to the Executive alone.  It should not require repeating that "[w]hatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004).

Plaintiffs' Complaint makes clear that Defendants have violated clearly established constitutional rights.  Outside the context of armed conflict, lethal force may be used only as a last resort to counter an imminent threat of grave harm.  The killings of Plaintiffs' sons and 16 year-old grandson—all American citizens—violated this standard, in part because officials have defined the term "imminent" so broadly as to negate its plain meaning.  Even if the decedents had been killed in the context of armed conflict, Defendants' actions would have been illegal

because the laws of war prohibit the use of lethal force against civilians who are not "directly participating in hostilities"—a standard that requires a causal and temporal connection to actual hostilities.  And if the person targeted is directly participating in hostilities, measures must still be taken to protect bystanders and minimize harm to civilians not targeted.  As the Complaint makes clear, Defendants' actions did not meet these standards.

Defendants' argument that the Judiciary should turn a blind eye to the Executive's extrajudicial killing of American citizens misunderstands both the individual rights guaranteed by the Constitution and the courts' constitutional duty to safeguard those rights from encroachment.  The Court should deny Defendants' motion.

## BACKGROUND

Since 2001, and routinely since 2009, the United States has carried out deliberate and premeditated killings abroad of individuals suspected of terrorism.  Compl. ¶ 1.  While some of these "targeted killings" have been carried out in the context of the wars in Afghanistan and Iraq, others—including those challenged in this lawsuit—have taken place outside the context of any armed conflict.  *Id.*  These killings occur after government officials deliberate in a closed executive process, making life-and-death decisions on the basis of undisclosed legal standards and evidence never presented to any court.  *Id.*  In September and October 2011, Defendants Leon C. Panetta, William H. McRaven, Joseph Votel, and David H. Petraeus authorized and directed the killings of three United States citizens in Yemen.  *Id.*  Their actions violated fundamental rights afforded to all Americans by the Constitution, including the right not to be deprived of life without due process of law.  The three individuals—Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi—were killed without ever being charged with or convicted of a crime.  Their families have never received any explanation of why they were killed.

In April 2012, then–Deputy National Security Advisor John Brennan acknowledged publicly that the United States carries out targeted killings "beyond hot battlefields like Afghanistan," frequently using "remotely piloted aircraft" known as "drones." *Id.* ¶ 18.  Both the Central Intelligence Agency ("CIA") and the Joint Special Operations Command ("JSOC") have responsibility for the authorization, planning, and execution of these killings, and the two entities "share intelligence and coordinate attacks." *Id.*  Each maintains a "kill list[]"— "basically a hit list"—identifying individuals authorized for death by targeted killing. *Id.* ¶ 19. Senior government officials have made clear that the Executive claims the authority to carry out the killings of individuals on these lists, including American citizens, outside of recognized armed conflicts. *Id.* ¶ 20.  But government officials have only offered "cryptic and imprecise" explanations of the legal standards they use to add Americans to the CIA and JSOC kill lists, "generally without citing to any statute or court decision that justifies [the government's] conclusions." *N.Y. Times Co. v. U.S. Dep't of Justice*, Nos. 11 Civ. 9336 & 12 Civ. 794, 2013 WL 50209, at *1 (S.D.N.Y. Jan. 3, 2013) ("*Targeted Killing FOIA*").

In 2010, the *Washington Post* reported that the CIA and JSOC had added Anwar Al-Aulaqi to their kill lists.[1]  Compl. ¶ 23.  JSOC reportedly tried to kill Al-Aulaqi in 2009, and in September 2011, the CIA and JSOC carried out the killing. *Id.* ¶¶ 23, 31.  After personnel under Defendants' command surveilled Al-Aulaqi for as long as three weeks, Defendants authorized and directed their subordinates to fire missiles from unmanned drones at Al-Aulaqi and his vehicle on September 30, 2011. *Id.* ¶ 31.  The missiles destroyed the vehicle and killed Al-

---

[1] In approximately June 2010, the Department of Justice's Office of Legal Counsel completed a memorandum purporting to provide a legal justification for the killing of Anwar Al-Aulaqi. Compl. ¶ 25.  Portions have been summarized in the media, but the government has continued to withhold the memorandum itself.  *See Targeted Killing FOIA*, 2013 WL 50209, at *35.

Aulaqi, Samir Khan, and at least two others.  *Id.*  Soon after, senior government officials publicly proclaimed that the United States had killed Al-Aulaqi.  *Id.* ¶ 33.

Two weeks later, on October 14, 2011, sixteen-year-old Abdulrahman Al-Aulaqi was eating dinner at an open-air restaurant in the southern Yemeni province of Shabwa when Defendants authorized and directed another drone strike, killing Abdulrahman and at least six others, including another child.  *Id.* ¶¶ 36–37.  An anonymous senior government official described Abdulrahman as a "military-aged male" after his death.  *Id.* ¶ 38.  It was only after his family released his birth certificate that U.S. officials acknowledged, again anonymously, that Abdulrahman was a child.  *Id.*

The killings of Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi took place outside the context of any armed conflict.  These killings were unlawful because at the time of their deaths, none of the three were engaged in activities that presented a concrete, specific, and imminent threat of death or serious physical injury.  *Id.* ¶¶ 34, 35, 40.  The killings were unlawful even if they were carried out in the context of armed conflict because at the time of their deaths, none of the three were directly participating in hostilities.  *Id.*  If Khan and Abdulrahman Al-Aulaqi were killed as bystanders, they died because of Defendants' failure to take legally required measures to protect them.  *Id.* ¶¶ 35, 40.  In authorizing and directing the use of lethal force that killed these three Americans, Defendants violated the decedents' rights under the Constitution.  Through this lawsuit, Plaintiffs ask this Court to exercise its proper role as the ultimate interpreter of the Constitution and hold Defendants to account for their unlawful actions.

**ARGUMENT**

I.    **Plaintiffs Have Properly Pled Constitutional Claims and Defendants' Arguments Depend on Factual Assertions That Cannot be Considered at This Stage of the Litigation**

Plaintiffs state claims under the Fourth and Fifth Amendments.  Defendants do not—indeed, cannot—contest that the "Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens."  *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 167 (2d Cir. 2008) (quotation marks omitted); *see also Reid v. Covert*, 354 U.S. 1, 6 (1957).  But through their Motion to Dismiss, Defendants improperly attempt to introduce facts contesting the Complaint's well-pled allegations, and specifically contest that the decedents were unlawfully killed outside the context of armed conflict.[2]  *See, e.g.*, Defs. Br. 2, 9, 14, 37.  Indeed, Defendants premise their entire argument against this Court's jurisdiction over Plaintiffs' claims on the erroneous *assumption* that Plaintiffs' family members were killed in the context of armed conflict.[3]  That assumption is predicated on factual assertions that cannot be credited by this Court at this stage of the litigation.  While Defendants may challenge Plaintiffs' allegations at trial or through a motion for

---

[2] Plaintiffs clearly allege that the killings of all three decedents took place outside the context of armed conflict.  *See* Compl. ¶¶ 1, 4, 17, 18, 20.  The Complaint provides factual context for these allegations, referencing a statement by John Brennan "acknowledg[ing] publicly that the United States carries out targeted killings of suspected terrorists 'beyond hot battlefields like Afghanistan,'" and specifically in Yemen.  Compl. ¶ 18.  And the Complaint alleges that U.S. officials "have made clear that the government's claimed authority to carry out the targeted killing of suspected terrorists, including killings executed outside the context of armed conflict, extends to American citizens."  *Id.* ¶ 20.  These allegations more than satisfy federal pleading requirements, and Defendants do not argue otherwise.

[3] *Compare* Compl. ¶¶ 4, 17, 18 (alleging killings took place outside of armed conflict and far from any battlefield), *with, e.g.*, Defs. Br. 6 ("enemy forces engaged in an armed conflict against the United States"), 26 ("active-war decision-making"), 30 ("in the course of waging war"), 32 ("active battlefield"), 40 ("on the battlefront"), 40 n.28 ("active hostilities"), 41 ("The very context of Plaintiffs' claims" is "the conduct of hostilities in an armed conflict . . . .").

summary judgment, they may not do so through a motion to dismiss.[4]  *See, e.g.*, *Richards v. Mileski*, 662 F.2d 65, 67 (D.C. Cir. 1981) ("[Q]uestion[s] . . . turn[ing] on controverted facts" are not "appropriately decided on a motion to dismiss.").  The same is true when an allegation involves a mixed question of law and fact, which is the case with Plaintiffs' allegation of non-armed conflict.  *See McMillian v. Dist. of Columbia*, 466 F. Supp. 2d 219, 222 (D.D.C. 2006) ("[I]n resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—*including mixed questions of law and fact*—as true and draw all reasonable inferences therefrom in the plaintiff's favor." (emphasis added)); *accord Warren v. Dist. of Columbia*, 353 F.3d 36, 39–40 (D.C. Cir. 2004); *McConnell v. Air Line Pilots' Ass'n, Int'l*, No. 08-1600 (RMC), 2009 WL 765884, at *1 (D.D.C. Mar. 23, 2009).[5]

In support of their attempt to introduce their own factual record, Defendants ask the Court to take judicial notice of the asserted basis for the government's designation of Anwar Al-Aulaqi as a "Specially Designated Global Terrorist."  Defs. Br. 2 n.1; *see id.* 9 n.4.  But the Court may not take judicial notice of Executive Branch assertions that are subject to reasonable

---

[4] As permitted by the Federal Rules, *see United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011), Plaintiffs plead in the alternative that even if the killings did take place in the context of armed conflict, Defendants violated the Constitution as informed by the laws of war.  *See* Compl. ¶¶ 34, 35, 40.

[5] Thus, Defendants may not simply assert in their brief—nor may the Court accept—that the United States is engaged in an armed conflict with Al-Qaeda in the Arabian Peninsula ("AQAP"), or that it "part of, or an associated force of" Al-Qaeda, Defs. Br. 20 n.12 (quotation marks omitted).  Those assertions depend on factual findings that the Court cannot make at this stage of the litigation, including whether, at the time of the killings: (1) AQAP was an "associated force" of Al-Qaeda under the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (reprinted at 50 U.S.C. § 1541 note) ("AUMF"); and (2) the United States was engaged in an armed conflict with AQAP in Yemen.  *See Prosecutor v. Tadić*, Case No. IT-94-1-AR72, Decision on Defence Motion for Interlocutory Appeal on Jurisdiction, ¶ 70 (ICTY Appeals Chamber Oct. 2, 1995) (existence of armed conflict between a state and an armed group depends on facts such as the intensity and duration of any hostilities, and the level of organization of the armed group); *Prosecutor v. Haradinaj, Balaj and Brahimaj*, Case No. IT-4-84-T, Judgment, ¶ 38 (ICTY Trial Chamber Apr. 3, 2008) (same).

dispute.  *See Haim v. Islamic Rep. of Iran*, 784 F. Supp. 2d 1, 6 (D.D.C. 2011) (because findings

of fact even in prior *judicial* proceedings are "'subject to reasonable dispute'—a necessary

requisite under the Federal Rules of Evidence," they are "not subject to judicial notice" (quoting

FED. R. EVID. 201(b))).  The single case Defendants cite in support of their notice request does

not actually support their argument.  *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220,

1222 (D.C. Cir. 2005) (a court "may look to record of another proceeding to avoid unnecessary

proceedings when *an undisputed fact on the public record* makes it clear that the plaintiff does

not state a claim upon which relief could be granted" (emphases added) (quotation marks

omitted)) (cited at Defs. Br. 2 n.1, 9 n.4).[6]  Defendants' notice request is meritless.

