# EXHIBIT 1

Defendants' Response to the Court's May 22, 2013 Order

*Nasser Al-Aulaqi, et al. v. Panetta, et al.*, No. 1:12-cv-01192 (RMC)



# Office of the Attorney General
## Washington, D. C. 20530

May 22, 2013

The Honorable Patrick J. Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20530

Dear Mr. Chairman:

    Since entering office, the President has made clear his commitment to providing Congress and the American people with as much information as possible about our sensitive counterterrorism operations, consistent with our national security and the proper functioning of the Executive Branch. Doing so is necessary, the President stated in his May 21, 2009 National Archives speech, because it enables the citizens of our democracy to "make informed judgments and hold [their Government] accountable."

    In furtherance of this commitment, the Administration has provided an unprecedented level of transparency into how sensitive counterterrorism operations are conducted. Several senior Administration officials, including myself, have taken numerous steps to explain publicly the legal basis for the United States' actions to the American people and the Congress. For example, in March 2012, I delivered an address at Northwestern University Law School discussing certain aspects of the Administration's counterterrorism legal framework. And the Department of Justice and other departments and agencies have continually worked with the appropriate oversight committees in the Congress to ensure that those committees are fully informed of the legal basis for our actions.

    The Administration is determined to continue these extensive outreach efforts to communicate with the American people. Indeed, the President reiterated in his State of the Union address earlier this year that he would continue to engage with the Congress about our counterterrorism efforts to ensure that they remain consistent with our laws and values, and become more transparent to the American people and to the world.

    To this end, the President has directed me to disclose certain information that until now has been properly classified. You and other Members of your Committee have on numerous occasions expressed a particular interest in the Administration's use of lethal force against U.S. citizens. In light of this fact, I am writing to disclose to you certain information about the number of U.S. citizens who have been killed by U.S. counterterrorism operations outside of areas of active hostilities. Since 2009, the United States, in the conduct of U.S. counterterrorism operations against al-Qa'ida and its

associated forces outside of areas of active hostilities, has specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi. The United States is further aware of three other U.S. citizens who have been killed in such U.S. counterterrorism operations over that same time period: Samir Khan, 'Abd al-Rahman Anwar al-Aulaqi, and Jude Kenan Mohammed. These individuals were not specifically targeted by the United States.

As I noted in my speech at Northwestern, "it is an unfortunate but undeniable fact" that a "small number" of U.S. citizens "have decided to commit violent attacks against their own country from abroad." Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during the current conflict, it is clear and logical that United States citizenship alone does not make such individuals immune from being targeted. Rather, it means that the government must take special care and take into account all relevant constitutional considerations, the laws of war, and other law with respect to U.S. citizens – even those who are leading efforts to kill their fellow, innocent Americans. Such considerations allow for the use of lethal force <u>in a foreign country</u> against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans, in the following circumstances: (1) the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; (2) capture is not feasible; and (3) the operation would be conducted in a manner consistent with applicable law of war principles.

These conditions should not come as a surprise: the Administration's legal views on this weighty issue have been clear and consistent over time. The analysis in my speech at Northwestern University Law School is entirely consistent with not only the analysis found in the unclassified white paper the Department of Justice provided to your Committee soon after my speech, but also with the classified analysis the Department shared with other congressional committees in May 2011 – months before the operation that resulted in the death of Anwar al-Aulaqi. The analysis in my speech is also entirely consistent with the classified legal advice on this issue the Department of Justice has shared with your Committee more recently. In short, the Administration has demonstrated its commitment to discussing with the Congress and the American people the circumstances in which it could lawfully use lethal force in a foreign country against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans.

Anwar al-Aulaqi plainly satisfied all of the conditions I outlined in my speech at Northwestern. Let me be more specific. Al-Aulaqi was a senior operational leader of al-Qa'ida in the Arabian Peninsula (AQAP), the most dangerous regional affiliate of al-Qa'ida and a group that has committed numerous terrorist attacks overseas and attempted multiple times to conduct terrorist attacks against the U.S. homeland. And al-Aulaqi was not just a senior leader of AQAP – he was the group's chief of external operations, intimately involved in detailed planning and putting in place plots against U.S. persons.

In this role, al-Aulaqi repeatedly made clear his intent to attack U.S. persons and his hope that these attacks would take American lives. For example, in a message to

Muslims living in the United States, he noted that he had come "to the conclusion that *jihad* against America is binding upon myself just as it is binding upon every other able Muslim." But it was not al-Aulaqi's <u>words</u> that led the United States to act against him: they only served to demonstrate his intentions and state of mind, that he "pray[ed] that Allah [would] destro[y] America and all its allies." Rather, it was al-Aulaqi's <u>actions</u> – and, in particular, his direct personal involvement in the continued planning and execution of terrorist attacks against the U.S. homeland – that made him a lawful target and led the United States to take action.

