**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| NASSER AL-AULAQI, | ) | |
| as personal representative of the | ) | |
| Estates of ANWAR AL-AULAQI and | ) | |
| ABDULRAHMAN AL-AULAQI, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-1192 (RMC) |
| | ) | |
| LEON C. PANETTA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____  )

**OPINION**

Because Anwar Al-Aulaqi was a terrorist leader of al-Qa'ida in the Arabian Peninsula, the United States intentionally targeted and killed him with a drone strike in Yemen on September 30, 2011. The missile also killed Samir Khan, who was riding in the same vehicle. Both men were U.S. citizens. Two weeks later, on October 14, 2014, the United States killed additional individuals in Yemen with a missile from another drone. While this second drone targeted someone else, among those it killed was Abdulrahman Al-Aulaqi, Anwar Al-Aulaqi's teenage son. Nasser Al-Aulaqi, father of Anwar and grandfather of Abdulrahman, and Sarah Khan, mother of Samir, sue various U.S. officials in their personal capacities. Plaintiffs claim, *inter alia*, that these officials violated the Fifth Amendment rights of the decedents by authorizing the drone strikes. The question presented is whether federal officials can be held personally liable for their roles in drone strikes abroad that target and kill U.S. citizens. The question raises fundamental issues regarding constitutional principles, and it is not easy to

answer.  However, on these facts and under this Circuit's precedent, the Court will grant

Defendants' motion to dismiss.

## I.  FACTS

### A.  The Drone Strikes and Prior Suit

President Barack Obama and Attorney General Eric Holder, Jr., have admitted

that the United States targeted and killed Anwar Al-Aulaqi, a terrorist who was a key leader of

al-Qa'ida in the Arabian Peninsula (AQAP).  *See* Def. Resp. to May 22, 2013 Order [Dkt. 26],

Ex. 1 [Dkt. 26-1], Letter from AG Holder (May 22, 2013) (AG Letter) at 1-2; *see also id.*, Ex. 2

[Dkt. 26-2], Remarks by President Obama at the National Defense University (May 23, 2013)

(President Obama Speech) at 9-10.  They also have acknowledged that Mr. Khan and

Abdulrahman Al-Aulaqi were killed as "bystanders" by U.S. drones that targeted someone else.

AG Letter at 2.

More than a year before Anwar Al-Aulaqi was killed, the U.S. Joint Special

Operations Command (JSOC)[1] had placed him on a military "kill list" and tried unsuccessfully

to kill him.  Compl. [Dkt. 3] ¶¶ 2, 23 (citing Dana Priest, *U.S. Military Teams, Intelligence*

*Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010).  The Office of Legal

Counsel within the U.S. Department of Justice allegedly completed a memorandum that provided

legal justification for killing Anwar Al-Aulaqi overseas.  *See id.* ¶ 25 (citing Charlie Savage,

*Secret U.S. Memo Made Legal Case to Kill a Citizen*, N.Y. Times, Oct. 8, 2011).[2]  Government

officials told reporters that Anwar Al-Aulaqi had "cast his lot" with terrorist groups, encouraged

---

[1] JSOC is a component of the Department of Defense.

[2] *See* Dep't of Justice White Paper, Lawfulness of a Lethal Operation Directed Against a U.S.
Citizen Who Is a Senior Operational Leader of Al-Qa'ida or An Associated Force, (Nov. 8, 2011
draft), http://bit.ly/Wv7Cdh (last visited Apr. 4, 2014).

others to engage in terrorist activity, and "played a key role in setting the strategic direction" for

AQAP.  *See id.* ¶ 26.  Leon Panetta, former Director of the Central Intelligence Agency (CIA),[3]

and Admiral William H. McRaven, former Commander of JSOC,[4] allegedly participated in the

decision to add Anwar Al-Aulaqi to the list.  *Id.* ¶ 24.  The U.S. Government never publicly

indicted or prosecuted Anwar Al-Aulaqi for any crime.  *Id.* ¶ 26.

Upon hearing rumors that the United States had placed Anwar Al-Aulaqi on a kill

list, Nasser Al-Aulaqi filed suit on behalf of his son against the President, CIA Director, and

Secretary of Defense in their official capacities.  *See Al-Aulaqi v. Obama*, Civ. No. 10-1469

(D.D.C.), Compl. filed Aug. 30, 2010.  That suit, captioned *Al-Aulaqi v. Obama*, sought to enjoin

the Government from carrying out the planned killing of Anwar Al-Aulaqi unless "he presented

a concrete, specific, and imminent threat to life, and that there were no reasonably available

measures short of lethal force that could be expected to address that threat."  Compl. [Dkt. 3]

¶ 27 (describing prior suit).  The United States moved to dismiss the complaint and invoked the

"military and state secrets" privilege.[5]  *See Al-Aulaqi v. Obama*, Civ. No. 10-1469, Mot. to

Dismiss (filed Sept. 25, 2010).  In support of the privilege, the Government submitted both

unclassified and classified declarations from James Clapper, Director of National Intelligence;

---

[3] Mr. Panetta served as Director of the CIA from February 13, 2009 to June 30, 2011, and as
Secretary of Defense from July 1, 2011 to February 27, 2013.

[4] Admiral McRaven was JSOC Commander from June 2008 to June 2011.  *See* U.S. Navy
Biography of Admiral McRaven, http://www.navy.mil/navydata/bios/navybio.asp?bioID=401
(last visited Apr. 4, 2014).

[5] The state secrets privilege encompasses two applications:  one completely bars adjudication of
claims based on state secrets, which requires dismissal, and the other excludes privileged
evidence from the case, which may result in dismissal.  *Mohamed v. Jeppesen Dataplan, Inc.*,
614 F.3d 1070, 1077 (9th Cir. 2010) (*en banc*).  "The state secrets privilege is premised on the
recognition that 'in exceptional circumstances courts must act in the interest of the country's
national security to prevent disclosure of state secrets, even to the point of dismissing a case
entirely.'"  *Id.* (citing *Totten v. United States*, 92 U.S. 105, 107 (1876)).

Robert Gates, then-Secretary of Defense; and Leon Panetta, then-Director of the CIA.  *See id*., Mot. to Dismiss, Ex. 1 (Clapper Decl.), Ex. 4 (Gates Decl.), & Ex. 5 (Panetta Decl.).  While invoking the state secrets privilege, the Government advised the district court that it need not and should not reach the privilege issue because the case could be resolved on other grounds.  Agreeing with the Government, Judge John Bates did not address the issue of state secrets and instead resolved the case on different legal principles.  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 52-54 (D.D.C. 2010).  Judge Bates dismissed the suit, finding that Nasser Al-Aulaqi did not have standing to assert his son's constitutional rights, *see id*. at 14-35, and that at least some of the issues raised were non-justiciable political questions, *see id.* at 44-52.  Nasser Al-Aulaqi did not appeal.

On the morning of September 30, 2011, the plan to kill Anwar Al-Aulaqi came to fruition.  On that day, Anwar Al-Aulaqi and Samir Khan were in a vehicle in the Yemeni province of al-Jawf, approximately ninety miles northeast of Sana'a.  Compl. ¶ 31.  Missiles from one or more unmanned U.S. drones hit the vehicle and destroyed it, killing them and at least two others.  Plaintiffs allege that Defendants had been surveilling Anwar Al-Aulaqi for weeks.  *Id.* ¶ 31 (citing media reports).  According to the Complaint, the surveillance and the strike were carried out by CIA and JSOC, after Defendants personally authorized and directed the strike.  *Id.* ¶¶ 12-15, 32.

Abdulrahman Al-Aulaqi was killed by a separate U.S. drone strike two weeks later.  He was in an open-air café near the town of Azzan, in the southern Yemeni province of Shabwa, on October 14, 2011, when a U.S. drone fired a missile at a person at or near the restaurant.  *Id.* ¶ 37.  The drone allegedly targeted Ibraham Al-Banna, an Egyptian national.  *Id.*

While it was reported that Mr. Al-Banna was not killed, the strike did kill at least seven people, including Abdulrahman Al-Aulaqi. *Id*.

### B. Designation of Anwar Al-Aulaqi as a Terrorist

More than a year before the September 30, 2011 drone strike against Anwar Al-Aulaqi, the U.S. Department of the Treasury had designated him as a Specially Designated Global Terrorist, expressly finding him to be a key leader of AQAP. *See* Designation of Anwar Al-Aulaqi Pursuant to Executive Order 13224 and Global Terrorism Sanctions Regulations, 75 Fed. Reg. 43,233-01 (July 23, 2010) (publicly announced July 12, 2010). Executive Order 13224,[6] issued by President George W. Bush on September 23, 2001, declared a national emergency for the purpose of addressing grave acts of terrorism and threats of terrorism. The Executive Order authorized the imposition of economic sanctions on named persons and entities who have committed, pose a significant risk of committing, or support acts of terrorism. To implement the Order, the Secretary of the Treasury promulgated Global Terrorism Sanctions Regulations, *see* 31 C.F.R. Part 594, and delegated his authority over the Sanctions Regulations to the Director of the Office of Foreign Assets Control (OFAC), *see* 31 C.F.R. § 594.802.