## II.     Plaintiffs' Constitutional Claims Are Not Barred by the Political Question Doctrine

Defendants assert the broadest and most consequential authority any government official

can claim against a citizen—the power to deprive him of life—and then argue that their actions

should be insulated from judicial review.  While Defendants invoke the separation of powers in

arguing that Plaintiffs' constitutional claims raise nonjusticiable political questions, their position

turns that principle on its head.  Under the Constitution, it is the Judiciary that is charged with

interpreting and ultimately safeguarding the fundamental rights Plaintiffs assert under the Fourth

and Fifth Amendments, not the political branches.  *See Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what

the law is.").  Far from offending the separation of powers, judicial review of Plaintiffs' claims is

required by it.  *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen*, 130 S. Ct. 584,

590 (2009) ("'We have no more right to decline the exercise of jurisdiction which is given, than

---

[6] Defendants may rely on these supplemental "facts" in support of their political question
argument under FED. R. CIV. P. 12(b)(1), *see* Defs. Br. 13 n.6, but the supplemental facts do not
affect the political question analysis or render Plaintiffs' claims nonjusticiable.  *See infra* § II.

to usurp that which is not given.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404

(1821))).[7]

In its most recent political question opinion, the Supreme Court reaffirmed that "the

Judiciary has a responsibility to decide cases properly before it, even those it would gladly

avoid." *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quotation marks omitted).  The

Court emphasized that when a plaintiff asserts individual rights and his claims require familiar

tasks of statutory and constitutional interpretation, those tasks are committed to the Judiciary,

even if they directly implicate national security and foreign policy.  *Id*. at 1427–28.  In rejecting

the Executive's political question argument, the Court underscored that the doctrine is a "narrow

exception" to judicial review.  *Id*. at 1427.  Indeed, the Court has declined jurisdiction on

political question grounds only twice since *Baker v. Carr*, 369 U.S. 186 (1962).[8]

The questions Plaintiffs raise could not be more squarely committed to the Judiciary, nor

more fundamental: whether Defendants' use of lethal force against Plaintiffs' sons and grandson

---

[7] Defying the most elementary understanding of separation of powers, Defendants make the argument that executive power is not "unbounded" in this context because "checks and balances exist within the Executive Branch itself."  Defs. Br. 13 n.7 (quotation marks omitted); *see* Eric Holder, Attorney General, Speech at Northwestern University (Mar. 5, 2012) ("The Constitution guarantees due process, not judicial process."), *available at* 1.usa.gov/y8SorL.  But "[t]here is considerable risk of error . . . inherent in any process . . . that is closed and accusatorial." *Boumediene v. Bush*, 553 U.S. 723, 786 (2008) (quotation marks omitted).  Defendants further argue that Congress "enjoys a broad range of authorities with which to exercise restraint and balance."  Defs. Br. 13 n.7 (quotation marks omitted).  *But see* Letter from Sens. Ron Wyden *et al.* to President Barack Obama (Feb. 4, 2013) (Senators renewing request to be provided with the "the secret legal opinions outlining" the Executive Branch's understanding of its "authority to authorize the killing of Americans in the course of counterterrorism operations"), *available at* http://www.wyden.senate.gov/download/letter-to-president-obama-seeking-legal-opinions. Unsurprisingly, Defendants cite no authority for their proposition that oversight by the political branches alone is constitutionally sufficient to protect against the arbitrary deprivation of life.

[8] *See Nixon v. United States*, 506 U.S. 224 (1993) (power to adjudicate merits of impeachment proceedings against federal judges is textually committed to the Senate in Art. I, § 3, cl. 6), and *Gilligan v. Morgan*, 413 U.S. 1 (1973) (surveillance over the weaponry, training, and standing orders of the National Guard are vested exclusively in the Executive and Legislative Branches).

violated the rights of the decedents under the Fourth and Fifth Amendments.  That Plaintiffs'

claims may have arisen in a national-security context does not change these core constitutional

questions, nor remove them from the expertise of the judicial sphere.  *See, e.g.*, *Comm. of U.S.*

*Citizens v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988).  Plaintiffs' constitutional claims can be

readily resolved under existing judicial standards; they involve legal issues, not policy choices;

and their adjudication is not a display of disrespect to the political branches, but this Court's

constitutional duty.

      A.      <u>Resolution of the constitutional questions Plaintiffs pose is committed to the</u>
<u>Judiciary.</u>

Of the six factors *Baker* identified as potentially implicating the political question

doctrine, the first one—whether there is a "textually demonstrable constitutional commitment of

the issue to a coordinate political department," *Baker*, 369 U.S. at 217—is the "dominant

consideration."  *Lamont v. Woods*, 948 F.2d 825, 831 (2d Cir. 1991); *accord Powell v.*

*McCormack*, 395 U.S. 486, 521 n.43 (1969) ("[T]he force of respondents' other arguments that

this case presents a political question depends in great measure on the resolution of the textual

commitment question.").

Defendants' attempt to deprive this Court of jurisdiction depends on a

mischaracterization of the question presented in this case.  Whether a political question exists

"turns not on the nature of the government conduct under review but more precisely on the

question *the plaintiff raises* about the challenged action."  *El-Shifa Pharm. Indus. Co. v. United*

*States,* 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (emphasis added) (citing *Campbell v.*

*Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring)).  The question here is not

whether Defendants "unlawfully applied the warmaking and national defense powers of the

political branches to conduct alleged missile strikes abroad," Defs. Br. 6, but Plaintiffs' question:

whether Defendants' use of lethal force against three American citizens violated their Fourth and Fifth Amendment rights.[9]  The two questions are not "one and the same."  *Zivotofsky*, 132 S. Ct. at 1427.

In *Zivotofsky*, the plaintiff sought to record his birthplace as "Jerusalem, Israel" (rather than "Jersusalem") on his U.S. passport pursuant to a federal statute authorizing such a request.  *Id*. at 1426.  The Secretary of State refused, citing the Executive's policy of neutrality toward recognition of Jerusalem as part of Israel and arguing that that there was a "textually demonstrable constitutional commitment to the President of the sole power to recognize foreign sovereigns."  *Id*. at 1428 (quotation marks omitted).  The Supreme Court focused on the plaintiff's specific request—enforcement of a statutory right—and determined that there was no "exclusive commitment" of that issue to the Executive, and that the case was justiciable.  *Id*. Even though a decision in the plaintiff's favor on the merits would force the Executive's hand in contravention of its longstanding policy position—on a delicate and significant political issue intrinsically tied to U.S. national security—*see id*. at 1440 (Breyer, J., dissenting), the Court found that it was not being asked to "supplant a foreign policy decision of the political branches."  *Id*. at 1427 (majority opinion).  Rather, the plaintiff's claims asked the Court to determine if the plaintiff's interpretation of a statute was correct—a "familiar judicial exercise." *Id.*  The judicial task Plaintiffs' constitutional claims present to this Court is no less familiar.[10]

---

[9] That the target of the October 14, 2011 strike that killed Abdulrahman Al-Aulaqi may have been a foreign national does not alter the constitutional question Plaintiffs raise about the legality of the use of lethal force against Abdulrahman, an American citizen, *see* Defs. Br. 11; *see also infra* note 42, or affect the justiciability of that question.

[10] *El-Shifa*, in which foreign-citizen plaintiffs sought declaratory and injunctive relief for allegedly defamatory statements and failure to compensate, 607 F.3d 840, is not to the contrary. The claims in *El-Shifa* were nonjusticiable because they sought a decision on the wisdom of military action; they did not "present[] purely legal issues such as whether the government had legal authority to act."  *Id.* at 842.  Unlike *El-Shifa*, Plaintiffs' constitutional claims on behalf of

Defendants urge the Court to demur from that task by asserting that the "conduct of armed conflict" is a matter with a "textually demonstrable constitutional commitment" to the political branches. Defs. Br. 9–10. But even if armed conflict were the context, the Supreme Court has already—repeatedly and emphatically—rejected Defendants' argument that the war power provides the Executive with a "blank check." *Hamdi*, 542 U.S. at 536 (plurality opinion). In *Hamdi*, the Court adjudicated the Executive's authority to indefinitely detain an American citizen "enemy combatant" captured on a battlefield in Afghanistan. *Id.* at 535–36. The Court held that even "*in times of conflict*," the Constitution "most assuredly envisions a role for all three branches when individual liberties are at stake." *Id*. at 536 (emphasis added).[11] Indeed, the Supreme Court has long decided challenges to executive authority in the context of U.S. military operations during wartime. *See, e.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).[12]

---

United States citizens are legal questions that are exclusively within the Judiciary's power to adjudicate.

[11] Defendants' argument, again, assumes a conclusion contrary to Plaintiffs' allegation that the use of lethal force against the decedents occurred outside of armed conflict. *See supra* § I. Moreover, the question of whether an armed conflict existed at the time of the decedents' killings is a justiciable question well within the competence of the Judiciary. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 629–31 (2006) (determining the threshold question of the existence and nature of the conflict between the United States and Al-Qaeda in Afghanistan and reaching plaintiff's statutory and international law claims); *Hamdi*, 542 U.S. at 521 (using "longstanding law-of-war principles" to determine the existence of an armed conflict and reaching plaintiff's constitutional claim); *Khan v. Obama*, 655 F.3d 20, 32 (D.C. Cir. 2011) (interpreting the AUMF to determine whether a group was an "associated force" in the habeas context); *Barhoumi v. Obama*, 609 F.3d 416, 419 (D.C. Cir. 2010) (same).

[12] Defendants also assert that their actions were pursuant to the "Executive's prerogative of national self-defense," under Article II of the Constitution. Defs. Br. 6. But the use of lethal force as a matter of national self-defense in response to an armed attack or imminent threat of one relates only to the question whether that force violates the *territorial sovereignty* of the state in which a killing occurs—a question Plaintiffs do not raise. *Cf.* U.N. Charter art. 2, para. 4 (providing that states must refrain "from the threat or use of force against the territorial integrity" of another state); *id*. art. 51 (permitting exception in exercise of self-defense); Report of the Special Rapporteur on Extrajudicial Executions, Human Rights Council, 14th Sess., ¶ 35,

B.      The Court is capable of resolving the constitutional questions Plaintiffs pose.

Defendants "do not suggest that there are *no* standards" for this Court to apply; rather, they object to the "notion of *judicially* crafted and managed standards." Defs. Br. 12–13 (first emphasis added). Again, their concern loses force when Plaintiffs' question is properly understood as whether Defendants violated the constitutional rights of the deceased, a question squarely committed to the Judiciary. *See, e.g.*, *Zivotofsky*, 132 S. Ct. at 1428 (stating that concerns about the lack of judicially manageably standards "dissipate . . . when the issue is recognized to be the more focused one" of statutory and constitutional interpretation).

After conceding that there *are* standards according to which this Court can adjudicate Plaintiffs' claims, Defendants assert—incongruously—that the Court would have to "fashion[] out of whole cloth some standard." Defs. Br. 15 (citing *El-Shifa*, 607 F.3d at 845). No such task would be required. There is a well-developed body of judicial standards for evaluating Plaintiffs' claims that Defendants' use of lethal force against the decedents violated the Fourth and Fifth Amendments. *See infra* § IV(A)(2)(b) (discussing judicial tests for reasonableness and deliberate indifference). Defendants' assertion is further undermined by their own subsequent argument: When they insist that the killings of decedents did *not* violate the Fourth and Fifth Amendments, they cite some of the relevant case law, Defs. Br. 35–39, 41–44. *See Zivotofsky*, 132 S. Ct. at 1428 (judicially manageable standards were evidenced by both sides' detailed legal arguments).