For example, when Umar Farouk Abdulmutallab – the individual who attempted to blow up an airplane bound for Detroit on Christmas Day 2009 – went to Yemen in 2009, al-Aulaqi arranged an introduction via text message. Abdulmutallab told U.S. officials that he stayed at al-Aulaqi's house for three days, and then spent two weeks at an AQAP training camp. Al-Aulaqi planned a suicide operation for Abdulmutallab, helped Abdulmutallab draft a statement for a martyrdom video to be shown after the attack, and directed him to take down a U.S. airliner. Al-Aulaqi's last instructions were to blow up the airplane <u>when it was over American soil</u>. Al-Aulaqi also played a key role in the October 2010 plot to detonate explosive devices on two U.S.-bound cargo planes: he not only helped plan and oversee the plot, but was also directly involved in the details of its execution – to the point that he took part in the development and testing of the explosive devices that were placed on the planes. Moreover, information that remains classified to protect sensitive sources and methods evidences al-Aulaqi's involvement in the planning of numerous <u>other</u> plots against U.S. and Western interests and makes clear he was continuing to plot attacks when he was killed.

Based on this information, high-level U.S. government officials appropriately concluded that al-Aulaqi posed a continuing and imminent threat of violent attack against the United States. Before carrying out the operation that killed al-Aulaqi, senior officials also determined, based on a careful evaluation of the circumstances at the time, that it was not feasible to capture al-Aulaqi. In addition, senior officials determined that the operation would be conducted consistent with applicable law of war principles, including the cardinal principles of (1) necessity – the requirement that the target have definite military value; (2) distinction – the idea that only military objectives may be intentionally targeted and that civilians are protected from being intentionally targeted; (3) proportionality – the notion that the anticipated collateral damage of an action cannot be excessive in relation to the anticipated concrete and direct military advantage; and (4) humanity – a principle that requires us to use weapons that will not inflict unnecessary suffering. The operation was also undertaken consistent with Yemeni sovereignty.

While a substantial amount of information indicated that Anwar al-Aulaqi was a senior AQAP leader actively plotting to kill Americans, the decision that he was a lawful target was not taken lightly. The decision to use lethal force is one of the gravest that our government, at every level, can face. The operation to target Anwar al-Aulaqi was thus subjected to an exceptionally rigorous interagency legal review: not only did I and other Department of Justice lawyers conclude after a thorough and searching review that the

operation was lawful, but so too did other departments and agencies within the U.S. government.

The decision to target Anwar al-Aulaqi was additionally subjected to extensive policy review at the highest levels of the U.S. Government, and senior U.S. officials also briefed the appropriate committees of Congress on the possibility of using lethal force against al-Aulaqi. Indeed, the Administration informed the relevant congressional oversight committees that it had approved the use of lethal force against al-Aulaqi in February 2010 – well over a year before the operation in question – and the legal justification was subsequently explained in detail to those committees, well before action was taken against Aulaqi. This extensive outreach is consistent with the Administration's strong and continuing commitment to congressional oversight of our counterterrorism operations – oversight which ensures, as the President stated during his State of the Union address, that our actions are "consistent with our laws and system of checks and balances."

The Supreme Court has long "made clear that a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 578, 587 (1952). But the Court's case law and longstanding practice and principle also make clear that the Constitution does not prohibit the Government it establishes from taking action to protect the American people from the threats posed by terrorists who hide in faraway countries and continually plan and launch plots against the U.S. homeland. The decision to target Anwar al-Aulaqi was lawful, it was considered, and it was just.

\* \* \* \* \*

This letter is only one of a number of steps the Administration will be taking to fulfill the President's State of the Union commitment to engage with Congress and the American people on our counterterrorism efforts. This week the President approved and relevant congressional committees will be notified and briefed on a document that institutionalizes the Administration's exacting standards and processes for reviewing and approving operations to capture or use lethal force against terrorist targets outside the United States and areas of active hostilities; these standards and processes are either already in place or are to be transitioned into place. While that document remains classified, it makes clear that a cornerstone of the Administration's policy is one of the principles I noted in my speech at Northwestern: that lethal force should not be used when it is feasible to capture a terrorist suspect. For circumstances in which capture is feasible, the policy outlines standards and procedures to ensure that operations to take into custody a terrorist suspect are conducted in accordance with all applicable law, including the laws of war. When capture is not feasible, the policy provides that lethal force may be used only when a terrorist target poses a continuing, imminent threat to Americans, and when certain other preconditions, including a requirement that no other reasonable alternatives exist to effectively address the threat, are satisfied. And in all circumstances there must be a legal basis for using force against the target. Significantly,

the President will soon be speaking publicly in greater detail about our counterterrorism operations and the legal and policy framework that governs those actions.

I recognize that even after the Administration makes unprecedented disclosures like those contained in this letter, some unanswered questions will remain. I assure you that the President and his national security team are mindful of this Administration's pledge to public accountability for our counterterrorism efforts, and we will continue to give careful consideration to whether and how additional information may be declassified and disclosed to the American people without harming our national security.

Sincerely,

Eric H. Holder, Jr.
Attorney General

cc: Ranking Member Charles Grassley
Chairman Dianne Feinstein
Vice Chairman Saxby Chambliss
Chairman Carl Levin
Ranking Member James Inhofe
Chairman Bob Goodlatte
Ranking Member John Conyers, Jr.
Chairman Mike Rogers
Ranking Member C.A. Dutch Ruppersberger
Chairman Howard P. McKeon
Ranking Member Adam Smith
Chairman Robert Menendez
Ranking Member Bob Corker
Chairman Ed Royce
Ranking Member Eliot Engel
Majority Leader Harry Reid
Minority Leader Mitch McConnell
Speaker John Boehner
Majority Leader Eric Cantor
Minority Leader Nancy Pelosi
Minority Whip Steny Hoyer