Pursuant to the Executive Order and the Sanctions Regulations, on July 12, 2010, the Director of OFAC named Anwar Al-Aulaqi as a key leader of AQAP and added his name to the list of those subject to economic sanctions. In consultation with the Departments of State, Homeland Security, Justice, and other relevant agencies, OFAC designated Anwar Al-Aulaqi "as an individual whose property and interests in property are blocked" because he was "acting for or on behalf of [AQAP]" and he was "providing financial, material or technological support for,

---

[6] Executive Order 13224 was issued pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, and the United Nations Participation Act of 1945, 22 U.S.C. § 287c.

or other services to or in support of, acts of terrorism . . . ."  75 Fed. Reg. at 43,233-34; *cf*. 31

C.F.R. § 594.201 (providing that Treasury, in consultation with other agencies, can block access

to property of persons determined to assist in terrorism or provide support to terrorists).

Specifically, OFAC determined that Anwar Al-Aulaqi was a key leader in AQAP

who had been, and continued to be, involved in recruiting, training, and preparing terrorists for

attacks on U.S. targets as follows:

> ANWAR AL-AULAQI, a dual U.S.-Yemeni citizen, is a leader of al-Qa'ida in the Arab Peninsula (AQAP), a Yemen-based terrorist group[7] that has claimed responsibility for numerous terrorist acts[8] against Saudi, Korean, Yemeni, and U.S. targets since its inception in January 2009. ANWAR AL-AULAQI has pledged an oath of loyalty to AQAP emir, Nasir al-Wahishi, and is playing a key role in setting the strategic direction for AQAP. ANWAR AL-AULAQI has also recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on planning attacks on U.S. interests.
>
> Since late 2009, ANWAR AL-AULAQI has taken on an increasingly operational role in the group, including preparing Umar Farouk Abdulmutallab, who attempted to detonate an explosive device aboard a Northwest Airlines flight from Amsterdam to Detroit on Christmas Day 2009, for his operation.

---

[7] It is the Executive Branch's position that AQAP is a Yemen-based terrorist group that is either part of, or associated with, al-Qa'ida.  *See* Statement of Michael Leiter, Director of the National Counterterrorism Center, Senate Homeland Security and Government Affairs Committee, "Nine Years After 9/11: Confronting the Terrorist Threat to the Homeland," Sept. 22, 2010 (Director Leiter Statement) at 2, 4-5 (found in record of related case, *Al-Aulaqi v. Obama*, Civ. No. 10-cv-1469, Mot. to Dismiss, Ex. 3).  Director Leiter indicated that "[w]e witnessed the reemergence of AQAP in early 2009 and continue to view Yemen as a key battleground and potential regional base of operations from which AQAP can plan attacks, train recruits, and facilitate the movement of operatives."  *Id*. at 4.  As explained below, the Court takes judicial notice of certain positions of the Executive Branch identified in this Opinion.

[8] These include: the March 2009 suicide bombing against South Korean tourists in Yemen; the August 2009 attempt to assassinate Saudi Prince Muhammad bin Nayif; the December 25, 2009 failed mid-air bombing of Northwest Flight 253 from Amsterdam to Detroit, Michigan; and the April 26, 2010 attempted assassination of the United Kingdom's Ambassador to Yemen in Sana'a.  U.S. Statement of Interest [Dkt. 19], Ex. 1 [Dkt. 19-1] (Clapper Decl.) ¶ 13.

> In November 2009, while in Yemen, Abdulmutallab swore allegiance to the emir of AQAP and shortly thereafter received instructions from ANWAR AL-AULAQI to detonate an explosive device aboard a U.S. airplane over U.S. airspace.  After receiving this direction from ANWAR AL-AULAQI, Abdulmutallab obtained the explosive device he used in the attempted Christmas Day attack.
>
> ANWAR AL-AULAQI was imprisoned in Yemen in 2006 on charges of kidnapping for ransom and being involved in an al-Qa'ida plot to kidnap a U.S. official, but was released from jail in December 2007 and subsequently went into hiding in Yemen.

75 Fed. Reg. 43,233-01; *see also id*. at 43,234 (Anwar Al-Aulaqi was also known as Anwar Nasser Abdulla Al-Awlaki or Al-Awlaqi).  Thus, the determination that Anwar Al-Aulaqi was an AQAP leader was based, at least in part, on the training and instruction he provided to Umar Farouk Abdulmutallab, the "Christmas Day bomber."

In lieu of trial, Umar Farouk Abdulmutallab voluntarily pled guilty to Conspiracy to Commit an Act of Terrorism Transcending National Boundaries in violation of 18 U.S.C. § 2332b(a)(1) & (2) as well as other offenses.  *See United States v. Abdulmutallab*, Crim. No. 10-CR-20005-1 (E.D. Mich.), Tr. of Plea Hr'g (Oct. 12, 2011).  He was sentenced to life in prison. *See id.*, Judgment (Feb. 16, 2012).  On appeal, the Sixth Circuit upheld his plea and sentence. *United States v. Abdulmutallab*, 739 F.3d 891 (6th Cir. 2014).

When pleading guilty, Mr. Abdulmutallab stated that he conspired with Anwar Al-Aulaqi to carry an explosive device onto the aircraft, thereby attempting to kill those onboard and wreck the plane, as an act of jihad against the United States.  Tr. of Plea Hr'g (Oct. 12, 2011) at 26.  Mr. Abdulmutallab was debriefed by FBI agents at various times between January and April 2010; he specifically named Anwar Al-Aulaqi as the AQAP leader who approved the Christmas Day attack, and he described in detail the nature of Anwar Al-Aulaqi's participation in the attack.  *See United States v. Abdulmutallab*, Crim. No. 10-CR-20005-1 (E.D. Mich.), Gov't

Sentencing Mem., Supp. Factual Appx. (Sentencing Mem.) at 12-14.  Mr. Abdulmutallab had

been a follower of the online teachings of Anwar Al-Aulaqi, and he travelled from his home in

Dubai to Yemen to meet with Anwar Al-Aulaqi.  *Id*. at 12; *see Abdulmutallab*, 739 F.3d at 902

("Abdulmutallab studied the teachings of the radical Imam Anwar Awlaki, which prompted his

decision to travel to Yemen for the purpose of meeting Awlaki.").  During a three-day stay at

Anwar Al-Aulaqi's house, Mr. Abdulmutallab discussed martyrdom and jihad with Anwar Al-

Aulaqi.  Sentencing Mem. at 13.  At the end of the meeting, Anwar Al-Aulaqi "accepted" Mr.

Abdulmutallab for a "martyrdom mission."  *Id*.  Subsequently, AQAP bomb maker Ibrahim Al

Asiri discussed a plan for Mr. Abdulmutallab's martyrdom mission with Anwar Al-Aulaqi, and

Anwar Al-Aulaqi gave his final approval.  *Id*.  Over the next few weeks, Mr. Al Asiri

constructed a bomb for the suicide mission and trained Mr. Abdulmutallab in its use.  *Id*. at 13-

14.  Anwar Al-Aulaqi also assisted Mr. Abdulmutallab in writing a martyrdom statement and

making a martyrdom video.  *Id.* at 14.  Anwar Al-Aulaqi's final instructions to Mr.

Abdulmutallab were to attack a U.S. airliner over U.S. soil.  *Id*.  The bomb constructed by Mr. Al

Asiri was the bomb that Mr. Abdulmutallab carried in his underwear on board a Northwest

Airlines flight on December 25, 2009, and was the bomb that he unsuccessfully attempted to

detonate when the plane, carrying 289 passengers, was close to landing in Detroit, Michigan.[9]

*Id*. at 14; *see Abdulmutallab*, 739 F.3d at 895.

Media sources reported ties between Anwar Al-Aulaqi and Nidal Malik Hasan,

the U.S. Army Major recently convicted of murdering thirteen people in November 2009 at Fort

---

[9] Mr. Abdulmutallab is known nationally as the "underwear bomber."  *Abdulmutallab*, 739 F.3d
at 895.

Hood, Texas.[10]  *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 10.  Anwar Al-Aulaqi and Major

Hasan exchanged eighteen emails prior to the Fort Hood shootings.  *Id*.  In a May 2010 video

interview of Anwar Al-Aulaqi,[11] he called for "jihad against America," praised the actions of his

"students" (naming Mr. Abdulmutallab and Major Hasan), and asked others to follow.  *Id*.; *see*

*also* Clapper Decl. ¶ 16.[12]  In the same May 2010 interview, Anwar Al-Aulaqi declared that he

"will never surrender" to the United States.  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 11; Clapper

Decl. ¶ 16.  In July 2010, Anwar Al-Aulaqi wrote an article for the AQAP publication *Inspire* in

which he asserted that because Western "government, political parties, the police, [and] the

intelligence services . . . are part of a system within which the defamation of Islam is . . .

promoted . . . [,] the attacking of any Western target [is] legal from an Islamic viewpoint."  *Al-*

*Aulaqi v. Obama*, 727 F. Supp. 2d at 21.  He elaborated on his theme and urged that a U.S.

civilian who drew a cartoon depiction of Mohammed should be "a prime target of assassination"

---

[10] On August 13, 2013, in a court martial proceeding, a jury convicted Major Hasan and
sentenced him to death.  Billy Kenber, *Nidal Hasan Sentenced to Death for Fort Hood Shooting
Rampage*, Wash. Post, Aug. 28, 2013.