---

A/HRC/14/24/Add.6 (May 28, 2010); Ashley S. Deeks, "*Unwilling or Unable": Toward a Normative Framework for Extraterritorial Self-Defense*, 52 VA. J. INT'L L. 483 (2012). The question Plaintiffs raise is separate and distinct: whether the use of lethal force *against the deceased* was lawful. The law related to national self-defense has no bearing on Plaintiffs' question.

Even if this Court were to conclude that the decedents' killings occurred in the context of armed conflict, there are also "longstanding" law-of-war standards that courts—including this Court in the Guantánamo habeas litigation—regularly use to determine the legality of military force.  *See Hamdi*, 542 U.S. at 521; *see infra* § IV(B)(1).[13]  As Defendants note, the Attorney General himself set out the key legal norms that would apply to "targeted killings" in the context of armed conflict.  Defs. Br. 13 (citing Eric Holder, Attorney General, Speech at Northwestern University (Mar. 5, 2012) ("Holder Speech") ("The Constitution guarantees due process, not judicial process."), *available at* 1.usa.gov/y8SorL).  Those standards are more than "enough to establish that this case does not 'turn on standards that defy judicial application,'" *Zivotofsky*, 132 S. Ct. at 1430 (quoting *Baker*, 369 U.S. at 211).

As the experience of this Court in the Guantánamo habeas cases demonstrates, courts are also fully capable of handling classified and otherwise sensitive military and intelligence information, and applying legal standards to that information.  *See, e.g.*, *Al Ginco v. Obama*, 626 F. Supp. 2d 123 (D.D.C. 2009) (construing the AUMF to determine whether petitioner was "part of" Al-Qaeda or the Taliban at the time he was taken into custody); *Khan v. Obama*, 741 F. Supp. 2d 1 (D.D.C. 2010) (construing the AUMF to determine whether an organization was an "associated force" of Al-Qaeda and the Taliban).[14]  Defendants' argument that the courts are

---

[13] Despite Defendants' attempt to distinguish the habeas cases, Defs. Br. 12, claims alleging unlawful deprivation of life under the Fifth Amendment's Due Process Clause are as textually committed to the courts as claims brought under the Suspension Clause.  Both are fundamental judicial checks on executive authority.  *Cf. Boumediene v. Bush*, 476 F.3d 981, 993 (D.C. Cir. 1997) (rejecting distinction between the Suspension Clause and Bill of Rights amendments because both are "restrictions on governmental power"), *rev'd on other grounds by Boumediene*, 553 U.S. 723.

[14] In *Hamdi*, the Executive Branch also argued that any "individual process" or "factual exploration" by the Judiciary regarding the Executive's bases for detaining a U.S. citizen "enemy combatant" was categorically impermissible in light of a "[r]espect for separation of powers and the limited institutional capabilities of courts in matters of military decision-making."  542 U.S.

"hardly competent" to evaluate such information, Defs. Br. 14, flies in the face of this experience.

Indeed, in *Al-Aulaqi v. Obama*, Judge Bates stated that the plaintiff was "correct to point out that habeas cases involving Guantanamo detainees often involve judicial scrutiny of highly sensitive military and intelligence information." 727 F. Supp. 2d 1, 50 (D.D.C. 2010). Judge Bates ultimately concluded that the relief the plaintiff sought in that case—an injunction against future action—"dictate[d] a different outcome" there than in the habeas litigation. *Id*. But the relief Plaintiffs now seek relief requires only the type of "post hoc determinations [that] are 'precisely what courts are accustomed to assessing,'" *id*. (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 65 (D.D.C. 2004)). Defendants gloss over this important distinction in arguing that the "same logic" of Judge Bates' deliberately narrow political question ruling applies here, Defs. Br. 10. *See Al-Aulaqi*, 727 F. Supp. 2d at 52 ("[T]his Court does not hold that the Executive possesses unreviewable authority to order the assassination of any American whom he labels an enemy of the state." (quotation marks omitted)).

C.   <u>Plaintiffs' constitutional claims pose legal questions, not policy choices, and the Court's adjudication of those questions would not show a lack of due respect to the political branches.</u>

Defendants erroneously argue that Plaintiffs' claims involve "policy choices," the adjudication of which would show a lack of respect to the political branches, Defs. Br. 17–18. But Plaintiffs ask this Court to determine whether Defendants' use of lethal force against the decedents was lawful—not whether it was "strategic" or "wise," *id.* 19; *see El-Shifa*, 607 F.3d at

---

at 527 (plurality opinion) (alteration in original). The government demanded that the courts "*assume the accuracy* of the Government's articulated basis for Hamdi's detention"—a lone Defense Department official's declaration that Hamdi was an enemy combatant. *Id.* at 527–28 (emphasis added). Eight Justices of the Court forcefully rejected this position, as it would invert our system of separation of powers. *See id.* at 536–37; *id.* at 541 (Souter, J., concurring in part); *id.* at 564 (Scalia, J., dissenting).

842; *see also Zivotofsky*, 132 S. Ct. at 1427.  The factors involved in evaluating Plaintiffs'

constitutional claims—for example, whether a threat is imminent, whether non-lethal alternatives

are available, and whether lethal force is permissible in light of the threat to bystanders—are not

"policy choices and value determinations," Defs. Br. 18 (quotation marks omitted), but well-

established legal criteria that courts routinely apply in evaluating the constitutionality of the use

of lethal force under the Fourth and Fifth Amendments.[15]  *See infra* § IV(A)(1)–(2).

 Finally, the Court "should be particularly cautious before forgoing adjudication of a

dispute on the basis that judicial intervention . . . would express a lack of respect due coordinate

branches of government."  *Zivotofsky*, 132 S. Ct. at 1432 (Sotomayor, J., concurring) (quotation

marks omitted).  The Supreme Court has "repeatedly rejected th[is] view."  *Id.*  Simply put,

"[i]nterpretation of the Constitution does not imply lack of respect for a coordinate branch."

*Goldwater v. Carter*, 444 U.S. 996, 1001 (1979).[16]

## III.  A *Bivens* Remedy Is Available to Plaintiffs

 "'[I]t has been the rule from the beginning,'" the Supreme Court stated in *Bivens v. Six*

*Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), that "'where

---

[15] *People's Mojahedin Org. of Iran v. U.S. Dep't of State* ("*PMOI*"), 182 F.3d 17 (D.C. Cir. 1999), is a far cry from the proposition for which Defendants cite it: that the determination of whether the decedents presented an imminent threat—a judicially established inquiry that is part of the Fourth and Fifth Amendment tests for determining the legality of lethal force—is a political question, Defs. Br. 15.  In *PMOI*, the D.C. Circuit found that the Secretary of State's determination, for the purpose of designating foreign terrorist organizations, that an organization "threatens . . . the national security of the United States" was a "political judgment[]" beyond the competence of the Judiciary to disturb.  182 F.3d at 23.  Plaintiffs' claims, which allege violations of the constitutional rights of U.S. citizens, are the antithesis of "decisions of a kind for which the Judiciary has neither aptitude, facilities[,] nor responsibility," *id.* (quotation marks and citations omitted).

[16] Defendants' assertion that the use of lethal force against the decedents was authorized by the AUMF and that, necessarily, judicial review of that use of force would show a lack of respect to the political branches, Defs. Br. 20—once again—contradicts Plaintiffs' allegation that Defendants' conduct occurred outside the context of armed conflict, Compl. ¶ 4.  *See supra* § I.

federally protected rights have been invaded, . . . courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id.* at 392 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).  In *Bivens*, the Supreme Court held that an individual alleging a Fourth Amendment violation by federal officers could sue those officers directly under the Constitution.  *Id.* at 390; *accord Davis v. Passman*, 442 U.S. 228, 245 (1979) (same as to violation of Fifth Amendment Due Process).  A *Bivens* remedy is available unless: (1) Congress has displaced the remedy with an alternative that is "equally effective in the view of Congress," or (2) a balance of "special factors counseling hesitation" weighs against relief.  *Bivens*, 403 U.S. at 397, 396.  Subsequent Supreme Court decisions have adhered to that approach.  *See, e.g.*, *Minneci v. Pollard*, 132 S. Ct. 617, 621–22 (2012).  Congress has not precluded the *Bivens* remedy Plaintiffs seek, and no special factors prevent this Court from providing that remedy to Plaintiffs.

"[F]rom its inception," *Bivens* liability has been founded "on the deterrence of individual officers who commit unconstitutional acts."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001).  Defendants' conduct—the premeditated killing of three U.S. citizens by executive fiat— is of an extraordinary nature.  For this Court to conclude that Plaintiffs' claims do not give rise to a *Bivens* action would lead to the chilling conclusion that federal officials can unlawfully take the lives of their fellow citizens without ever having to answer for their actions in court.  But "[n]o man in this country is so high that he is above the law," *United States v. Lee*, 106 U.S. 196, 220 (1882), and accepting Defendants' argument would negate both *Bivens*'s animating deterrent purpose and this Court's "particular responsibility to assure the vindication of constitutional interests," *Bivens*, 403 U.S. at 407 (Harlan, J., concurring).  *See Carlson v. Green*, 446 U.S. 14, 25 (1980) ("A federal official contemplating unconstitutional conduct . . . must be prepared to face the prospect of a *Bivens* action.").

A.    No special factors counsel hesitation.

1.    *"Special factors" identified by the Supreme Court concern the legislative, not executive, prerogative.*

Defendants correctly represent that "separation-of-powers concerns" underlie the "hesitation" aspect of the *Bivens* "special factors" analysis. Defs. Br. 21.  But they wrongly imply that such concerns relate to judicial reluctance to interfere with *executive* action.  Rather, the Supreme Court has clearly identified "special factors" relating to the *legislative* prerogative as those "counseling hesitation" under *Bivens*.[17]  Recognizing a *Bivens* claim here would implicate no such concerns.

The Supreme Court has identified only a limited number of "special factors" to date: (1) concerns relating to "federal fiscal policy" or a congressional delegation of authority, *see Bivens*, 403 U.S. at 396–97; (2) intrusion on "'the unique disciplinary structure of the Military Establishment and Congress' activity in the field,'" *United States v. Stanley*, 483 U.S. 669, 683 (1987) (quoting *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)); and (3) "difficulty in defining a workable cause of action," *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007).  Caution in the "special factors" analysis is therefore only related to congressional action—particularly to Congress's decisionmaking as to whether, and which, remedies should lie for rights violations.[18]

---

[17] *See Bush v. Lucas*, 462 U.S. 367, 380 (1983) (describing the "special factors" cited in *Bivens* as "not concern[ing] the merits of the particular remedy" but, rather, "the question of who should decide whether such a remedy should be provided"—*i.e.*, the Judiciary or the Legislature).  In fact, Defendants' own citation of *Bush* acknowledges that it is "those who write the laws" to whom "special factors" deference is due.  Defs. Br. 24 (quotation marks omitted).