[11] Al-Malahem Media Production, the official media arm of AQAP, posted the video interview
online.  Clapper Decl. ¶ 16; *see* Partial English Transcript of Interview of Anwar al-Awlaki (May
26, 2010), http://publicintelligence.net/anwar-al-awlaki-may-2010-interview-video/ (last visited
Apr. 4, 2014); May 2010 Video Interview of Anwar Al-Awlaki With English Subtitles,
http://www.muslimvideo.com/tv/watch/2fdd60665099993430d6/(May-2010)-Interview-With-
Anwar-Al-Awlaki(Arabic/Eng.Subs) (last visited Apr. 4, 2014).

[12] While the United States is not a party to this case, it filed a Statement of Interest, explaining
that the allegations set forth in the Complaint include allegations regarding information covered
by the state secrets privilege, and reserving the right to raise the privilege if the Court denies
Defendants' motion to dismiss.  *See* U.S. Statement of Interest ¶¶ 9-10.  The Statement of
Interest was filed pursuant to 28 U.S.C. § 517, which provides that "[t]he Solicitor General, or
any officer of the Department of Justice, may be sent by the Attorney General to any State or
district in the United States to attend to the interests of the United States in a suit pending in a
court of the United States, or in a court of a State, or to attend to any other interest of the United
States."  The United States filed an unclassified version of the Clapper Declaration, but did not
submit the classified version to this Court.

and that "[a]ssassinations, bombings, and acts of arson" are "legitimate forms of revenge against a system that relishes the sacrilege of Islam in the name of freedom." *Id.*

After Anwar Al-Aulaqi was killed, Attorney General Holder wrote to Senator Patrick Leahy that "[i]t was al-Aulaqi's actions—and, in particular, his direct personal involvement in the continued planning and execution of terrorist attacks against the U.S. homeland—that . . . led the United States to take action." AG Letter at 3. The Attorney General described Anwar Al-Aulaqi's involvement in the Christmas Day attack, and asserted the position of the Executive Branch that Anwar Al-Aulaqi was a continuing and imminent threat to the United States when he was killed and that it had not been feasible to capture him:

> Moreover, information that remains classified to protect sensitive sources and methods evidences al-Aulaqi's involvement in the planning of numerous <u>other</u> plots against U.S. and Western interests and makes clear he was continuing to plot attacks when he was killed.

> Based on this information, high level officials appropriately concluded that al-Aulaqi posed a continuing and imminent threat of violent attack against the United States. Before carrying out the operation that killed al-Aulaqi, senior officials also determined, based on a careful evaluation of the circumstances at the time, that it was not feasible to capture him.

*Id.* (emphasis in original);[13] *see also* President Obama Speech at 10 (stating that Anwar Al-Aulaqi "was continuously trying to kill people" and that he "helped oversee the 2010 plot to

---

[13] Attorney General Holder further explained the Executive Branch's position regarding the circumstances under which lethal force may be used:

> Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during the current conflict, it is clear and logical that United States citizenship alone does not make such individuals immune from being targeted. Rather, it means that the government must take special care and take into account all relevant constitutional considerations, the laws of war, and other law with respect to U.S. citizens—even those who are leading efforts to kill their fellow, innocent

detonate explosive devices on two U.S.-bound cargo planes.").[14]  Attorney General Holder

assured Senator Leahy that the decision to target Anwar Al-Aulaqi with lethal force was

"subjected to an exceptionally rigorous interagency legal review" and an "extensive policy

review."  AG Letter at 3-4.  Attorney General Holder also stated that the Executive Branch

informed Congress of the planned drone assault in advance:  "Indeed, the Administration

informed the relevant congressional oversight committees that it had approved the use of lethal

force against al-Aulaqi in February 2010—well over a year before the operation in question—

and the legal justification was subsequently explained in detail to those committees, well before

action was taken against [al]-Aulaqi."  *Id*. at 4.[15]

---

Americans.  Such considerations allow for the use of lethal force <u>in a foreign country</u> against a U.S. citizen who is a senior operational leader of al-Qa'ida or its associated forces, and who is actively engaged in planning to kill Americans, in the following circumstances: (1) the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; (2) capture is not feasible; and (3) the operation would be conducted in a manner consistent with applicable law of war principles.

AG Letter at 3 (emphasis in original).

[14] The President did not elaborate further regarding the 2010 plot to attack two U.S.-bound cargo planes.

[15] *See also* Diane Feinstein, *Feinstein Statement on Intelligence Committee Oversight of Targeted Killings*, Feb. 13, 2013, http://www.feinstein.senate.gov/public/index.cfm/press-releases?ID=5b8dbe0c-07b6-4714-b663-b01c7c9b99b8 (last visited Apr. 4, 2014) (Senate Intelligence Committee has held thirty-five oversight meetings for the purpose of reviewing strike records and questioning "every aspect of the [drone] program"; the Committee receives "notifications with key details of each strike shortly after it occurs . . . .").

### C.  The Immediate Lawsuit

In this suit, Nasser Al-Aulaqi sues as the personal representative of his son and grandson's estates, and Sarah Khan sues as the personal representative of her son's estate.[16] Nasser Al-Aulaqi is a Yemeni citizen who moved to the United States in 1966 to study as a Fulbright scholar at New Mexico State University.  Compl. ¶ 21.  He and his wife, who is an American citizen, remained in the United States until their return to Yemen in 1978.  While living in Yemen, Nasser Al-Aulaqi has served as Yemen's Minister of Agriculture and Fisheries, president of Sana'a University, and president of Ibb University.

Nasser Al-Aulaqi's son, Anwar Al-Aulaqi, was born in 1971 in New Mexico.  *Id.* ¶ 22.  He moved to Yemen with his parents in 1978, but later returned to the United States to attend college at Colorado State University.  He obtained a Master's Degree from San Diego State University and enrolled in a Ph.D. program at George Washington University, which he attended through December 2001.  Anwar Al-Aulaqi married in the United States and had three children while he was living here, including Abdulrahman, who was born in Denver, Colorado, on August 26, 1995.  Anwar Al-Aulaqi and his family left the United States in 2002 or 2003 and eventually moved to Yemen.[17]

At the time of his death, Anwar Al-Aulaqi was a dual U.S.–Yemeni citizen, living in Yemen.  Clapper Decl. ¶ 13; *see Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 10.  When he died,

---

[16] On March 21, 2012, Nasser Al-Aulaqi filed in the Probate Division of D.C. Superior Court a notice of appointment as personal representative of the Estates of Anwar and Abdulrahman Al-Aulaqi.  On May 17, 2012, Sarah Khan filed in the same court notice of appointment as personal representative of the Estate of Samir Khan.  *See* Notice of Probate Appointments [Dkt. 30].

[17] Abdulrahman Al-Aulaqi "moved with his family to Yemen" in 2002, *see* Compl. ¶ 36, while Anwar Al-Aulaqi "left the United States in 2003," *see id.* ¶ 22.

Abdulrahman Al-Aulaqi was a 16-year-old high school student residing with his family in Sana'a, Yemen.  Compl. ¶ 36.

Samir Khan also was a U.S. citizen at the time of his death.  *Id.* ¶ 28.  His mother, Sarah Khan, has lived in the United States since 1992 with her husband and children; she is an American citizen.  *Id.* ¶¶ 11, 28.  Samir Khan was born in 1985 in an unidentified country and became a U.S. citizen in 1998.  *Id.* ¶ 28.  In 2003, he graduated from high school in Long Island, New York, after which he moved to North Carolina, where he attended a community college and worked.  Samir Khan left the United States for Yemen in 2009.  *Id.*

Defendants are former Secretary of Defense Panetta; former JSOC Commander Admiral McRaven; JSOC Commander Lieutenant General Joseph Votel;[18] and former CIA Director General David H. Petraeus.[19]  Defendants allegedly personally authorized and directed the strikes that killed Anwar Al-Aulaqi, Samir Khan, and Abdulrahman Al-Aulaqi.  *Id.* ¶¶ 12-15, 35.  Plaintiffs allege that the targeted killings took place in Yemen, which was "outside the context of armed conflict" and that "[t]hese killings rel[ied] on vague legal standards, a closed executive process, and evidence never presented to the courts."  *Id.* ¶ 1.