[18] Concerns about intrusion into Executive Branch functions and decisionmaking are more appropriately considered in the context of absolute or qualified immunities from suit, the state-secrets privilege, or the political question doctrine.  *See Hui v. Castaneda*, 130 S. Ct. 1845, 1852 (2010) (explaining that *Bivens* "special factors" and qualified immunity "present[] . . . *separate question*[*s*]" (emphasis added)); *Stanley*, 483 U.S. at 684 ("[T]he *Bivens* inquiry . . . is analytically distinct from the question of official immunity from *Bivens* liability.");  *Carlson*, 446 at 19.  By invoking the same concerns in relation to *Bivens* that they raise in their political

Thus, in *Chappell*, the Court identified the military's congressionally enacted system of discipline as a special factor counseling against the recognition of a *Bivens* claim for racial discrimination brought by enlisted personnel against their superior officers.  462 U.S. at 304. And in *Stanley*, the Court held that "special factors" weighed against inferring a *Bivens* remedy for an action brought by a serviceman claiming that he was secretly administered LSD as part of an Army experiment.  483 U.S. at 683–84.  The "special factor" implicated by *Chappell* and *Stanley* was expressly limited to claims by servicemembers that would intrude on Congress's carefully legislated system of internal military discipline.[19]

Here, Congress has not acted in a way to cause this Court to "stay its *Bivens* hand," *Wilkie*, 551 U.S. at 554.  To the contrary, Defendants point to no statute or category of legislation whose purposes would be frustrated by a *Bivens* remedy here.  Reaching for one, Defendants cite a congressional "humanitarian relief" fund that gives the Secretary of Defense sole discretion over its use in reconstruction efforts in Iraq and Afghanistan.  *See* Defs. Br. 24.  But a congressional choice to authorize discretionary humanitarian relief inside two war zones says nothing about a congressional prerogative to authorize or reject a cause of action against high-ranking officials for killing Americans far from any battlefield.  Defendants also cite two other statutes, arguing that both "preclude compensation for injuries resulting from combat."  Defs. Br.

---

question argument, *see* Defs. Br. 23, Defendants are asking this Court to engage in improper double-counting of the same considerations.

[19] To the same effect, the *Bivens* dissents focused their criticisms on the manner in which the case's holding "imping[ed] on the legislative and policy functions that the Constitution vests *in Congress*." 403 U.S. at 418 (Burger, C.J., dissenting) (emphasis added); *accord id.* at 429 (Black, J., dissenting) ("The task of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures of the States.").  And in later cases in which the Supreme Court has declined to recognize *Bivens* liability, it has justified such restraint as a means of protecting against judicial arrogation of Congress's power to fashion remedies.  *See, e.g.*, *Malesko*, 534 U.S. at 75 (Scalia, J., concurring); *F.D.I.C. v. Meyer*, 510 U.S. 471, 485 (1994).

24 n.18 (citing 10 U.S.C. §§ 2733(a), 2734(a)).  Yet neither statute applies to claims for

constitutional violations, *see* 32 C.F.R. § 536.42, nor do they apply to intentional torts, *see id.*

§ 536.45(h).  Authorizing discretionary relief in limited cases simply cannot demonstrate an

affirmative congressional purpose to bar claims to which that relief *does not even apply*.  It is

only "if Congress has 'not inadvertently' omitted damages against officials in the statute at

issue" that "courts must abstain from supplementing Congress' otherwise comprehensive

statutory relief scheme with *Bivens* remedies."  *Spagnola v. Mathis*, 859 F.2d 223, 229 (D.C. Cir.

1988); *accord Wilson v. Libby*, 535 F.3d 697, 706 (D.C. Cir. 2008).  There must be both an

applicable "statutory relief scheme" and a deliberate decision by Congress to exempt certain

officials from liability under that scheme.[20]  But neither is present in this case.[21]

Rather, here, due deference for Congress's role in deciding whether to legislate remedies

or leave them for the courts to provide counsels in favor of a *Bivens* remedy.  At least since

*Mitchell v. Forsyth*, 472 U.S. 511 (1985), Congress has been aware that the courts do not afford

absolute immunity to high-ranking officials for constitutional violations resulting from

decisionmaking in the context of national security.  *See id.* at 524 ("We do not believe that the

security of the Republic will be threatened if its Attorney General is given incentives to abide by

clearly established law.").[22]  Likewise, *Bivens* has been a canonical part of U.S. law for more

---

[20] In *Wilson*, the D.C. Circuit primarily relied on the "special factor" that "Congress created a *comprehensive* Privacy Act scheme that *did not inadvertently exclude a remedy* for the claims brought against these defendants."  535 F.3d at 710 (emphases added).

[21] In fact, even when Congress drafted statutes after the September 11, 2011 attacks that *do* limit the liability of government actors in a variety of national-security-related areas (unlike those cited by Defendants), it never acted to shield government officials from liability for injuries they caused.  *See, e.g.*, Military Commissions Act of 2006, Pub. L. No. 109-366, § 7(a), 120 Stat. 2600, 2635-36 (2006) (codified at 28 U.S.C. § 2241(e)); Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1004(a) (2005) (codified at 42 U.S.C. § 2000dd-1(a)).

[22] In *Mitchell*, the plaintiff sought damages from the Attorney General for authorizing a warrantless wiretap of his communications in the name of national security.  472 U.S. at 513–14.

than forty years.  Thus, since that decision, Congress has known that federal officers may be sued for damages in federal courts for violations of citizens' constitutional rights.  Defendants' argument would have the Court accept that Congress's awareness—and its long silence as to the issues at stake in this case—mean precisely the opposite of what logic dictates.[23]

       2.    *The "special factors" identified by Defendants do not counsel hesitation.*

The "special factors" identified by Defendants are unpersuasive on their own merits, and the cases upon which Defendants rely in fashioning those factors are readily distinguishable from this one.  Indeed, it would be perverse to deny Plaintiffs a *Bivens* remedy in this case, which involves the gravest of constitutional harms, when that remedy is available to remedy federal law-enforcement officers' "unlawful arrest of an individual in his Brooklyn apartment," Defs. Br. 22, and other, far lesser abuses.[24]

---

The Attorney General insisted that he should be absolutely immune from suit for such decisions, but the Supreme Court squarely rejected that approach, holding that the availability of qualified immunity provided ample breathing space for national-security decisions.  *Id.* at 520, 524.

[23] Contrary to Defendants' position and the analysis of some courts, the deference to legislative functions underlying the "special factors" analysis does not suggest that "courts should not proceed down this . . . road in the absence of affirmative action by Congress," *Lebron v. Rumsfeld*, 670 F.3d 540, 555 (4th Cir.), *cert. denied*, 132 S. Ct. 2751 (2012).  *Bivens* did not impose a requirement that Congress authorize damages suits before the federal courts may imply them directly under the Constitution.  To see the error of the *Lebron* analysis, the Court need look no further than *Bivens* itself, where a remedy was awarded even without such "affirmative action" by Congress—and that, of course, is the very import of the *Bivens* decision.  *See Butz v. Economou*, 438 U.S. 478, 503 (1978) (explaining that "[t]he presence or absence of congressional authorization for suits against federal officials is . . . relevant to," but not determinative of, "the question whether to infer a right of action for damages for a particular violation of the Constitution").

[24] *See, e.g.*, *Morgan v. United States*, 323 F.3d 776, 780–82 (9th Cir. 2003) (remanding for consideration of Fourth Amendment claim against military officers for unreasonable vehicle search); *Del Raine v. Williford*, 32 F.3d 1024, 1031, 1037–38 (7th Cir. 1994) (reversing dismissal of prisoner's Eighth Amendment deliberate-indifference claim based on plaintiff's "bitterly cold" cell).

Defendants are wrong in their portrayal of D.C. Circuit cases as having created a blanket "national security" exemption from *Bivens* liability.  Defendants rely on three cases for the proposition that "special factors" are present "where claims directly implicate matters involving national security and particularly war powers," or "the effectiveness of the military."  Defs. Br. 25 (citing *Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012), *reh'g en banc denied*, Order, No. 11-5209 (D.C. Cir. July 30, 2012); *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011); *Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009)).  But far from announcing a categorical *Bivens* exception, those cases are quite limited in their collective reach.

As the D.C. Circuit itself emphasized in *Doe v. Rumsfeld*, that case falls squarely within *Chappell* and *Stanley*, the Supreme Court's twin "internal military affairs" *Bivens* cases.  The *Doe* court saw no distinction between the plaintiff before it—a civilian translator for a defense contractor operating in Iraq—and the servicemembers in *Chappell* and *Stanley*; the case was therefore a straightforward application of Supreme Court precedent.  *See Doe*, 683 F.3d at 394 ("Granted, [the plaintiff] is a contractor and not an actual member of the military, but we see no way in which this affects the special factors analysis.").  Plaintiffs' suit does not involve claims by or on behalf of servicemembers or military contractors, and it does not come close to raising concerns about judicial circumvention of a congressionally structured system of internal military discipline.[25]

Next, Defendants note that both *Ali* and *Rasul* contain language suggesting that a *Bivens* "special factor" in those cases was "the danger of obstructing U.S. national security policy."  Defs. Br. 25 (quotation marks omitted).  But, critically, Defendants leave out the relevant

---

[25] Moreover, any language in *Doe* suggesting a widening of the "special factor" identified in *Stanley* and *Chappell* was simply unnecessary to the case's resolution and, therefore, dicta.  *See Kastigar v. United States*, 406 U.S. 441, 454–55 (1972); *Lawson v. United States*, 176 F.2d 49, 51 (D.C. Cir. 1949).

contexts in those cases.  The claims in *Ali* and *Rasul* were brought by foreign citizens against

U.S. officials, and the D.C. Circuit's explicit *Bivens* concerns in both cases related to the fear of

*foreign nationals* using U.S. courts to litigate national-security and foreign-relations matters

against U.S. officials.  *See Ali*, 649 F.3d at 774; *Rasul*, 563 F.3d at 532 n.5. Contrary to

Defendants' bare assertion that citizenship was immaterial to those cases, *see* Defs. Br. 25 n.19,

it was inseparable from the analyses in both.  *Ali* and *Rasul* each relied primarily on *Sanchez-

Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), a case involving claims by Nicaraguan

citizens against U.S. officials concerning activities that took place in Nicaragua.  *See id.* at 209.

And the Circuit expressly predicated its decision in *Sanchez-Espinoza* on the "the danger of

*foreign* citizens' using the courts in situations such as this to obstruct the foreign policy of *our*

government."  *Id.* (emphases added).  *Ali* and *Rasul* confirmed that interpretation.  *See Ali*, 649

F.3d at 774; *Rasul*, 563 F.3d at 532 n.5.  Citizenship was thus inextricable from the "special

factors" discussions.[26]

  *Doe*, *Ali*, and *Rasul* thus do not recognize the broad national-security "special factor"

Defendants assert here.  Even if they did, however, national-security concerns should not bar

recognition of a *Bivens* remedy here.  Defendants' actions go beyond even the horrific

allegations of mistreatment and torture of the plaintiffs in previous cases:  This case is

fundamentally about *life*, and its loss—three times over—as a result of Defendants' actions.  The

gravity of the harm alone supplies a "reason for," *Wilkie*, 551 U.S. at 550, recognizing a remedy

even in the face of "special factors" concerns.  *See infra* § III(C).

---

[26] In *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (en banc), the Seventh Circuit rejected
the *Bivens* claim of two U.S. citizens who alleged that they were subjected to unconstitutional
mistreatment while in military custody in Iraq.  *Id.* at 195–96.  While the majority did not view
the plaintiffs' citizenship to be "dispositive one way or the other," *id.* at 203, it ignored entirely
that "background statutes—not to mention international law—are replete with distinctions based
on citizenship," *id.* at 209 (Wood, J., concurring) (citing relevant statutes).