Plaintiffs seek to hold Defendants individually liable for monetary damages for violating the rights of the deceased under the U.S. Constitution.  *Id.*, Prayer for Relief.  They allege that Defendants violated (1) the Fifth Amendments right of the deceased to substantive and procedural due process; (2) the Fourth Amendment right of the deceased to be free from unreasonable seizures; and (3) the right of Anwar Al-Aulaqi under the Constitution's Bill of Attainder Clause.  *Id.* ¶¶ 41-43.  Defendants have moved to dismiss, arguing that (1) the Court

---

[18] Lt. Gen. Votel succeeded Adm. McRaven as JSOC Commander.

[19] Gen. Petraeus served as CIA Director from September 6, 2011 until November 9, 2012.

lacks jurisdiction because the Complaint raises a non-justiciable political question; (2) "special factors" preclude implying a cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971); and (3) Defendants are entitled to qualified immunity.  *See* Mot. to Dismiss [Dkt. 18]; Reply [Dkt. 23].  Plaintiffs oppose.  *See* Opp'n [Dkt. 21].  As explained below, the motion to dismiss will be granted because special factors counsel hesitation in implying a *Bivens* remedy in these circumstances.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory requirement and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal

conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).  A court may

consider materials outside the pleadings to determine its jurisdiction.  *Settles v. U.S. Parole*

*Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*,

333 F.3d 193, 198 (D.C. Cir. 2003).  A court has "broad discretion to consider relevant and

competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion.  *Finca Santa*

*Elena, Inc. v. U.S. Army Corps of Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B

Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also*

*Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in

reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may

examine testimony and affidavits).  In these circumstances, consideration of documents outside

the pleadings does not convert the motion to dismiss into one for summary judgment.  *Al-Owhali*

*v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### B.  Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  Fed. R. Civ. P. 12(b)(6).

A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the

grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's

obligation to provide the grounds for his entitlement to relief  "requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

to state a claim for relief that is "plausible on its face."  *Id.* at 570.  A court must treat the

complaint's factual allegations as true, "even if doubtful in fact."  *Twombly*, 550 U.S. at 555.

But a court need not accept as true legal conclusions set forth in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

"Unlike motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), factual challenges are not permitted under 12(b)(6) and the Court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto, and matters subject to judicial notice in weighing the merits of the motion." *Kursar v. Transp. Sec. Admin.*, 581 F. Supp. 2d 7, 14 (D.D.C. 2008), *aff'd*, 442 F. App'x 565 (D.C. Cir. 2011). When a document is referred to in a complaint and is central to a plaintiff's claim, the court may consider the document without converting the motion to dismiss into one for summary judgment. *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).

### C. Judicial Notice

Federal Rule of Evidence 201 provides that a court may judicially notice a fact that is not subject to "reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take judicial notice of facts contained in public records of other proceedings, *see Covad Communications Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005), and of historical, political, or statistical facts, and any other facts that are verifiable with certainty, *see Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.5 (D.D.C. 2010). Also, a court generally may take judicial notice of materials published in the Federal Register. *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.C. Cir. 2011); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."). Further, judicial notice may be taken of public records and government documents available from reliable sources. *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15

(D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012); *see D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1257-58 (D.C. Cir. 1971) (noting that congressional documents and speeches made on the floor of the House of Representatives are part of the public record); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 905 (D.C. Cir. 1996) (common law right of access to "public records" includes access to government documents "created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived").  In addition, a court may take judicial notice of a formal *position* of the U.S. Government.  *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 178 n.5 (D.D.C. 2005) (taking judicial notice of State Department's annual publication, Patterns of Global Terrorism, as a reflection of the formal and official position of U.S. Government), *aff'd*, 470 F.3d 356, 362 (D.C. Cir. 2006).

Because the Court may take judicial notice of facts contained in the public records of other proceedings, *see Covad*, 407 F.3d at 1222, the Court takes judicial notice of the facts regarding Anwar Al-Aulaqi's involvement in the Christmas Day attack.  *See* Sentencing Mem. at 12-14; Tr. of Plea Hr'g (Oct. 12, 2011) at 26.  The Court also takes judicial notice of the fact that in a May 2010 video interview, Anwar Al-Aulaqi called for "jihad against America" and declared that he would "never surrender."  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 10-11; Clapper Decl. ¶ 16.  Judicial notice is taken, too, of the Treasury publication in the Federal Register, *i.e.*, the designation of Anwar Al-Aulaqi as a Specially Designated Global Terrorist due to the fact that he was a key leader of AQAP.  *See* 75 Fed. Reg. 43,233-01.

Plaintiffs urge the Court to refrain from taking judicial notice of "Executive Branch assertions that are subject to reasonable dispute."  *See* Opp'n at 6-7; Pl. Reply to Court's Order [Dkt. 28] at 2-4.  These assertions include: (1) that the United States is engaged in armed

conflict with AQAP and that AQAP is part of or associated with al-Qa'ida, *see* Opp'n at 6 n.5; (2) that Anwar Al-Aulaqi posed a continuing, imminent threat to the United States; (3) that it was not feasible to capture him; and (4) that the decision to target him with lethal force underwent rigorous interagency legal and policy review and had the prior approval of congressional oversight committees.  *See* AG Letter at 3-4.  Defendants concede the point by stating that "[a]ny additional specific facts included in the AG Letter . . . that either are not alleged in the complaint or might be contrary to Plaintiffs' well-pled allegations would not technically be before the Court . . . ."  Def. Resp. to Court Order [Dkt. 26] at 2 n.3.  For the purpose of considering Defendants' motion, the Court will take judicial notice of the Treasury designation, AG Holder's letter, President Obama's speech, and Director Leiter's statement only as representations of the Government's *position* that Anwar Al-Aulaqi was a terrorist leader of AQAP, that AQAP is associated with al-Qa'ida, and that Anwar Al-Aulaqi posed a continuing threat to the United States.  *See Simpson*, 362 F. Supp. 2d at 178 n.5.

### III.  ANALYSIS

This case presents fundamental questions regarding the nature of a citizen's right to due process under the Fifth Amendment: it is poised at the intersection of the federal Government's separation of powers into three co-equal Branches.

#### A.  Political Question Doctrine

Defendants move to dismiss for lack of jurisdiction pursuant to the political question doctrine, urging the Court to find that there is no judicial role here.  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean*

*Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine is "primarily a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 210 (1962).

However, "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and the political question doctrine's "shifting contours and uncertain underpinnings" make it "susceptible to indiscriminate and overbroad application to claims properly before the federal courts," *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C. Cir. 1984) (*en banc*), *vacated on other grounds*, 471 U.S. 1113 (1985).  "The political question doctrine has occupied a more limited place in the Supreme Court's jurisprudence than is sometimes assumed.  The Court has relied on the doctrine only twice in the last 50 years."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (*en banc*) (Kavanaugh, J., concurring in judgment).

"[T]he Supreme Court has repeatedly found that claims based on [due process] rights are justiciable, even if they implicate foreign policy decisions."  *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988) (citing *Regan v. Wald*, 468 U.S. 222 (1984); *Dames & Moore v. Regan*, 453 U.S. 654 (1981)).  In *U.S. Citizens v. Reagan*, a group of U.S. citizens living in Nicaragua advanced Fifth Amendment claims challenging U.S. support of military actions by the so-called "Contras."  They argued that funding the Contras deprived them of liberty and property without due process of law because they were threatened by the war in Nicaragua and they were intended targets of the Contras.  859 F.2d at 935.  The D.C. Circuit determined that these due process claims were "serious allegations and not ones to be dismissed as nonjusticiable" because "[t]he Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche*

to trample the most fundamental liberty and property rights of this country's citizenry." *Id.* (quoting *Ramirez de Arellano*, 745 F.2d at 1515).[20]

The same reasoning applies here.  The powers granted to the Executive and Congress to wage war and provide for national security does not give them *carte blanche* to deprive a U.S. citizen of his life without due process and without any judicial review.  *See U.S. Citizens v. Reagan*, 859 F.2d at 935.  The interest in avoiding the erroneous deprivation of one's life is uniquely compelling.  *See Ake v. Oklahoma*, 470 U.S. 68, 78 (1985) ("The private interest in the accuracy of a criminal proceedings that places an individual's life or liberty at risk is almost uniquely compelling."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]his qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").  The Bill of Rights was passed to protect individuals from an over-reaching government, and this Court cannot refuse to provide an independent legal analysis.