Defendants' "special factors" warnings of damage to military effectiveness, prestige, and decisionmaking are unconvincing.  *See* Defs. Br. 25–27.  Military and intelligence officers must obey the commands of the Constitution regardless of the context in which they act, even when exercising national-security and war powers.[27]  When those officers violate the constitutional rights of citizens, judicial review is not an "intrusion" into their affairs but rather the performance of the courts' constitutional duty to ensure that the officers act "consistent with . . . the Constitution."  *Parisi v. Davidson*, 405 U.S. 34, 55 (1971) (Douglas, J., concurring); *see id.* ("When the military steps over [the] bounds [of constitutional civil liberties], it leaves the area of its expertise and forsakes its domain.  The matter then becomes one for civilian courts to resolve . . . ." (footnote omitted)).

And in the particular circumstances presented by Plaintiffs' claims, Defendants' "special factors" arguments ring particularly hollow.  This is not a lawsuit that implicates real-time decisionmaking in war:  Defendants' decisions to authorize and direct the killings of the three deceased citizens have already been made; the intelligence Defendants relied upon in making those decisions has already been collected, evaluated, and acted upon; and the decisions have been publicly discussed and defended by Defendants and others in the government.  *See* Compl. ¶¶ 32–33.  If Defendants' argument were correct, military defendants would never see the ink of a federal-pleading caption.  Yet they regularly do, without any "profound implications on military effectiveness" or a notable "infus[ion of] . . . hesitation into the real-time, active-war decision-making of military officers," Defs. Br. 26.[28]

---

[27] *See* U.S. Dep't of the Army, Field Manual 27-10: The Law of Land Warfare ¶ 7 (1956); *cf. Philips v. Perry*, 106 F.3d 1420, 1439 (9th Cir. 1997) ("[T]he military is not above the constitution.").

[28] Civilians may sue military personnel who violate their constitutional rights.  *See Vance v. Rumsfeld*, 701 F.3d 193, 213–14 (7th Cir. 2012) (en banc) (Hamilton, J., dissenting) (listing

Moreover, unlike other cases in which courts have dismissed *Bivens* claims, this lawsuit does not seek to delve into the "job risks and responsibilities of covert CIA agents" or "ongoing covert operations," *Wilson*, 535 F.3d at 710 (quotation marks omitted).[29]  It does not seek to uncover future national-security plans.  It is, instead, a suit of limited aim, asking the Court to determine whether Defendants acted in accordance with the Constitution when they took actions resulting in the deaths of three American citizens.[30]

Finally, any "special factor" concern related to foreign relations is likewise unfounded and unpersuasive.  As Defendants' own brief acknowledges, "the precise foreign affairs concerns detailed in *Ali* and *Sanchez-Espinoza*"—the two cases, in addition to *Doe*, they cite to demonstrate the very existence of such a "special factor"—"do not squarely arise in this case." Defs. Br. 28.[31]  While Defendants cast Plaintiffs' claims—whether Defendants' killings of U.S. citizens violated the U.S. Constitution—as having the potential to "clearly affect our government's relations with the government[s] of Yemen," Egypt, and other countries, *id.*, this is

---

cases); *see also, e.g.*, *Case v. Milewski*, 327 F.3d 564 (7th Cir. 2003) (addressing a civilian's Fourth and Fifth Amendment claims against military officers).

[29] To the extent Defendants argue that Plaintiffs' claims "raise the specter of disclosing classified intelligence information in open court," Defs. Br. 26; *see Wilson*, 535 F.3d at 710, consideration of such a "specter" (1) is inappropriate in the "special factors" analysis, (2) is premature at this stage, and (3) can be adequately mitigated by the Classified Information Procedures Act, 18 U.S.C. app.

[30] Courts are plainly competent to review cases implicating even the most sensitive national-security issues.  More than three decades ago, the Supreme Court rejected the suggestion that national-security matters are "too subtle and complex for judicial evaluation."  *United States v. U.S. Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 320 (1972); *see Zweibon v. Mitchell*, 516 F.2d 594, 641–42 (D.C. Cir. 1975) (en banc) ("[W]e do not believe federal judges will be insensitive to or uncomprehending of the issues involved in foreign security cases . . . ." (quotation marks omitted)); *see also supra* § II(B) (discussing this Court's role in evaluating the legality of executive detention over the past decade).

[31] In any event, none of the three control this case, as discussed above in this subsection.

a diversion, not an argument directed at substance.[32]  In determining whether to provide a

remedy for constitutional violations committed in a foreign country, courts routinely inquire into

the relationships, cooperation, and communications between the United States and foreign

governments and officials.  *Cf. Zivotofsky*, 132 S. Ct. at 1428.

      B.      <u>Congress has not provided an alternative remedy.</u>

In considering Plaintiffs' *Bivens* claims, this Court must also consider whether an

existing remedy protects the constitutional interest at stake.  *Wilkie*, 551 U.S. at 550.  But just as

in *Bivens* itself, Plaintiffs have no alternative means of redress for the killings of their sons and

grandson.  For Plaintiffs, "it is damages or nothing," 403 U.S. at 410 (Harlan, J., concurring).

Statutes cited by Defendants are unavailable, inadequate, or both.[33]  Without a *Bivens* remedy,

Plaintiffs will have *no* opportunity to challenge the legality of Defendants' conduct in *any* U.S.

forum.  *See, e.g.*, *Lebron v. Rumsfeld*, 670 F.3d 540, 556 (4th Cir.) (finding that the plaintiff "had

extensive opportunities to challenge the legal basis for his detention" in several habeas

proceedings), *cert. denied*, 132 S. Ct. 2751 (2012).  The legality of Defendants' actions can only

be adjudicated through this lawsuit.

---

[32] *See, e.g.*, *United States v. Abu Ali*, 528 F.3d 210, 226–30 (4th Cir. 2008); *United States v. Yousef*, 327 F.3d 56, 123 (2d Cir. 2003).  Experience shows that those inquiries will proceed with due caution and care.  *See Abu Ali*, 350 F. Supp. 2d at 64.

[33] To the extent Defendants argue that other statutes provide alternative remedies here, even if such statutes applied to Plaintiffs' claims (which they do not, *see* 32 C.F.R. §§ 536.42, 536.45(h)), both are left entirely to Executive Branch discretion and afford no judicial review, *see* 10 U.S.C. §§ 2733(a), 2734(a).  For that reason, they are far from the "elaborate" remedial scheme that was the subject of "frequent and intense" "[c]ongressional attention" in *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988), and from the statutory scheme in *Bush v. Lucas*, 462 U.S. at 388–89.  Moreover, Plaintiff Sarah Khan would have been ineligible under one of the cited statutes' foreign-inhabitant criterion for bringing claims.  *See* 10 U.S.C. § 2734(a).

C.    A *Bivens* remedy should be available to Plaintiffs even if the Court concludes that special factors "counsel[] hesitation."

Crucially, the "special factors" test is not, as Defendants would have it, merely whether such factors exist.  Rather, the Supreme Court's *Bivens* jurisprudence instructs courts to "'make the kind of remedial determination that is appropriate for a common-law tribunal'" after "'*paying particular heed*'" to those factors.  *Wilkie*, 551 U.S. at 550 (emphasis added) (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1988)); *accord Wilson*, 535 F.3d at 708.  A *Bivens* remedy ultimately is "a subject of judgment," *Wilkie*, 551 U.S. at 550, and this Court should not lose sight of that mandate despite Defendants' attempt to fashion an on–off switch from the "special factors" analysis.

There could not be a case presenting a clearer instance of when a court must allow a *Bivens* claim even in the face of any "special factors counseling hesitation."  Three American citizens who had never been charged by the government with a crime were killed after Defendants authorized and directed their killings in a closed executive process, on the basis of vague standards and untested evidence.  Presented with these allegations, the Court should not be swayed by Defendants' appeal to implications for "military effectiveness" or "real-time, active-war decision-making," Defs. Br. 26.  Again, the active-war context Defendants assert is not the setting for Plaintiffs' claims.  *See supra* § I.  But in wartime or not, provoking "hesitation" to ensure conformity with the law is precisely the purpose of the *Bivens* action:  "'Where an official could be expected to know that his conduct would violate statutory or constitutional rights, *he should be made to hesitate . . . .*'"  *Mitchell*, 472 U.S. at 524 (some emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)); *accord Carlson*, 446 U.S. at 25 ("A federal official contemplating unconstitutional conduct . . . must be prepared to face the prospect of a *Bivens* action.").

In long ago rejecting an absolute-immunity rule in national-security cases, the Supreme Court took for granted officials' good faith in executing their duties, but, even so, warned that the "danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity." *Mitchell*, 472 U.S. at 523; *accord Butz v. Economou*, 438 U.S. 478, 501 (1978) ("[T]he cause of action recognized in *Bivens* . . . would . . . be drained of meaning if federal officials were entitled to absolute immunity for their constitutional transgressions." (quotation marks omitted)). That "danger" is distinctly present in this case. Defendants' arguments would deny a cause of action to *all* future plaintiffs based on the *mere possibility* that their suits might somehow burden Executive Branch officials by requiring them to justify grave constitutional abuses. But that is manifestly not what *Bivens* represents. This Court should not endorse a rule that would effectively insulate from judicial review the most egregious type of official misconduct.

## IV.    The Defendants Are Not Entitled to Qualified Immunity from Their Violations of Decedents' Constitutional Rights

The constitutional right not to be deprived of life by government officials without due process of law is elemental. Under the circumstances Plaintiffs allege, Defendants' use of deadly force against the decedents—Americans citizens who had never been charged with and convicted of a crime, and did not pose a specific, concrete, and imminent threat—was unambiguously unconstitutional under the Fourth and Fifth Amendments. Even in the context of armed conflict, the Constitution continues to protect U.S. citizens and, at a minimum, the laws of warestablish clear constraints on the use of lethal force against civilians that are well known to, and binding

on, U.S. military and intelligence officials.[34]  Defendants therefore violated the decedents'

clearly established rights and are not entitled to qualified immunity.  *See Harlow*, 457 U.S. at

818 (1982).[35]

      A.    <u>Defendants' use of lethal force violated the decedents' clearly established constitutional rights.</u>

Outside the context of armed conflict, the Constitution unambiguously prohibits the

deprivation of life and the use of excessive force in effecting seizures, except where lethal force

---

[34] Defendants concede that the clearly established Fourth and Fifth Amendment standards upon which Plaintiffs rely are "accepted" standards.  Defs. Br. 41.  They assert, however, that Plaintiffs seek to "import" these standards into the context of armed conflict, thereby rendering the decedents' rights in that context unclear.  *Id.* 35.  But Defendants misconstrue Plaintiffs' argument:  Plaintiffs argue that Fourth and Fifth Amendment standards developed in the law-enforcement context apply to their claims in the *non-armed-conflict* context Plaintiffs allege; they separately argue that clearly established law-of-war standards apply to the use of lethal force in the context of armed conflict.  *See infra* § IV(B)(1).  And while Defendants argue that the decedents' rights not to be arbitrarily killed were unclear in the factual context they ask the Court to assume, that argument—yet again—depends on factual assertions that are improper at this stage.  *See supra* § I.  In any event, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 454 n.4 (1971) ("It has been repeatedly decided that [the Fourth and Fifth] Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous executive officers.").