This conclusion is not changed because Defendants argue that *El-Shifa Pharmaceutical Industries v. United States* makes this case non-justiciable.  The *El-Shifa* plaintiffs were owners of a Sudanese pharmaceutical plant who sued the United States for destroying their plant with a missile strike.  U.S. officials asserted that the plant was producing chemical weapons for Osama bin Laden.  607 F.3d at 838-39.  The plaintiffs sought compensation for the plant's destruction and the retraction of allegedly defamatory statements. *Id.* at 839.  The Circuit dismissed the case based on the political question doctrine.  *Id.* at 840-44. *El-Shifa* is distinguishable from this case in key respects—the *El-Shifa* plaintiffs were not U.S. citizens and there was no allegation that they had a substantial connection to the United States

---

[20]  *U.S. Citizens v. Reagan* found the plaintiffs' Fifth Amendment claims justiciable, but ultimately declined to hear their claims because they did not allege that the United States participated in or encouraged injuries to Americans in Nicaragua.  859 F.2d at 934-35.

that might have given rise to cognizable Fifth Amendment rights. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265-66 (1990) (a non-U.S. resident foreign national is entitled to certain constitutional protections if the foreign national had a "substantial connection" to the United States); *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (foreign plaintiff was not entitled to due process regarding State Department's designation of it as a foreign terrorist organization because plaintiff did not have a controlling interest in property in the United States and did not show any other substantial connection). Foreign aliens suing for deprivation of a foreign property interest are not comparable to U.S. citizens suing for deprivation of their lives. Because Plaintiffs here pointedly allege that Defendants, U.S. officials, intentionally targeted and killed U.S. citizens abroad without due process, the Court finds that this case is justiciable and that it has subject matter jurisdiction.[21]

### B. Constitutional Claims Pursuant to *Bivens*

In analyzing a *Bivens* claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). Plaintiffs contend that Defendants violated the Fourth and Fifth Amendments. The Fourth Amendment reads:

---

[21] The Court recognizes that its holding regarding the political question doctrine is inconsistent with Judge Bates's decision in *Al-Aulaqi v. Obama*. That earlier case alleged that the United States' intention to kill Anwar Al-Aulaqi violated the Fifth Amendment. In contrast, the instant Complaint raises the issue more directly and acutely, asserting a claim for damages for the actual taking of Anwar Al-Aulaqi's life without regard to Fifth Amendment protections. *Al-Aulaqi v. Obama* considered the issues of separation of powers, competence of the Judicial Branch to review military decisions, whether there were judicially discoverable and manageable standards for reviewing the nature of the security threat, and whether the use of lethal force was justified. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 44-53. The question here is whether one or more of the same issues prevents Plaintiffs from seeking a *Bivens* remedy against individual U.S. officials.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . . . nor be deprived of life, liberty, or property, without due process of law . . . .

U.S. Const. amend. V.  United States citizens are entitled to constitutional protections even when abroad.  *Reid v. Covert*, 354 U.S. 1, 5-9 (1957) (plurality opinion).  The fact that Anwar Al-Aulaqi, Samir Khan and Abdulrahman Al-Aulaqi were in Yemen at the time they were killed did not alter these basic legal rights under the U.S. Constituion.

## 1. Fourth Amendment

Plaintiffs allege that Defendants violated the decedents' Fourth Amendment right to be free from unreasonable seizure "by authorizing and directing their subordinates to use lethal force" against them.  Compl. ¶ 42.  In Fourth Amendment parlance, Plaintiffs assert a claim of excessive force.  In addressing an excessive force claim, "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." *Id*.  For example, the plaintiff in *Graham* claimed that an officer used excessive force during an investigatory stop in violation of his right to substantive due process under the Fourteenth Amendment.  Because the case related to a "seizure," which is specifically addressed by the Fourth Amendment, the Supreme Court

analyzed his claim under the Fourth Amendment and not under the Fourteenth Amendment as

alleged.[22]  *Id*. at 395.  Thus, "*Graham* . . . requires that if a constitutional claim is covered by a

specific constitutional provision . . . the claim must be analyzed under the standard appropriate to

that specific provision, not under the rubric of substantive due process."  *United States v. Lanier*,

520 U.S. 259, 272 n.7 (1997).

      In this case, the opposite is true—the Court must analyze Plaintiffs' claims under

the rubric of the Fifth Amendment and not the Fourth Amendment.  While Plaintiffs assert that

Defendants violated the Fourth Amendment right to be free from unreasonable seizure, in fact

there was no "seizure" of Anwar Al-Aulaqi, Samir Khan or Abdulrahman Al-Aulaqi as that term

is defined in Fourth Amendment jurisprudence.  "Only when [an] officer, by means of physical

force or show of authority, has in some way restrained the liberty of a citizen may we conclude

that a 'seizure' has occurred."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  The Supreme Court

has further clarified that a "seizure" occurs when an officer brings a person "within the officer's

control," either by application of force, even if slight, or by the person's submission to a law

enforcement officer's show of authority.  *California v. Hodari D*., 499 U.S. 621, 624-626 (1991);

*accord United States v. Jordan*, 951 F.2d 1278, 1281 (D.C. Cir. 1991).

      Plaintiffs do not allege that Defendants "seized" the decedents.  They do not

allege that Defendants restrained decedents' liberty or that Defendants took the decedents into

their control through an application of force or show of authority.  Plaintiffs impliedly concede

this point when they complain that Defendants should have captured (*i.e.*, seized) Anwar Al-

---

[22] The *Graham* plaintiff asserted his constitutional rights by asserting a violation of 42 U.S.C. § 1983, which applies to State, not Federal, actors.  Courts interpret § 1983 and *Bivens* claims in a parallel manner.  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 82 (2001).  The application of different standards for claims against State and Federal actors would be "incongruous and confusing."  *Id*. (quoting *Butz v. Economou*, 438 U.S. 468, 499 (1978)).

Aulaqi instead of killing him.  In fact, Plaintiffs do not even allege that Defendants intended to seize Mr. Khan and Abdulrahman Al-Aulaqi, since Mr. Khan and Abdulrahman Al-Aulaqi were killed by unmanned U.S. drones that targeted another person.  Plaintiffs further admit the inapplicability of Fourth Amendment principles by asserting that the United States killed the three men with missiles from *unmanned* drones.  Unmanned drones are functionally incapable of "seizing" a person; they are designed to kill, not capture.  As the decedents were not "seized," Plaintiffs have not stated a Fourth Amendment claim.

### 2. Procedural and Substantive Due Process

The due process clause of the Fifth Amendment was intended to secure the individual from arbitrary exercises of governmental power.  *Daniels v. Williams*, 474 U.S. 327, 330 (1986).  It encompasses both substantive and procedural components.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  To state a procedural due process claim, a plaintiff must establish that he had a protected interest in life, liberty or property, *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), and that government officials knowingly, and not merely negligently, deprived him of that interest, *see Daniels*, 474 U.S. at 335-36, without notice and an opportunity to be heard "at a meaningful time and in a meaningful manner," *see Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).[23]

---

[23] "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  To determine what procedural process is due, courts balance the following factors: (1) the private interest that will be affected by the restraint; (2) the risk of an erroneous deprivation of such interest through the procedures used; (3) the probable value, if any, of additional or substitute procedural safeguards; and (4) the Government's interest, including the burden of a hearing.  *Mathews*, 424 U.S. at 335.  "[T]he necessity of quick action by the State or the impracticality of providing any predeprivation process may mean that a postdeprivation remedy is constitutionally adequate."  *Zinermon*, 494 U.S. at 128 (internal quotation marks and citation omitted).

To state a substantive due process claim, a plaintiff must assert that a government official was so "deliberately indifferent" to his constitutional rights that the official's conduct "shocks the conscience." *Estate of Phillips v. Dist. of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006); *see also Cnty. of Sacramento*, 523 U.S. at 847 n.8 (government conduct must have been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"). Conduct "shocks the conscience" when it was "*intended* to injure in some way." *Cnty. of Sacramento*, 523 U.S. at 849; *see also Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (government conduct that was "gravely unfair," such as "a deliberate flouting of the law that trammels significant personal or property rights," gives rise to a substantive due process claim). Conduct that "shocks in one environment may not be so patently egregious in another," and the "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." [24] *Cnty. of Sacramento*, 523 U.S. at 850–51.  No court has ever examined the precise nature of the substantive due process rights of an enemy, who also is a U.S. citizen, killed by a drone.  *Cf. O.K. v. Bush*, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context.").

---

[24] Context is important.  If a soldier in foreign uniform is killed by the U.S. military on a battlefield, his death does not raise substantive due process concerns, even if the soldier was a U.S. citizen, since such a killing would not constitute government conduct that was so egregious or outrageous that it may be said to "shock the conscience."  *See Cnty. of Sacramento*, 523 U.S. at 847 n.8.  Use of military force against those individuals—even U.S. citizens—who fight against U.S. troops is permissible under the Constitution.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality) (detention of U.S. citizen who was classified as "enemy combatant" did not violate due process); *id*. at 587, 597 (Thomas, J., dissenting); *Ex parte Quirin*, 317 U.S. 1, 37-38 (1942) ("Citizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts, are enemy belligerents within the meaning of the Hague Convention and the law of war.").

Plaintiffs have not stated a Fifth Amendment due process claim on behalf of Mr. Khan or Abdulrahman Al-Aulaqi.  Mr. Khan and Abdulrahman Al-Aulaqi were not targeted and their deaths were unanticipated.  In fact, Plaintiffs' due process claim on behalf of Mr. Khan and Abdulrahman Al-Aulaqi asserts only negligence, *i.e.*, that the Government should have taken better care to avoid harming them as bystanders.  *See* Compl. ¶ 5 ("If the Defendants were targeting others, they had an obligation under the Constitution and international human rights law to take measures to prevent harm to Samir Khan, Abdulrahman Al-Aulaqi, and other bystanders.").  Mere negligence does not give rise to a constitutional deprivation.  *Daniels*, 474 U.S. at 331-32; *accord Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986) (the due process clause, whether procedural or substantive, is not triggered by the lack of due care of an official causing unintended injury to life, liberty, or property).  "[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *Cnty. of Sacramento*, 523 U.S. at 849.  Accordingly, the Fifth Amendment claims asserted on behalf of Mr. Khan and Abdulrahman Al-Aulaqi will be dismissed for failure to state a claim.