[35] The Court should thus not forgo, as Defendants urge, the usual first inquiry of the qualified immunity analysis—whether the facts alleged, "[t]aken in the light most favorable" to Plaintiffs, make out the violation of a constitutional right, *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  When Defendants raise a qualified immunity defense, courts may "avoid avoidance" because, as the Supreme Court has "long recognized . . . [, its] regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo."  *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011).  Where, as here, government officials' unconstitutional conduct may recur, avoiding the constitutional question threatens "the development of constitutional precedent and the promotion of law-abiding behavior."  *Id.* (quotation marks omitted).  Indeed, in light of the fundamental rights at stake, "clarify[ing] the legal standards governing public officials," *id.* at 2032, could not be more critical.  The Court should thus first determine whether Defendants' conduct violated the decedents' constitutional rights, and next decide whether Defendants should have known that such conduct violated the Constitution.  *See Saucier*, 533 U.S. at 201.

is a last resort in the face of an imminent threat.  Defendants do not argue otherwise. [36]  That the decedents were killed abroad does not render their clearly established constitutional rights unclear.  *See, e.g.*, *Reid*, 354 U.S. at 6 ("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.  This is not a novel concept.  To the contrary, it is as old as government.").

> 1.   *Defendants' conduct violated the Fourth Amendment rights of the decedents.*

It is among the most basic of constitutional interpretations that the Fourth Amendment's prohibition on "unreasonable seizures" bars government officials from using excessive force against citizens.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under the Supreme Court's prevailing standard, an official's use of deadly force violates the Fourth Amendment unless it is "objectively reasonable" under the circumstances.  *Id*. at 397.

To evaluate the reasonableness of lethal force, courts routinely rely on two primary criteria.  First, the use of lethal force is reasonable only when an individual poses a concrete and imminent threat of deadly harm.  *See Scott v. Harris*, 550 U.S. 372, 384 (2007); *see also, e.g.*, *Graham*, 490 U.S. at 396; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  The imminence of a threat is assessed at the moment force is applied.  *See Graham*, 490 U.S. at 396.  An individual who poses a general threat that has not yet become concrete and imminent thus does not justify "such a level of force that death is nearly certain."  *Cordova v. Aragon*, 569 F.3d 1183, 1190

---

[36] To the extent that Defendants rely on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), Defs. Br. 33, to somehow suggest that the Fourth Amendment did not apply in this context, the case is inapposite.  *Verdugo* turned on the foreign-national status of the plaintiff, who had no ties to this country.  *See* 494 U.S. at 274–75.  It did not call into question the baseline rule that the Fourth Amendment protects U.S. citizens abroad.

(10th Cir. 2009).  Second, officials' intentional use of lethal force must be a "last resort,"

meaning that no non-lethal means of preventing the threat can reasonably be used.  *Price v.*

*United States*, 728 F.2d 385, 388 (6th Cir. 1984); *see, e.g., Phillips v. Cmty. Ins. Corp.*, 678 F.3d

513, 519 (7th Cir. 2012) (finding that force is unreasonable if the officer uses "greater force than

was reasonably necessary to effectuate the arrest"); *Johnson v. Dist. of Columbia*, 528 F.3d 969,

977 n.4 (D.C. Cir. 2008) (same).  And when, as here, officials use deadly force against an

individual who has not been accused or charged with a crime, the use of force becomes less

objectively reasonable.  *See, e.g., Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir.

2010); *cf. Garner*, 471 U.S. at 9 ("The use of deadly force also frustrates the interest of the

individual, and of society, in judicial determination of guilt and punishment.").[37]

(a)     Anwar Al-Aulaqi

Applying the clear standards above to the Complaint, Defendants' deliberate use of lethal

force against Anwar Al-Aulaqi was an unreasonable seizure.  Although Defendants (improperly)

assert facts supporting their contention that lethal force was reasonable against Al-Aulaqi

because he was "an enemy and an active threat," Defs. Br. 37–38, they do not claim that he

posed a concrete and imminent threat when he was killed as the Fourth Amendment requires for

lethal force to be reasonable.  The distinction is critical; it means that federal officials cannot

---

[37] The Fourth Amendment's limitations on the use of deadly force are consistent with established standards under international human rights law.  *See, e.g.,* Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, princ. 4, 9, U.N. Doc. A/CONF.144/28/Rev.1 at 112 (Aug. 27–Sept. 7, 1990) (requiring an "imminent" threat and use of non-violent means before resort to lethal force); *Andronicou and Constantinou v. Cyprus*, 1997-VI Eur. Ct. H.R., ¶¶ 183–85, 191 (same); *Aytekin v. Turkey*, App. No. 22880/93, Eur. Comm'n H.R., ¶¶ 95–96 (1997) (holding that a general threat of terrorist activity will not justify the use of lethal force); *McCann v. United Kingdom*, 324 Eur. Ct. H.R., ¶¶ 201–3 (1995) (concluding that U.K. security officials' automatic resort to lethal force in counter-terrorism operation was evidence of a lack of requisite care in planning it).

impose an extrajudicial death sentence on the ground that a citizen presented a threat in the past or might present one in some unspecified future.[38]

Moreover, Defendants authorized Al-Aulaqi's addition to and continued placement on their "kill lists" beginning as early as January 2010, Compl. ¶¶ 12, 13, 23, which amounted to a standing order to kill him, *Id*. ¶ 19.  Defendants then directed Al-Aulaqi's killing after identifying his whereabouts and monitoring his movements with multiple drones for as long as three weeks leading up to the September 30 airstrike.  Compl. ¶ 31.  These facts undermine any argument that Defendants' decision to use lethal force was a "split-second judgment[]," Defs. Br. 37; to the contrary, their decision to kill Al-Aulaqi was clearly deliberate and made far in advance.  *See Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) (use of lethal force was not justified when there were no "exigent circumstances" and officers were able to "proceed[] deliberately").  In addition, despite the seriousness of the allegations Defendants make against Al-Aulaqi, Defs. Br. 37–38—which are up to two years old and independently fail to meet the imminence requirement, even if they could be properly considered at this stage—the U.S. government never charged him with a crime.[39]  That factor weighs against Defendants in the reasonableness calculus.  *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012).

While Defendants rely on *Garner* for the argument that lethal force can be used to prevent escape if there is "probable cause to believe that [a suspect] has committed a crime,"

---

[38] While Defendants cite *Scott v. Harris* to argue against "rigid preconditions" for when force may be reasonable, Defs. Br. 37, *Scott*'s conclusion that the use of lethal force was reasonable because of the presence of an "actual and imminent" threat of serious harm, 550 U.S. at 384–86, supports Plaintiffs instead.

[39] Defendants' claim that they can demonstrate their understanding of Al-Aulaqi's activities through the September 24, 2010 Clapper Declaration suffers from fatal flaws.  Defs. Br. 38 n.26.  Any threat posed by Al-Aulaqi must be assessed "at the moment" force is applied, *Graham*, 490 U.S. at 396, not more than a year before.  Moreover, Defendants' "underlying intent or motivation" is irrelevant to the objective-reasonableness inquiry.  *Id.* at 397.

Defs. Br. 38, *Garner* did not dispense with the imminence requirement, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer . . . the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").  And Defendants' assertion that Al-Aulaqi's surrender was not a viable option, Defs. Br. 38, is no answer at all (even setting aside its procedural deficiency) to the relevant question of whether Defendants could reasonably have pursued non-lethal alternatives, such as capture.  To Plaintiffs' knowledge, no court has ever held that a suspect's professed unwillingness to turn himself in—in the absence of criminal charges—justifies the use of lethal force; certainly, Defendants do not cite any.

(b)      Samir Khan

Defendants argue that the killing of Samir Khan did not violate the Fourth Amendment solely on the grounds that Khan was a bystander "unintentionally struck" when Al-Aulaqi was killed, and thus was not "seized" for Fourth Amendment purposes.  Defs. Br. 36, 42.[40] Defendants' argument directly contradicts clearly established law.  As Defendants note, a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis removed).  A seizure occurs "even when an unintended person or thing is the object of the detention or taking," so long as the taking was "willful," and not merely "an unknowing act." *Id.* at 596.  Specifically, when the government takes action against a vehicle, all persons in the vehicle are "seized" along with the driver because government action in that circumstance "does not normally . . . distinguish between passenger and driver." *Brendlin v. California*, 551 U.S. 249, 257 (2007); *see id.* at 260 (rejecting the state's argument that for an occupant to be

---

[40] If Khan was a target of Defendants' operation, the use of lethal force against him was unreasonable because, he was not engaged in any activity that presented an imminent threat of serious harm.  Compl. ¶ 35.  Defendants have never argued otherwise.

seized he must be the officer's "target").  Plaintiffs allege that Defendants authorized and directed missiles at Al-Aulaqi and his vehicle, destroying the vehicle and killing Al-Aulaqi, Khan and two others.  Compl. ¶ 31.  Khan was thus "seized" for purposes of the Fourth Amendment because lethal force was directed at the car in which he was traveling.

Defendants' use of lethal force in "seizing" Khan was unreasonable because their use of lethal force against Al-Aulaqi was unreasonable.  *See, e.g.*, *Lytle v. Bexar Cnty.*, 560 F.3d 404, 417 (5th Cir. 2009) (holding that a jury could find the use of lethal force against a passenger unreasonable because the intended target did not pose the requisite threat of harm).[41]  In addition, the intensive and lengthy monitoring of Al-Aulaqi shows that Defendants knew or should have known that bystanders were present with Al-Aulaqi at the time of the strike, and had time in advance to consider alternatives that would minimize bystander deaths.  *See, e.g.*, *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004) ("[I]t cannot be a reasonable use of force . . . to throw [an explosive weapon] 'blind' into a room occupied by innocent bystanders absent . . . careful consideration of alternatives and appropriate measures to reduce the risk of injury.").  Because Defendants made a deliberate decision to use lethal force at the moment Khan was in the vehicle (as opposed to before or after), leaving no possibility that he would survive, the use of force against Khan was unreasonable.

(c)     <u>Abdulrahman Al-Aulaqi</u>

As with Samir Khan, Defendants defend the killing of sixteen-year-old Abdulrahman on the theory that he was a bystander who was not "seized."  Defs. Br. 36.[42]  But as Plaintiffs

---

[41] The court further found that even if the officer were responding to a significant threat of harm, shooting at a vehicle in a residential area may be found unreasonable by a jury because of the risk of striking an unintended target.  *Id.* at 413.

[42] Defendants incorrectly state that Plaintiffs assert Ibraham Al-Banna was the target of the October 14, 2011 strike.  Defs. Br. 8 n.3.  Plaintiffs allege that Defendants ordered missiles to be

demonstrate above, even if Abdulrahman was an unintended victim of the October 14 drone

strike, he was "seized" within the meaning of the Fourth Amendment because the "means" of the

seizure (missile strikes) were "intentionally applied."[43]  *See Brower*, 489 U.S. at 596–97.

Moreover, regardless of whether or not Defendants directed a strike at Abdulrahman, their

actions were "willful," not accidental—a far cry from the cases cited by Defendants, where stray

bullets resulted in inadvertent injuries to third parties whom, *e.g.*, officers did not know were

present or were trying *to save*.[44]  The missile strike on the open-air restaurant where

Abdulrahman was eating was a seizure of his person, whether or not he was the intended target.

*See Brower*, 489 U.S. at 599 (using truck as roadblock to stop a fleeing car constitutes "seizure"

of passenger); *Brendlin*, 551 U.S. at 261 (discussing *Brower*); *see also Nelson*, 685 F.3d at 877.