In contrast, with regard to Anwar Al-Aulaqi, Plaintiffs allege both procedural and substantive due process claims.  They allege a procedural claim by asserting that Anwar Al-Aulaqi was executed without charge, indictment, or prosecution. [25]  *See* Compl. ¶ 26.  They also

---

[25] Had he been captured alive, Anwar Al-Aulaqi might have been charged with treason.  The U.S. Constitution defines treason as follows:

> Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort.  No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in Open Court.

U.S. Const. art. III, § 3.

allege a substantive due process claim by asserting that Defendants killed Anwar Al-Aulaqi with deliberate indifference to his constitutional right to life, both outside of armed conflict and at a time when he did not present a concrete, specific, and imminent threat to the United States.  *See id*. ¶¶ 4, 24, 33-34.  The Court does not opine that Anwar Al-Aulaqi was entitled to notice and a predeprivation hearing, or that his Estate was entitled to a postdeprivation hearing, or that the drone killing of Anwar Al-Aulaqi "shocks the conscience."  The Court merely holds that the Complaint states a "plausible" procedural and substantive due process claim on behalf of Anwar Al-Aulaqi.  *See Twombly*, 550 U.S. at 570.

### 3. Special Factors Preclude a *Bivens* Claim

The Court concludes that the political question doctrine does not bar its review of Plaintiffs' Complaint and that Plaintiffs have stated a claim that Defendants violated Anwar Al-Aulaqi's due process rights.  Nonetheless, the Court finds no available remedy under U.S. law for this claim.

Plaintiffs rely on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), to support their claims against individual federal officials.  Indeed, *Bivens* permits a damages action against a federal officer for a violation of a plaintiff's clearly-established constitutional rights.[26]  *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001) (*Bivens* "is concerned solely with deterring individual officers' unconstitutional acts.")  However, in the more than forty years since *Bivens* was decided, the Supreme Court has extended its analysis in only two contexts.  *See Carlson v. Green*, 446 U.S. 14 (1980) (permitting federal prisoner to seek *Bivens* remedy for violation of Eighth Amendment); *Davis v. Passman*,

---

[26] A *Bivens* suit is the federal counterpart of a claim brought under 42 U.S.C. § 1983 against a state or local official for violation of constitutional rights.  *Ali v. Rumsfeld*, 649 F.3d 762, 768 n.3 (D.C. Cir. 2011).

442 U.S. 228 (1979) (permitting former Congressional staffer to seek *Bivens* remedy for gender discrimination in violation of Fifth Amendment).  Neither of these contexts applies here.  Since 1980, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants."  *Malesko*, 534 U.S. at 68.

      Courts refuse to imply a remedy under *Bivens* when Congress has provided an "alternative remedy" to protect the interest in question, *Wilke v. Robbins*, 551 U.S. 537, 550 (2007), or when "special factors counsel[ ] hesitation" in extending *Bivens* to a new fact pattern, *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) (quoting *Bivens*, 403 U.S. at 396).  The parties here agree that Plaintiffs have no alternative remedy for their allegations of constitutional violations.  Instead, both sides focus on whether "special factors counsel hesitation" in allowing a *Bivens* remedy on these facts.  *Id.*

      No case has discussed precisely whether a plaintiff can proceed on a *Bivens* action that claims deprivation of life without due process based on the overseas killing by United States officials of a U.S. citizen deemed to be an active enemy.  There are, however, analogous cases in which circuit courts have barred *Bivens* actions to remedy deprivations of liberty without due process arising from military detention and alleged abuse of U.S. citizens.  Specifically, the D.C. Circuit, as well as the Fourth and Seventh Circuits, have decided that special factors—including separation of powers, national security, and the risk of interfering with military decisions— preclude the extension of a *Bivens* remedy to such cases.  *See Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012); *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir.), *cert. denied*, 132 S. Ct. 2751 (2012); *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (*en banc*).[27]

---

[27] Similarly, courts have held that special factors preclude the use of *Bivens* to remedy deprivations of liberty without due process arising from military detention and alleged abuse of *non*-U.S. citizens.  *See Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) (Afghani and Iraqi

The D.C. Circuit held in *Doe v. Rumsfeld* that special factors counseled hesitation and forestalled a *Bivens* lawsuit brought by a civilian government contractor who was subjected to military detention in Iraq.  *Doe*, 683 F.3d at 394.  The *Doe* plaintiff was a U.S. citizen and employee of an American-owned defense contracting firm.  *Id*. at 392.  He worked as a civilian Arabic translator in Iraq to develop intelligence through contact with local Iraqis.  When Mr. Doe had been in Iraq for almost one year, he was detained and interrogated by agents of the Navy Criminal Investigative Service (NCIS) and then turned over to the custody of the U.S. military.  He was detained at a U.S. military facility near Baghdad, where he was harshly questioned for over six months but never formally charged.  *Id*.  When finally released in the United States, Mr. Doe was placed on watch lists that interfered with his employment and travel.  *Id*.  Mr. Doe claimed that his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments were violated and sought a *Bivens* remedy.

The D.C. Circuit concluded that Mr. Doe's claims could not be remedied under *Bivens* because the Supreme Court "has never implied a *Bivens* remedy in a case involving the military, national security, or intelligence."  *Id*. at 394.  "[T]he insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the Army, Navy, and militia upon political branches . . . counsels hesitation in our creation of damages remedies in this field."  *Id*. (citing *United States v. Stanley*, 483 U.S. 668, 682 (1987) (finding no *Bivens* remedy for damages arising out of military service)).

---

detainees captured and held by the U.S. military in their home countries were precluded from bringing *Bivens* claim, as special factors applied); *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2011) (Iranians could not proceed under *Bivens* on claims of illegal detention during deportation proceedings due to special factors such as implications for diplomacy and foreign policy); *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (*en banc*) (due to special factors, dual citizen of Canada and Syria was not permitted to proceed on a *Bivens* claim alleging improper and abusive custody in the context of extraordinary rendition).

The *Doe* court referenced the numerous clauses of the Constitution that squarely place warmaking and national defense powers in the hands of the Executive and Legislative Branches and not in the Judicial Branch.  Article I of the Constitution gives to Congress the authority to "provide for the Common Defense," "declare War," "raise and support Armies," "provide and maintain a Navy," "make Rules for the Government and Regulation for the land and naval Forces," and "provide for calling forth the Militia to . . . repel Invasions."  U.S. Const. art. I, § 8.  Thus, the "Constitution contemplated that the Legislative Branch has plenary control over rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures, and remedies."  *Chappell v. Wallace*, 462 U.S. 296, 301 (1983).  Authority over national defense and the military is shared with the Executive; Article II appoints the President Commander in Chief of the Armed Forces.  *Id*. art. II, § 2.  As a result, the Seventh Circuit has held that "civilian courts should not interfere with the military chain of command."  *Vance*, 701 F.3d at 199.  Courts regularly accord great deference to Congress with respect to its authority over national defense and military affairs, *see Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981), and to military authorities with respect to decisions concerning the relative importance of a particular military interest, *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Also, courts "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).

*Doe* held that special factors counseled hesitation in implying a *Bivens* remedy for Mr. Doe's claims.  The Circuit found that the *Doe* complaint would "require a court to delve into the military's policies regarding the designation of detainees as 'security internees' or 'enemy combatants,' as well as policies governing interrogation techniques."  *Doe*, 683 F.3d at 396.  In addition, Mr. Doe's allegations against Secretary of Defense Donald Rumsfeld implicated the

military chain of command and the discretion given to NCIS agents to detain and question potential enemy combatants. *Id.* These issues raised concerns relating to separation of powers; even more, the Circuit found that "[l]itigation of Doe's case would require testimony from top military officials as well as forces on the ground, which would detract focus, resources, and personnel from the mission in Iraq." *Id.* Extending *Bivens* to allow a remedy against military officials in Iraq would "disrupt and hinder the ability of our armed forces to act decisively and without hesitation in defense of our liberty and national interests." *Id.* at 395 (quoting *Ali*, 649 F.3d at 773); *see Vance*, 701 F.3d at 200 (recognizing a *Bivens* remedy would "come at an uncertain cost in national security").