Defendants' "seizure" of Abdulrahman was constitutionally unreasonable.  If Defendants

sought to use lethal force against an individual other than Abdulrahman, it was unreasonable to

do so when their target was at a restaurant, Compl. ¶ 37, as opposed to targeting that person

before he arrived or after he left.  The deliberate decision to direct overwhelming deadly force at

---

fired at "a person at or near the restaurant" where Abdulrahman was eating, and that "media
sources" reported that Al-Banna was the intended target, but also later reported that he was not
among those killed by the strike.  Compl. ¶ 37; *see also id.* ¶ 40 ("If [Abdulrahman] was killed
because the government was targeting another individual, his killing was unlawful.").

[43] The government has never alleged that Abdulrahman Al-Aulaqi was involved in wrongdoing
of any kind, let alone terrorism.  But if he was a target of the October 14 drone strike, the use of
lethal force against him was unreasonable.  *See* Compl. ¶ 40 (alleging that Abdulrahman was not
engaged in any activity that presented an imminent threat of serious harm).

[44] Defs. Br. 36 n.25 (citing *Claybrook v. Birchwell,* 199 F.3d 350, 354 (6th Cir. 2000) (no Fourth
Amendment claim where stray bullet struck third party whom officers did not know was there);
*Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000) (injuring hostages while
making "every effort to deliver them from unlawful abduction" was not seizure); *Medeiros v.
O'Connell*, 150 F.3d 164, 168 (2d Cir. 1998) (injury hostage sustained by ricocheted bullet was
not seizure where "every effort was bent on delivering all the hostages from deadly peril");
*Emanuel v. Dist. of Columbia*, 224 F. App'x 1 (D.C. Cir. 2007) (one-page unpublished opinion
affirming summary judgment against bystander victim of stray bullet)).

*a public restaurant* made it entirely foreseeable that bystanders, including children, would be killed.  Indeed, seven people, including Abdulrahman and another child, were killed.  Compl. ¶ 37.  Abdulrahman's status as a child also weighs heavily against the reasonableness of lethal force; courts have repeatedly held that deadly force deliberately used against minors who are not suspects and pose no other threat is objectively unreasonable.  *See*, *e.g.*, *Holland v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992).

2.      *Defendants' conduct violated the decedents' Fifth Amendment Rights.*

(a)      <u>Procedural Due Process</u>

There can be no doubt that the right not to be deprived of life without due process of law under the Fifth Amendment is fundamental, and that in the absence of a truly imminent threat, the Due Process Clause requires, at a minimum, fair notice and an opportunity to be heard before government officials may cause such a deprivation.  *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" (alteration in original) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring))).[45]  The decedents' interest in their rights to life—and against a wrongful or erroneous deprivation through inadequate, unilateral, Executive Branch process— could not be higher.

---

[45] For the purposes of this motion, Plaintiffs assume that the *Mathews v. Eldridge* balancing test is appropriate for this Court to consider how much process is due.  *But see Hamdi* 542 U.S. at 575–76 (Scalia, J., dissenting) (criticizing *Mathews* test when applied to citizen's constitutional right not to be detained by Executive, even in wartime: "Whatever the merits of this technique when newly recognized property rights are at issue (and even there they are questionable), it has no place where the Constitution and the common law already supply an answer.").

—35—

To comply with the Fifth Amendment, the government must provide an individual not only notice of the case against him but, more broadly, notice of the standard of conduct that may subject him to a deprivation. *See, e.g.*, *United States v. Bass*, 404 U.S. 336, 348 (1971) (noting that it has "long been part of our tradition" to provide "fair warning . . . of what the law intends to do if a certain line is passed"); *Jordan v. De George*, 341 U.S. 223, 231 (1951) (same, in a civil proceeding, because of the "grave nature" of the deprivation at issue).

Defendants authorized and directed lethal force against Al-Aulaqi in the *absence* of an imminent threat. Compl. ¶ 24. And while due process may permit lesser procedural protections "as the particular situation demands," *Mathews*, 424 U.S. at 334 (quotation marks omitted), Al-Aulaqi was denied even the baseline protections the Fifth Amendment requires of fair notice and a "meaningful" hearing before the government may subject an individual to a "grievous loss of any kind."[46] *Id.* at 333 (citations omitted). Indeed, even in the context of armed conflict, the Supreme Court has held that a meaningful hearing requires "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker" before the Executive may detain an American citizen designated as an "enemy combatant." *Hamdi*, 542 U.S. at 533; *see infra* § IV(B)(2)(c). Defendants provided Anwar Al-Aulaqi no notice or meaningful process, Compl. ¶¶ 1, 24, and their killing of Al-Aulaqi in the absence of an imminent threat, outside of armed conflict, violated the most rudimentary requirements of due process.

(b)  Substantive Due Process

The Fifth Amendment "guarantee[s] more than fair process"; it also prevents egregious abuses of power by government officials. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840

---

[46] Whether more process was due Al-Aulaqi need not be decided at the motion-to-dismiss stage. *See, e.g.*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 167 (1963) (official action cannot impose a serious deprivation as punishment without "a prior criminal trial and all its incidents").

(1998) (quotation marks omitted).[47]   In the language of Fifth Amendment doctrine, when the

conduct of an executive officer "may fairly be said to shock the conscience," it violates the

substantive component of the Due Process Clause.  *Id.* at 847 n.8.  When courts evaluate the use

of deadly force under the Fifth Amendment, they prescribe essentially the same objective

limitations as under the Fourth Amendment.  Thus, where the circumstances allow for "actual

deliberation" and "repeated reflection"—that is, when a threat is not imminent—an officer's use

of lethal force will shock the conscience if he acts with deliberate indifference to a risk of serious

harm.  *Id.* at 851, 853.[48]

Here, Defendants authorized and directed the strikes that killed the decedents with

premeditation and deliberation—indeed, in the case of the strike that killed Anwar Al-Aulaqi and

Samir Khan, with at least weeks (if not more) of advance planning.  Their actions were not made

"in haste" or in response to an "unforeseen" situation.  *Lewis*, 523 U.S at 853–55.  While

Defendants assert that there is no plausible basis to conclude that their actions were "unrelated to

a legitimate government interest," Defs. Br. 42, state action, "even if taken pursuant to legitimate

objectives[,] . . . may not proceed via means that shock the conscience."  *Norris v. Dist. of

Columbia*, 737 F.2d 1148, 1151 (D.C. Cir. 1984) (alteration and quotation marks omitted).

---

[47] Should the Court conclude that Plaintiffs' claims of excessive force are not properly analyzed under the Fourth Amendment, it must adjudicate those claims under the Fifth Amendment.  *See Lewis*, 523 U.S. at 842–45; *Graham*, 490 U.S. at 395 (discussing relationship between Fourth and Fifth Amendments in context of excessive-force claims).

[48] Defendants argue for a higher standard of liability that applies in situations where there is no time for deliberation, such as "sudden police chases," or "an occasion calling for fast action."  *Lewis*, 523 U.S. at 853.  *See* Defs. Br. 42 (arguing Plaintiffs must show that Defendants engaged in "'conduct intended to injure in some way unjustifiable by any government interest.'" (quoting *Lewis*, 523 U.S. at 846)).  That standard does not apply here because, as Plaintiffs allege, the government did not use lethal force in response to an imminent threat.

Defendants' reliance on *Davidson v. Cannon*, 474 U.S. 344 (1986), for the argument that Plaintiffs have not raised colorable substantive due process claims on behalf of Samir Khan and Abdulrahman, Defs. Br. 42, is incorrect.  If Khan and Abdulrahman were killed as bystanders, their deaths did not result from Defendants' negligent failure to protect them from unforeseeable third-party harm, as in *Davidson, see* 474 U.S. at 348.  Defendants intentionally authorized and directed lethal force to be used in a location where bystanders were both known to be present and certain to be killed in a missile strike.  Their actions were at least deliberately indifferent to a great risk of serious harm to all three decedents, and therefore "shocked the conscience" within the meaning of the Fifth Amendment.

> 3.  *Defendants' conduct violated the Bill of Attainder Clause with respect to Anwar Al-Aulaqi.*

Defendants assert that the Bill of Attainder Clause does not constrain the Executive when it unilaterally singles out an individual for killing.  But the concerns animating the Attainder Clause—separation of powers and due process—make clear that the Clause may apply equally to executive acts of attainder.  *See Joint Anti-Fascist Comm.*, 341 U.S. at 143–44 (1951) (Black, J., concurring) (explaining that Attorney General's designation of groups as Communist organizations violated attainder clause); *id.* ("I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.").[49]

---

[49] The Founders were guided by history and experience when they determined the Attainder Clause's place in the Constitution.  By the time the Founders wrote the Constitution, death warrants by the sovereign had long been abandoned by the English monarchy and outlawed by the Magna Carta.  *See* THE FEDERALIST NO. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961); Ryan Patrick Alford, *The Rule of Law at the Crossroads: Consequences of Targeted Killing of Citizens*, 2011 UTAH L. REV. 1203, 1263 (2011). The Founders' concerns about the abuse of executive power were not about arbitrary sentences of death, but arbitrary detention; the Suspension Clause addressed those concerns.  *See Boumediene*, 553 U.S. at 739–46.  Had

Defendants' conduct with respect to Anwar Al-Aulaqi has all the markings of a Bill of Attainder. *See Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984) (discussing specificity, punishment, and the lack of judicial process as the three elements of acts of attainder). Defendants authorized Al-Aulaqi's placement on CIA and JSOC kill lists. Compl. ¶¶ 23, 25. They directed the use of lethal force against Al-Aulaqi, inflicting the ultimate punishment. *See BellSouth Corp. v. F.C.C.*, 162 F.3d 678, 683 (D.C. Cir. 1998) (sentence of death "is a bill of attainder, without regard to whether Congress could articulate some nonpunitive purpose for the execution, such as the protection of public safety").[50] And they imposed punishment without any of the protections akin to those available in a judicial trial, authorizing and directing his killing after a secret executive process. *United States v. Lovett*, 328 U.S. 303, 316–17 (1946) (holding that the Attainder Clause prohibited plaintiffs from being tried by secret legislative hearings adjudicating guilt based on secret evidence). The death warrant for Anwar Al-Aulaqi unquestionably would have been unlawful if it had originated from the Legislature; it is no less constitutionally offensive because it came from the Executive. Other than citing to three cases holding no weight in this Circuit, Defendants offer no compelling reason why the Attainder Clause should not apply here.[51]

---

executive death warrants not been considered a monarchical relic at the Founding, the Attainder Clause would likely have had a place in Article II. *See Targeted Killing FOIA*, 2013 WL 50209, at *7 (citing THE FEDERALIST NO. 47 (James Madison)) (noting the Founders' fear of concentrating power in any single person, particularly in the Executive).

[50] At common law, bills of attainder imposed the death penalty. *Selective Serv. Sys.*, 468 U.S. at 852.

[51] This Court has already examined executive action under the Attainder Clause in several instances, albeit without deciding the question. *See, e.g.*, *Hoffa v. Saxbe*, 378 F. Supp. 1221, 1239 (D.D.C. 1974) (that executive action was at issue "[did] not legally distinguish" the case from another in which a state statute was challenged as a bill of attainder).

B.     Even if the law of armed conflict does apply, Defendants violated decedents'
       clearly established rights.

       1.     *The rights of the decedents were clearly established under the law of
              armed conflict.*

Even if the Court were to determine that the appropriate context here is armed conflict,

Defendants would still not be entitled to qualified immunity.  The Supreme Court has

emphasized that citizens are entitled to fundamental constitutional protections even in war, and it

has reaffirmed that principle in the specific armed conflict context Defendants assert here.  *See*,

*e.g.*, *Hamdi*, 542 U.S. at 531 ("reaffirm[ing] . . . the fundamental nature of a citizen's right to be

free from involuntary confinement by his own government without due process of law").