The D.C. Circuit's *Doe* opinion relied on the Fourth Circuit's decision in *Lebron*, which had extensively reviewed the factors counseling hesitation in analogous circumstances. *Doe*, 683 F.3d at 395 (citing *Lebron*, 670 F.3d at 548-556). *Lebron* addressed the constitutional claims of Jose Padilla, a U.S. citizen who was subjected to military detention in the United States. Mr. Padilla had joined al-Qa'ida and traveled to an al-Qa'ida camp in Afghanistan for combat training. *Lebron*, 670 F.3d at 544. He then returned to the United States and was arrested, declared an enemy combatant, and transferred to the Naval Consolidated Brig at Charleston, South Carolina. *Id.* at 545. Mr. Padilla alleged that he was questioned at length, repeatedly abused, threatened with torture, and deprived of basic necessities while in military custody.[28] *Id.* Mr. Padilla sued various federal officials in their personal capacities, seeking a *Bivens* damages remedy for the violation of his Fifth and Eighth Amendment rights. The Fourth

---

[28] Eventually, Mr. Padilla was indicted on criminal terrorism charges in the Southern District of Florida. He was transferred to civilian custody, tried, and convicted. *See United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) (affirming Padilla's conviction on terrorism charges and reversing his sentence of 208 months incarceration because it was too low).

Circuit refused to imply a *Bivens* remedy, emphasizing the wisdom behind the Constitution's

delegation of authority and power over the military to the political Branches:

> The reasons for this constitutional structure are apparent. Questions of national security, particularly in times of conflict, do not admit of easy answers, especially not as products of the necessarily limited analysis undertaken in a single case. It is therefore unsurprising that "our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them."

*Id*. at 549 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion)); *see*

*Marbury*, 5 U.S. (1 Cranch) at 165-66 (under the U.S. Constitution, "the President is invested

with certain important political powers, in the exercise of which he is to use his own discretion,

and is accountable only to his country in his political character, and to his own conscience.").

Lebron further noted that whenever the Supreme Court has considered a Bivens

remedy in a case involving the military, it has concluded that constitutional separation of powers

counsels hesitation in creation of a new civil remedy. *Id*. at 550 (citing Stanley, 483 U.S. at

682). "Padilla's enemy combatant classification and military detention raise fundamental

questions incident to the conduct of armed conflict." *Id*. at 550. "Padilla's complaint seeks quite

candidly to have the judiciary review and disapprove sensitive military decisions made after

extensive deliberations within the executive branch as to what the law permitted, what national

security required, and how best to reconcile competing values." *Id*. at 551. In refusing to imply

a Bivens claim, Lebron described the broad practical impact any Bivens action by Mr. Padilla

could have on military intelligence operations:

> Any defense to Padilla's claims—which effectively challenge the whole of the government's detainee policy—could require current and former officials, both military and civilian, to testify as to the rationale for that policy, the global nature of the terrorist threat it was designed to combat, the specific intelligence that led to the application of that policy to Padilla, where and from whom that

> intelligence was obtained, what specific military orders were given
> in the chain of command, and how those orders were carried out.

670 F.3d at 553.  The Fourth Circuit concluded that permitting Mr. Padilla's suit to proceed

would impermissibly draw the court into "the heart of executive and military planning and

deliberation."  *Id.*  at 550.  *Lebron* reasoned that while it could be debated whether a particular

national security policy or military decision was the most effective counterterrorism strategy, the

proper forum for such debate is not a civil cause of action.  *Id.* at 552; *see also Vance*, 701 F.3d

at 200 (judges lack the knowledge and expertise necessary to make decisions regarding national

security; Congress and the Commander in Chief ought to make the "essential tradeoffs"

required).

      The Fourth Circuit stressed that "the need to hesitate before using *Bivens*" is

particularly clear when Congress and the President have exercised their military responsibilities

"in concert."  *Lebron*, 670 F.3d at 549.  The political branches acted in concert in *Lebron*.

Congress enacted the Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115

Stat. 224 (reprinted at 50 U.S.C. § 1541 note), authorizing the Executive to use necessary and

appropriate military force against al-Qa'ida, the Taliban in Afghanistan, and affiliated forces.

The President detained Mr. Padilla pursuant to the AUMF.  Courts "accord the President the

deference that is his when he acts pursuant to a broad delegation of authority from Congress."

*Lebron*, 670 F.3d at 549 (citation omitted).

      Courts also have barred *Bivens* remedies due to the potential for interference with

U.S. foreign policy.  *See, e.g.*, *Arar*, 585 F.3d at 574.  Like war and national defense, foreign

affairs are constitutionally committed to the Executive and Congress.  The President "shall have

the Power, with the Advice and Consent of the Senate, to make Treaties . . . [and] appoint

Ambassadors" and to "receive Ambassadors and other public Ministers."  U.S. Const. art. II.

§§ 2-3.  Congress has the power to "regulate Commerce with foreign Nations" and to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  *Id*. art. I, § 8.  The *Arar* plaintiff was a dual citizen of Canada and Syria who attempted to obtain a *Bivens* remedy from federal officials who were allegedly responsible for torture he suffered while held in custody in the United States.  The Second Circuit refused to imply a *Bivens* remedy, in part because the suit would affect diplomacy and foreign policy.  *Arar*, 585 F.3d at 574; *see also Ali*, 649 F.3d at 774 (danger that *Bivens* suit by foreign citizens would obstruct Government foreign policy is "sufficiently acute" that courts must "leave to Congress the judgment whether a damage remedy should exist."); *cf. Arar*, 585 F.3d at 576 (the probing of intelligence and classified materials "entails the risk that other countries will become less willing to cooperate with the United States in sharing intelligence resources to counter terrorism.").

In this delicate area of warmaking, national security, and foreign relations, the judiciary has an exceedingly limited role.  This Court is not equipped to question, and does not make a finding concerning, Defendants' actions in dealing with AQAP generally or Anwar Al-Aulaqi in particular.  Its role is much more modest:  only to ensure that the circumstances of the exercise of war powers against a specifically-targeted U.S. citizen overseas do not call for the recognition of a new area of *Bivens* relief.

Here, Congress and the Executive acted in concert, pursuant to their Constitutional authorities to provide for national defense and to regulate the military.  U.S. Const. art. I, § 8; *id*. art. II, § 2.  The need to hesitate before implying a *Bivens* claim is particularly clear.  *See Lebron*, 670 F.3d at 549.  Congress enacted the AUMF, authorizing the Executive to use necessary and appropriate military force against al-Qa'ida *and affiliated forces*.

It is the Executive's position that AQAP is affiliated with al-Qa'ida.[29]  Further, the AUMF does

not contain geographical limits.  *See Bensayah v. Obama*, 610 F.3d 718, 720-21 (D.C. Cir. 2010)

(AUMF authorized detention of individual arrested in Bosnia and turned over to U.S. custody so

long as individual was part of al-Qa'ida); *Al-Adahi v. Obama*, 613 F.3d 1102, 1103, 1111 (D.C.

Cir. 2010) (AUMF authorized detention of person arrested in Pakistan and transferred to U.S.

custody).[30]  Thus, the fact that Anwar Al-Aulaqi was targeted in Yemen does not undermine the

AUMF as the source of authority for the use of force against him.

Further, the record is replete with evidence that Anwar Al-Aulaqi was an AQAP

leader.  He was intimately involved in planning the Christmas Day bombing.  *See United States*

*v. Abdulmutallab*, Crim. No. 10-CR-20005-1 (E.D. Mich.), Sentencing Mem. at 12-14; *id*., Tr. of

Plea Hr'g (Oct. 12, 2011); *see also* 75 Fed. Reg. 43,233-01.  In a May 2010 interview posted

online, he called for "jihad against America," praised the actions of his "students" Christmas Day

bomber Mr. Abdulmutallab and Fort Hood shooter Maj. Hasan, and asked others to follow.  *See*

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 10; Clapper Decl. ¶ 16.  In July 2010, he wrote an article

for the AQAP publication *Inspire*, advocating assassinations, bombings, and other attacks against

Western targets.  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d at 21.

---

[29] *See* Director Leiter Statement at 2, 4-5.

[30] The Executive Branch takes the position that AUMF provides legal authority for targeted
strikes against enemy forces beyond the battlefields of Afghanistan.  *See* Robert Chesney, *Text of
Deputy National Security Advisor John Brennan's Speech at the Wilson Center on Drone Strikes*,
Lawfare (Apr. 30, 2012) (found at http://www.lawfareblog.com/2012/04/brennanspeech/ (last
visited Apr. 4, 2014).  The Complaint quotes Mr. Brennan's speech, without citing to it.  *See*
Compl. ¶ 18 ("In April 2012, Deputy . . . Brennan acknowledged publically that the United
States carries out targeted killings of suspected terrorists 'beyond hot battlefields like
Afghanistan,' often using 'remotely piloted aircraft' known as 'drones.'").  At the time the
AUMF was enacted, the Executive Branch commonly asserted that the United States was
involved in a "global war on terror."

The fact is that Anwar Al-Aulaqi was an active and exceedingly dangerous enemy of the United States, irrespective of his distance, location, and citizenship.  As evidenced by his participation in the Christmas Day attack, Anwar Al-Aulaqi was able to persuade, direct, and wage war against the United States from his location in Yemen, *i.e.*, without being present on an official battlefield or in a "hot" war zone.  Defendants, top military and intelligence officials, acted against Anwar Al-Aulaqi, a notorious AQAP leader, as authorized by the AUMF.