Citizens asserting constitutional rights are thus protected, at a minimum, by law-of-war

limitations on the use of lethal force.  *Cf. Murray v. The Schooner Charming Betsy*, 6 U.S. (2

Cranch) 64, 118 (1804) (In the context of armed conflict, "an act of Congress ought never to be

construed to violate the law of nations," which includes the laws of war.).

       Defendants attempt to muddy the clarity of the decedents' rights not to be unlawfully

killed by arguing that the contours of the deceased's constitutional rights were not clearly

established in the context of armed conflict.  But it is clear that the decedents retained their

constitutional rights not to be arbitrarily deprived of life, and equally clear that killing civilians

outside the limitations established by the laws of war is unlawful and arbitrary.  Indeed,

Defendants do not suggest that they are not bound by due process and the laws of war in the

context of armed conflict.  To the contrary, they cite to a speech in which the Attorney General

acknowledged that when the government targets an American citizen for killing, that citizen is

entitled to due process and that law-of-war standards apply.  Defs. Br. 13 n.6 (citing Holder

Speech).[52]  This is not a situation where there is an "open legal question" about the circumstances under which lethal force is permissible, as in *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2085 (2011).  *See, e.g.*, Defs. Br. 29.  And the lack of a specific case on point addressing identical circumstances, without which Defendants claim they could not have known of the illegality of their actions, *id.* 32, is far from dispositive.  *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (where the constitutional violation is obvious, the lack of a case addressing factually identical circumstances is not fatal to showing that the right was "clearly established"); *Burgess v. Lowery*, 201 F.3d 942, 946 (7th Cir. 2000) ("The relevant sources of law from which perception of [the] contours [of a right] is derived include not only cases on point but also *the constitutional tradition* that generates those decisions." (emphasis added)).  No reasonable official would have believed that directing lethal force against American civilians without due regard for fundamental restrictions on the use of lethal force in armed conflict, as Plaintiffs allege occurred here, would be lawful.[53]

2.    *Plaintiffs have adequately alleged that the Due Process rights of the decedents, as informed by the laws of war, were violated within the context of armed conflict.*

---

[52] In his speech, the Attorney General explained that the use of lethal force in the United States' armed conflict with Al-Qaeda complies with "fundamental law of war principles governing the use of force," including the principles of distinction, proportionality, necessity, and humanity—principles upon which Plaintiffs rely in their alternatively pled context of armed conflict.

[53] Other lower courts have expressly rejected the argument Defendants make here.  *See Vance v. Rumsfeld*, 653 F.3d 591, 610–11 (7th Cir. 2011) (concluding plaintiffs' rights were clearly established and rejecting defendants' argument that the "precise constitutional contours applicable to the detention of individuals . . . seized in a foreign war zone" were unclear), *rev'd en banc on other grounds*, 701 F.3d 193; *Doe v. Rumsfeld*, 800 F. Supp. 2d 94, 120 (D.D.C. 2011) (rejecting similar argument by defendants and holding that there is "no convincing reason that United States citizens in Iraq should or must lose previously-declared substantive due process protections during prolonged detention in a conflict zone abroad"), *rev'd on other grounds*, 683 F.3d 390.

(a)      Targeting of the Decedents

In the context of an armed conflict, the laws of war prescribe core limitations on the use of deadly force.  "Distinction," one of the "cardinal principles" of the laws of war, requires that states distinguish between combatants against whom lethal force may be used, and civilians. Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, ¶ 78 (July 8); *see also* U.S. AIR FORCE, TARGETING: AIR FORCE DOCTRINE DOCUMENT 2-1.9, at 88 (2006) ("TARGETING"); U.S. DEP'T OF THE ARMY, FIELD MANUAL 27-10: THE LAW OF LAND WARFARE ch. 5 (1956) ("FM 27-10").  In a non-international armed conflict (that is, a conflict between a nation state and an armed group), it is clearly established that individuals who are not members of state armed forces are civilians, and equally clear that civilians may not be directly targeted "unless and for such time as they take a direct part in hostilities." Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), art. 13(3), June 8, 1977, 1125 U.N.T.S. 609; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, art. 3, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; *accord Hamlily v. Obama*, 616 F. Supp. 2d 63, 77 (D.D.C. 2009).[54]  Defendants' use of lethal force against the decedents was unlawful because, as Plaintiffs allege in the alternative, none were directly participating in hostilities at the time they were killed.  *See* Compl. ¶¶ 4, 5, 34, 35, 40.[55]

---

[54] Direct participation in hostilities is a broader restriction than the "imminence" requirement in the law-enforcement and human rights context, but it still requires a causal and temporal nexus to actual hostilities. *See* NILS MELZER, INTERPRETIVE GUIDANCE ON THE NOTION OF DIRECT PARTICIPATION IN HOSTILITIES UNDER INTERNATIONAL HUMANITARIAN LAW 51–64 (2009), http://www.icrc.org/eng/assets/files/other/icrc-002-0990.pdf; *see also id.* 65–68 (discussing beginning and end of direct participation in hostilities)

[55] These allegations, like those as to the non-existence of a state of armed conflict described above, *see supra* § 1, are mixed questions of law and fact and therefore must be taken as true on a motion to dismiss.  *See Ali v. D.C. Court Servs.*, 538 F. Supp. 2d 157, 161 (D.D.C. 2008).

(b)    Harm to the Decedents as Bystanders

Clear standards under the laws of war also constrain the use of lethal force against civilians who are bystanders.  *See* TARGETING 39, 89–90; FM 27-10 ¶ 254.  First, the "proportionality" requirement prohibits the use of lethal force that could reasonably be expected to cause excessive harm to civilian bystanders.  *See* TARGETING 89–90; FM 27-10 ¶ 41.  Second, even if the use of lethal force is proportionate, the party using lethal force must take all feasible precautions to avoid or minimize civilian harm.  *See* TARGETING 89–90; FM 27-10 ¶ 41. Defendants do not argue that these standards are unclear, and Plaintiffs have adequately pled that if Samir Khan and Abdulrahman Al-Aulaqi were killed as bystanders, Defendants' use of lethal force against them was unlawful because Defendants failed to "comply with the requirements of distinction and proportionality and [to] take all feasible measures to protect bystanders."  Compl. ¶¶ 5, 35, 40.[56]  Thus, for example, Defendants' missile strike at or near a public restaurant, where civilians gather, killing Abdulrahman, was objectively a violation of law of war limitations on the use of lethal force.

(c)    Procedural Due Process

Defendants' only argument against Plaintiffs' procedural due process claims as alternatively pled in armed conflict is that protections "may be diminished" in a battlefield situation, and that the closed executive process that resulted in the decedents' killings was sufficient under the circumstances.  *See* Defs. Br. 43.  But while process may be *diminished* in armed conflict, it may not be *extinguished* entirely under the circumstances Plaintiffs allege in the alternative.  Because none of the decedents were directly participating in hostilities, Compl. ¶¶ 4, 5, 34, 35, 40, Defendants could not have lawfully targeted them.  Rather, Defendants could

---

[56] *See also supra* § IV(A)(1)–(2) (Plaintiffs' additional factual bases for these allegations).

—43—

have only pursued non-lethal alternatives against them, such as capture and detention under the laws of war, or prosecution.  If the decedents had been captured and lawfully detained, they would have been entitled to the minimum Fifth Amendment protections of fair notice and an opportunity to be heard.  *Hamdi*, 542 U.S. at 535 (U.S. citizen captured in Afghanistan and detained as an "enemy combatant" was constitutionally entitled to "core" procedural due process rights); *Targeted Killing FOIA*, 2013 WL 50209, at *8 (suggesting that government's killing of Anwar Al-Aulaqi may have violated the Fifth Amendment's requirement of "notice of the proposed action and an opportunity to be heard").[57]  Defendants' unlawful use of lethal force against the decedents thus violated their right to procedural due process protections.

## V.   Plaintiffs Have Capacity To Sue on Behalf of Decedents

On a Rule 12(b)(6) motion, the Court "must accept" Plaintiffs' allegations that they are the personal representatives of the decedents' estates, Compl. ¶¶ 10, 11, "as true."  *Pino v. City of Sacramento*, No. Civ. S-052080, 2006 WL 193181, at *1–*2 (E.D. Cal. Jan. 19, 2006); *accord Clarke ex rel. Estate of Medina v. Dist. of Columbia*, No. CIV.A 06-0623, 2007 WL 1378488, at *1 (D.D.C. May 9, 2007); *Deirmenjian v. Deutsche Bank, A.G.*, No. CV 06-00774, 2006 WL 4749756, at *30 (C.D. Cal. Sept. 25, 2006) ("[A] plaintiff's capacity to sue generally cannot be decided on a motion to dismiss." (citing FED. R. CIV. P. 9(a)), and Defendants cite no pleading requirement to the contrary.[58]

---

[57] Defendants cite two cases for the proposition that judicial process is not always required in circumstances like rebellion or armed conflict.  Defs. Br. 44.  But the government provided post-deprivation process (like that sought here) in *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680 (1974), and *Moyer v. Peabody*, 212 U.S. 78 (1909), is properly read as a dismissal based on qualified immunity long before the robust development of that doctrine as it applies today.  *See Scheuer v. Rhodes*, 416 U.S. 232, 248 (1974).

[58] Although they are not obligated to do so, Plaintiffs attach an attorney declaration providing details about Plaintiffs' probate representations, and will file additional documents should the Court so require.  Plaintiff Khan is recognized as the personal representative of Samir Khan's

## Conclusion

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: February 5, 2013

Respectfully submitted,

*/s/ Hina Shamsi*
Hina Shamsi (*pro hac vice*)
Brett Max Kaufman (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street—18th Floor
New York, NY 10004
T: 212.519.2500
F: 212.549.2654
hshamsi@aclu.org

Pardiss Kebriaei (*pro hac vice*)
Maria C. LaHood (*pro hac vice*)
Susan Hu
Baher Azmy
Center for Constitutional Rights
666 Broadway—7th Floor
New York, NY 10012
T: 212.614.6452
F: 212.614.6499
pkebriaei@ccrjustice.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union of the
   Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
T: 202.457.0800
F: 202.452.1868
artspitzer@aclu-nca.org

---

estate in the District.  Kebriaei Decl. ¶ 3.  Plaintiff Al-Aulaqi was appointed the personal representative of the estates of his son and grandson in Yemen on January 10, 2012, *id.* ¶¶ 4–6, but that representation has not yet been recognized in the District.  Plaintiff made repeated, documented efforts to schedule a timely appointment at the U.S. Embassy in Sana'a to obtain the consular certification of his Yemeni record required by District law, but Embassy personnel did not grant that request until January 21, 2013.  *Id.* ¶¶ 7–8.  Plaintiffs' counsel will diligently assist Plaintiff in finalizing recognition after his scheduled March 2013 appointment.  *See id.* ¶ 8.

In filing this declaration now, Plaintiffs expressly disclaim reference to it in the event the Court would take its attachment as requiring conversion of Defendants' motion into one for summary judgment under Rule 56.  If there is a capacity defect, it is "curable," *Estate of Manook v. Research Triangle Inst., Int'l*, 693 F. Supp. 2d 4, 17 (D.D.C. 2010), and in any event, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, *after an objection*, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."  Fed. R. Civ. P. 17(a)(3) (emphasis added).  Moreover, D.C. Super. Ct. R. Civ. P. 44(a)(2) authorizes the Court to accept a foreign document even without consular certification "for good cause shown" where authenticity is not disputed.