Permitting Plaintiffs to pursue a *Bivens* remedy under the circumstances of this case would impermissibly draw the Court into "the heart of executive and military planning and deliberation," *Lebron*, 670 F.3d at 550, as the suit would require the Court to examine national security policy and the military chain of command as well as operational combat decisions regarding the designation of targets and how best to counter threats to the United States, *see Doe*, 683 F.3d at 396.  Anwar Al-Aulaqi's classification as a key AQAP leader to target by a drone strike raises fundamental questions regarding the conduct of armed conflict.  The Constitution commits decision-making in this area to the President, as Commander in Chief, and to Congress. *See Hamdi*, 542 U.S. at 531 (plurality opinion) ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.").  Further, allowing Plaintiffs to bring a *Bivens* action against Defendants would hinder their ability in the future to act decisively and without hesitation in defense of U.S. interests.  *See id*. at 395; *see also Vance*, 701 F.3d at 200 (Congress and the President, not judges, should make the "essential tradeoffs" required to manage national security).

Plaintiffs' Complaint also raises questions regarding foreign policy because Anwar Al-Aulaqi was a dual U.S.-Yemeni citizen who was killed in Yemen.  Plaintiffs' suit

against top U.S. officials for their role in ordering a missile strike against a dual citizen in a

foreign country necessarily implicates foreign policy.  *See Arar*, 585 F.3d at 574 (*Bivens* remedy

should not be permitted where suit would affect diplomacy and foreign policy).  These special

factors counsel hesitation in extending a *Bivens* remedy here.

      Although it gave this Court pause, a plaintiff's U.S. citizenship has not affected

the analysis of *Bivens* special factors by the circuit courts.  *See Doe*, 683 F.3d at 396 (a plaintiff's

U.S. citizenship "does not alleviate" applicable special factors).  The Seventh Circuit expounded:

> The Supreme Court has never suggested that citizenship matters to
> a claim under *Bivens*.  It would be offensive to our allies, and it
> should be offensive to our own principles of equal treatment, to
> declare that this nation systematically favors U.S. citizens over
> Canadians, British, Iraqis, and our other allies when redressing
> injuries caused by our military and intelligence operations.
> Treaties may pose a further obstacle to favoring U.S. citizens in the
> design of common-law remedies, but we need not decide, because
> the choice of remedies for military misconduct[31] belongs to
> Congress and the President rather than the judicial branch.

*Vance*, 701 F.3d at 203.

      Indeed, the danger posed by an individual who is aligned with an enemy of the

United States is very real, whether he is a citizen of this or another country.  The United States is

in a congressionally-declared military conflict.  Anwar Al-Aulaqi was an AQAP leader who

levied war against his birth country, as unambiguously revealed by his role in the Christmas Day

bombing, as well as his video and writings.  He also was a U.S. citizen.  Whether Plaintiffs can

claim damages against the United States is a decision for Congress and the Executive and not

something to be granted by judicial implication.  The persons holding the jobs of the named

---

[31] Congress has provided various remedies to persons harmed by the military, but no statute
provides for damages against military personnel or their civilian superiors.  *See, e.g., Vance*, 701
F.3d at 201 (discussing application of, *inter alia*, the Military Claims Act, 10 U.S.C. § 2733 and
the Foreign Claims Act, 10 U.S.C. § 2734).

Defendants must be trusted and expected to act in accordance with the U.S. Constitution when they intentionally target a U.S. citizen abroad at the direction of the President and with the concurrence of Congress.  They cannot be held personally responsible in monetary damages for conducting war.

Under binding D.C. Circuit precedent, this Court finds that special factors preclude the implication of a *Bivens* remedy here.  Because it reaches this conclusion, the Court does not address additional claims or defenses.  *See, e.g.*, *Doe v. Rumsfeld*, 683 F.3d at 397 (having determined that a *Bivens* claim was not viable, court did not reach qualified immunity defense).  Accordingly, the Court will grant Defendants' motion to dismiss.

### C.  Order for Ex Parte Submission of Classified Information

As exhibits to its Statement of Interest, the United States refiled the same unclassified declarations that it had filed in support of its invocation of the state secrets privilege in *Al-Aulaqi v. Obama*, namely the unclassified declarations of Messrs. Clapper, Gates, and Panetta.  *See* Clapper Decl.; U.S. Statement of Interest, Ex. 2 [Dkt. 19-2] (Gates Decl.); *id.*, Ex. 3 [Dkt. 19-3] (Panetta Decl.).  The unclassified declarations refer to more detailed classified declarations that were provided to the district court in *Al-Aulaqi v. Obama*.  This Court ordered the United States to provide the classified declarations to the Court, *see* Minute Order (Dec. 26, 2013),[32] but the United States refused, seeking a ruling on the threshold legal defenses raised in

---

[32] The Minute Order required the United States to lodge classified declarations, *in camera* and *ex parte*:

> in order to provide to the Court information implicated by the allegations in this case and why its disclosure reasonably could be expected to harm national security [ ], including information needed to address whether or not, or under what circumstances, the United States may target a particular foreign terrorist organization and its senior leadership, the specific threat posed by [ ] Anwar Al-

Defendants' motion to dismiss "before any court-ordered development of the factual record."

*See* Mot. for Recons. & to Stay Order [Dkt. 34] at ECF 6.[33]  The United States asserted that the

Defendants' motion to dismiss accepts the well-pled facts as true, without reference to classified

information, *see id.* at 9, and that the motion "can and should be resolved without reference to

the classified information," *see id.* at ECF 13.  Plaintiffs agreed.  Pls. Resp. to Mot. for Recons.

[Dkt. 35].  The United States argued that the factual information that the Court requested was not

relevant to the Defendants' special factors argument because special factors precluded Plaintiffs'

cause of action, given the context in which the claims, "as pled," arose—that is, "the alleged

firing of missiles by military and intelligence officers at enemies in a foreign country in the

course of an armed conflict."  Mot. for Recons. & to Stay Order at ECF 10.

The United States, however, mischaracterizes the Complaint.  Nowhere does the

Complaint allege that Anwar Al-Aulaqi was an "enemy" of the United States or that he was part

of AQAP.  The Complaint states only that "government officials told reporters that Al-Aulaqi

had "cast his lot" with terrorist groups and encouraged others to engage in terrorist activity.

Later, they claimed he had played "a key role in setting the strategic direction" for [AQAP]."

Compl. ¶ 26.  Further, far from alleging that Anwar Al-Aulaqi was killed "in the course of an

armed conflict," the Complaint asserts that he was killed *outside* of armed conflict, in Yemen.

*See* Compl. ¶ 4 ("At the time of the killing, the United States was not engaged in armed conflict

with or within Yemen.").  In fact, Plaintiffs allege that "at the time the strike was carried out,

---

Aulaqi, and other matters that Plaintiff[s have] put at issue, including any criteria governing the use of lethal force, updated to address the facts of this record.

Minute Order (Dec. 26, 2013).

[33] The Court cites the page number assigned by the Electronic Case Filing system.

Anwar Al-Aulaqi was not engaged in activities that presented a concrete, specific, and imminent threat of death or serious physical injury." *Id*. ¶ 34.

The United States' truculent opposition to the December 26, 2013 Minute Order made this case unnecessarily difficult. Were the Court not able to cobble together enough judicially-noticeable facts from various records, it would have denied the motion to dismiss for the sheer fact that the Defendants failed to support the assertion that *Bivens* special factors apply. Since the Court was able to take notice of facts sufficient to determine the special factors issue, the December 26, 2013 Minute Order will be vacated and the United States' motion for reconsideration will be denied as moot.

**D. Bill of Attainder**

Plaintiffs also allege that Defendants violated the Constitution's Bill of Attainder Clause by placing Anwar Al-Aulaqi on the JSOC "kill list."[34] The Constitution provides: "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9; *see also id*., § 10 ("No State shall . . . pass any Bill of Attainder [or] ex post facto Law . . . ."). That is, the Constitution forbids legislative acts that inflict punishment without a judicial trial. *BellSouth Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998). A Bill of Attainder requires *legislative action* intended to punish an individual. *Id.*; *Paradissiotis v. Rubin*, 171 F.3d 983, 988 (5th Cir. 1999). No formal action of either the House or Senate was taken to approve the strike against Anwar Al-Aulaqi. Because Plaintiffs can point to no legislative action, the Bill of Attainder Clause does not apply.

---

[34] The Bill of Attainder claim is made only on behalf of Anwar Al-Aulaqi.

**IV.  CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss [Dkt. 18] will be granted, and the Complaint will be dismissed.  The December 26, 2013 Minute Order will be vacated, and the United States' motion for reconsideration [Dkt. 34] will be denied as moot.  A memorializing Order accompanies this Opinion.


Date:  April 4, 2014                                              _____/s/_____
                                                                 ROSEMARY M. COLLYER
                                                                 United States District Judge